UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SWAIN  14 CV 3876

---------------------------------------------x

WATERFORD TOWNSHIP POLICE & FIRE
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                              Plaintiff,

      vs.

REGIONAL MANAGEMENT CORP.,
PALLADIUM EQUITY PARTNERS III, L.P.,
PALLADIUM EQUITY PARTNERS III,
L.L.C., PARALLEL 2005 EQUITY FUND,
LP, PARALLEL 2005 EQUITY PARTNERS,
LP, THOMAS F. FORTIN, C. GLYNN
QUATTLEBAUM, DONALD E. THOMAS,
DAVID PEREZ, ROEL C. CAMPOS,
RICHARD T. DELL'AQUILA, RICHARD A.
GODLEY, JARED L. JOHNSON, ALVARO
G. DE MOLINA, CARLOS PALOMARES,
ERIK A. SCOTT, STEPHENS INC., KEEFE,
BRUYETTE & WOODS, INC., BMO
CAPITAL MARKETS CORP., JMP
SECURITIES LLC and FBR CAPITAL
MARKETS & CO.,

                         Defendants.

---------------------------------------------x

Civil Action No. [Insert]

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>



RECEIVED
MAY 30 2014
U.S.D.C. S.D.N.Y.

Plaintiff, the Waterford Township Police & Fire Retirement System ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Regional Management Corp. ("Regional Management" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Regional Management pursuant to the Registration Statement issued in connection with Regional Management's September 20, 2013 secondary public stock offering (the "9/13 SPO") and its December 5, 2013 secondary public stock offering (the "12/13 SPO") (collectively, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act. This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

3.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred primarily in this District. Defendants Palladium, Perez, Scott and the majority of the Underwriter Defendants (defined below) maintain their principal places of business in this District. The road shows were conducted in substantial part in this District. Simpson Thacher & Bartlett LLP, headquartered in New York City (through Joshua Ford Bonnie Esq. and Lesley Peng Esq.), represented Regional

Management in its 2012 initial public stock offering ("IPO") and Lesley Peng Esq. acted as counsel to controlling shareholders Palladium and Parallel in the Offerings. Alston & Bird LLP represented the Underwriter Defendants in the Offerings and the closings took place at the offices of Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, NY 10016 at 10:00 a.m. New York City time on September 25, 2013 for the 9/13 SPO and on December 10, 2013 for the 12/13 SPO. The underwriting agreements in connection with both Offerings expressly provided that they were to "be governed by . . . the . . . laws of the State of New York applicable to agreements made and to be performed in such state," that "[a]ny legal suit, action or proceeding arising out of or based upon [those] Agreement[s] or the transactions contemplated [t]hereby . . . may be instituted in the federal courts of the United States of America located in the Borough of Manhattan in the City of New York," that "each party irrevocably submit[ed] to the exclusive jurisdiction . . . of such court[s]," and that those agreements were "confirmed and accepted by the Representative [of each party thereto] in New York, New York," with the parties to those agreements being Defendants Fortin for Regional Management, Stephens for the Underwriter Defendants, and Palladium and Parallel.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Waterford Township Police & Fire Retirement System purchased Regional Management common stock pursuant to the Offerings, and was damaged thereby.

6.      Defendant Regional Management is a subprime consumer finance company, providing various loan products primarily to subprime borrowers with limited access to consumer credit from banks, thrifts, credit card companies, and other traditional lenders, including small and large installment loans; automobile purchase loans; furniture and appliance purchase loans; and

payment protection insurance products, such as credit life, credit accident, health, involuntary unemployment, collateral protection collision, and property insurance. Regional Management stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RM."

7.      Defendants Palladium Equity Partners III, L.P., and its general partner Palladium Equity Partners III, L.L.C. (collectively, "Palladium Partners") are New York City-based private equity firms that were venture capital backers of Regional Management when it was a privately-held company. At the time of the Offerings, Palladium Partners was a party to an amended shareholders agreement among Regional Management and certain of its founders and initial employees dated March 21, 2007, as amended on March 12, 2012, pursuant to which, among other things, certain of those stockholders had the right to put their stock back into the Company if an IPO did not occur by May 21, 2012 (the "Shareholders Agreement"). Pursuant to the Shareholders Agreement, Defendants David Perez and Erik A. Scott served on the Regional Management Board of Directors as designees of Palladium Partners at the time of the Offerings and signed the Registration Statement. Immediately prior to the 9/13 Offering, the parties to the Shareholders Agreement collectively held more than 61% of Regional Management's outstanding shares and Palladium Partners held 29.5% of the Company's outstanding shares. Palladium Partners sold 2,547,335 shares in the 9/13 SPO and 1,148,622 shares in the 12/13 SPO, receiving, respectively, approximately $70 million and $35.6 million in proceeds in those Offerings.

8.      Defendants Parallel 2005 Equity Fund, LP, and its general partner Parallel 2005 Equity Partners, LP (collectively, "Parallel") are private equity firms that were venture capital backers of Regional Management when it was a privately-held company. Parallel was a party to the Stockholders Agreement. Defendants Jared L. Johnson and Richard T. Dell'Aquila served on the Regional Management Board of Directors as designees of Parallel at the time of the Offerings and

signed the Registration Statement.  Immediately prior to the 9/13 Offering, the parties to the Shareholders Agreement collectively held more than 61% of Regional Management's outstanding shares and Parallel held 16.9% of the Company's outstanding shares.  Parallel sold 1,454,665 shares in the 9/13 SPO and 658,232 shares in the 12/13 SPO, receiving, respectively, approximately $40 million and $20.4 million in proceeds in the Offerings.

9.      Defendant Thomas F. Fortin ("Fortin") is and was, at the time of the Offerings, Chief Executive Officer ("CEO") and a Director of Regional Management.

10.     Defendant C. Glynn Quattlebaum ("Quattlebaum"), who co-founded the Company with Defendant Godley, is, and was at the time of the Offerings, its President and Chief Operating Officer and a party to the Shareholders Agreement.  Immediately prior to the 9/13 Offering, the parties to the Shareholders Agreement collectively held more than 61% of Regional Management's outstanding shares and Quattlebaum held 3% of the Company's outstanding shares.  Defendant Quattlebaum sold 30,000 shares in the 12/13 SPO receiving $930,000 in proceeds.

11.     Defendant Donald E. Thomas ("Thomas") is, and was at the time of the Offerings, the Chief Financial Officer ("CFO") of Regional Management.

12.     Defendant David Perez ("Perez") was, at the time of the Offerings, a Director and Chairman of the Regional Management Board of Directors and, simultaneously, a managing director of Palladium.  Perez served on the Regional Management Board and as its Chairman at the time of the Offerings at the discretion of Palladium.  Following the sale of all of Palladium's shares of Regional Management in the Offerings, Defendant Perez did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders.  Defendant Parez is a resident of New York City.

13. Defendant Roel C. Campos ("Campos") is, and was at the time of the Offerings, a Director of Regional Management.

14. Defendant Richard T. Dell'Aquila ("Dell'Aquila") was, at the time of the Offerings, a Director of Regional Management and a managing director of Parallel. Defendant Dell'Aquila served on the Regional Management Board at the time of the Offerings at the discretion of Parallel. Following the sale of all of Parallel's shares of Regional Management in the Offerings, Defendant Dell'Aquila did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders.

15. Defendant Richard A. Godley ("Godley"), who co-founded Regional Management with Defendant Quattlebaum, is, and was at the time of the Offerings, a Director of Regional Management. Defendant Godley previously served as the Company's President and CEO from 1987 until January 2006 and served as the Chairman of its Board of Directors from January 2006 until March 2007. Immediately prior to the 9/13 Offering, the parties to the Shareholders Agreement collectively held more than 61% of Regional Management's outstanding shares and Godley held 5% of the Company's outstanding shares. Defendant Godley is the trustee of The Richard A. Godley, Sr. Revocable Trust dated August 29, 2005 (the "2005 Godley Trust"), which is a party to the Shareholders Agreement. Pamela Denise Godley, Defendant Godley's wife, is the trustee of the Tyler Godley Children 2012 Irrevocable Trust, dated December 17, 2012 (the "2012 Godley Trust"), which is also a party to the Shareholders Agreement. The 2005 Godley Trust and the 2012 Godley Trust sold 329,220 and 180,000 shares, respectively, in the 12/13 SPO, receiving $10.2 million and $5.6 million in proceeds, respectively.

16. Defendant Jared L. Johnson ("Johnson") was, at the time of the Offerings, a Director of Regional Management and a managing director of Defendant Parallel. Defendant Johnson served

on the Regional Management Board of Directors at the time of the Offerings at the discretion of Parallel. Following the sale of all of Parallel's shares of Regional Management in the Offerings, on December 30, 2013, Johnson resigned his directorships at both Regional Management and Parallel.

17.     Defendant Alvaro G. de Molina ("de Molina") is, and was at the time of the Offerings, a Director of Regional Management. On April 23, 2014, de Molina became Chairman of the Regional Management Board of Directors when Perez did not run for reelection on the Board.

18.     Defendant Carlos Palomares ("Palomares") is, and was at the time of the Offerings, a Director of Regional Management.

19.     Defendant Erik A. Scott ("Scott") was, at the time of the Offerings, a Director of Regional Management and a managing director of Palladium. Defendant Scott served on the Regional Management Board of Directors at the time of the Offerings at the discretion of Palladium. Following Palladium's sale of all shares of Regional Management in the Offerings, Defendant Scott did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders. Defendant Scott is a resident of New York.

20.     The defendants named in ¶¶9-19 are referred to herein as the "Individual Defendants." The Individual Defendants referred to herein at ¶¶9 and 11-19 each signed the Registration Statement.

21.     Defendant Stephens Inc. ("Stephens") is an Arkansas-based financial services firm with a substantial New York City presence and practice that acted as an underwriter and Joint Book Running Manager of Regional Management's Offerings, helping to draft and disseminate the offering documents.

22.     Defendant Keefe, Bruyette & Woods, Inc. ("Keefe") is a New York City-based financial services firm that acted as an underwriter and Joint Book Running Manager of Regional Management's Offerings, helping to draft and disseminate the offering documents.

23.     Defendant BMO Capital Markets Corp. ("BMO") is a Canadian financial services firm with a substantial New York City presence and practice that acted as an underwriter and Joint Book Running Manager of Regional Management's 9/13 SPO, helping to draft and disseminate the offering documents.

24.     Defendant JMP Securities LLC ("JMP") is a New York City-based financial services firm that acted as an underwriter and Joint Book Running Manager of Regional Management's 9/13 SPO, helping to draft and disseminate the offering documents.

25.     Defendant FBR Capital Markets & Co. ("FBR") is a Virginia-based financial services firm with a substantial New York City presence and practice that acted as an underwriter and Joint Book Running Manager of Regional Management's Offerings, helping to draft and disseminate the offering documents.

26.     The defendants named in ¶¶21-25 are referred to herein as the "Underwriter Defendants." Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     the Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Offerings and shared approximately $8.2 million in fees collectively. The Underwriter Defendants determined that in return for their share of the Offerings' proceeds, they were willing to merchandize Regional Management stock in the Offerings. The Underwriter Defendants arranged multi-city roadshows prior to the Offerings during which they, and representatives from Regional

Management, met with potential investors and presented highly favorable information about the Company, its operation, and its financial prospects;

(b)    the Underwriter Defendants also demanded and obtained an agreement from Regional Management that Regional Management would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Regional Management had purchased millions of dollars in directors' and officers' liability insurance;

(c)    representatives of the Underwriter Defendants also assisted Regional Management and the Individual Defendants in planning the Offerings, and purportedly conducted an adequate and reasonable investigation into the business and operations of Regional Management, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offerings. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Regional Management's operations and financial prospects;

(d)    in addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Regional Management's lawyers, management and top executives and engaged in "drafting sessions" between at least August 2013 and December 2013. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Regional Management stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Regional Management would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the

- 8 -

Underwriter Defendants' representatives and Regional Management's management and top executives, the Underwriter Defendants knew, or should have known, of Regional Management's existing problems as detailed herein; and

(e)     the Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

27.     Defendant Regional Management is a specialty consumer finance company providing a range of loan products primarily to subprime customers with limited access to consumer credit from banks, thrifts, credit card companies and other traditional lenders. The Company has a branch network throughout the Southeast and Southwestern United States. Each of its loan products is secured, structured on a fixed rate, fixed term basis with fully amortizing equal monthly installment payments and is repayable at any time without penalty. Regional Management's loans are sourced through its multiple channel platform, including in its branches, through direct mail campaigns, independent and franchise automobile dealerships, online credit application networks, furniture and appliance retailers and its consumer website. Loans range from $300 to $27,500 and all loans, regardless of origination channel, are serviced and collected through 264 Company branches requiring frequent contact with customers to properly oversee the loan portfolio and to undertake collections activities to preserve its assets. Regional Management's loan portfolio is comprised of approximately 50% small installment loans (including the Company's "live checks program"), 35% auto loans, 8% large installment loans and 6% retail loans.

28.     Regional Management was founded in 1987 by Defendants Godley and Quattlebaum. Prior to founding Regional Management, Defendant Godley was a senior vice president with World Acceptance Corp. ("World Acceptance") and Defendant Quattlebaum was a supervisor with World

Acceptance.   According to the Company's 2012 annual report to shareholders, Regional

Management's "largest installment loan competitor in most of the markets in which [it] operate[s] is

World Acceptance Corp., an installment finance lender with approximately 1,137 branches,

approximately half of which are located in states that [the Company] serve[s]."  The Company

further disclosed in its 2012 annual report to shareholders that it then "use[d] a software package

developed and owned by ParaData . . . ., a wholly owned subsidiary of World Acceptance . . ., one of

[its] primary competitors, to record, document, and manage [its] loans."

      29.    In March 2007, Defendants Palladium and Parallel acquired the majority of the

Company's outstanding common stock, paying $4.16 per share.  In connection with that transaction,

Regional Management also issued $25 million of mezzanine debt at an interest rate of 18.375%, plus

related fees, which the Company refinanced in 2007 and again in 2010 with Palladium and certain of

its prior individual owners and employees (including Defendant Godley) (hereinafter, the "Original

Owners").   Additionally, the Company began paying Defendants Palladium and Parallel annual

advisory fees of $675,000 in the aggregate, and the Original Owners annual consulting fees of

$450,000 in the aggregate, plus certain expenses.

      30.    Between 2007 and 2011, the small installment loan industry grew exponentially.  The

Company's own loan portfolio and number of branches almost doubled and its cash flow from

operations more than doubled during this same period:

| | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 2007[1] | 2008 | 2009 | 2010 | 2011 |
| | (Dollars in thousands, except for per share amounts) | | | | |
| Selected Operational Data: | | | | | |
| Average finance receivables[7] | $146,265 | $178,159 | $192,981 | $216,022 | $264,012 |
| Number of branches (at period end) | 96 | 112 | 117 | 134 | 170 |
| Cash flow from operations | $ 17,990 | $ 26,654 | $ 31,232 | $ 41,215 | $ 41,048 |

      31.    Meanwhile, Regional Management's revenue from interest, fees, insurance and other

income, increased exponentially to $105.2 million in 2011, from $86.8 million in 2010, $72.8

million in 2009, $66.7 million in 2008 and $56.6 million in 2007.  Net income also rose to $21.2

million in 2011, from $16.4 million in 2010, $9.87 million in 2009, $6.5 million in 2008 and $3.1 million in 2007.

32.     However, in 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") was enacted, authorizing the newly created Consumer Finance Protection Bureau (the "CFPB") to adopt rules to address the sprawling short-term consumer loan industry.  Title X of the Dodd-Frank Act established the CFPB, which became operational on July 21, 2011.

33.     Under the Dodd-Frank Act, the CFPB obtained regulatory, supervisory, and enforcement powers over providers of consumer financial products that the Company offers, including explicit supervisory authority to examine and require registration of installment lenders such as Regional Management.  Included in the powers afforded to the CFPB was the authority to adopt rules describing specified acts and practices as being "unfair," "deceptive," or "abusive," and hence unlawful.  Specifically, the CFPB obtained the express authority to declare an act or practice abusive if it, among other things, materially interfered with the ability of a consumer to understand a term or condition of a consumer financial product or service, or took unreasonable advantage of a lack of understanding on the part of the consumer of the product or service.

34.     Although the Dodd-Frank Act did not provide the CFPB with authority to establish usury limits, consumer advocacy groups were then advocating that the CFPB adopt rules making certain forms of alternative consumer finance products, such as installment loans, materially less profitable or impractical.  The CFPB could also target specific features of loans or loan practices, such as refinancings, by rulemaking that could cause the Company to cease offering certain products or engaging in certain practices such as continuous refinancings (where the borrower never catches up).

35.     The CFPB could also adopt rules that specifically restricted refinancings of existing loans. Regional Management's refinancings of existing loans was divided into three categories: (i) refinancings of loans in an amount greater than the original loan amount, (ii) renewals of existing loans that were current, and (iii) renewals of existing loans that were past due, which represented 15.0%, 32.4%, and 0.6%, respectively, of the Company's loan originations in 2012 and would represent 17.9%, 31.2%, and 0.6%, respectively, of its loan originations in 2013.  Any such rules would have a material adverse effect on the Company's operations and financial performance.  The Dodd-Frank Act also gave the CFPB the authority to examine and regulate entities it classified as a "larger participant of a market for other consumer financial products or services."

36.     In addition to the Dodd-Frank Act's grant of regulatory powers to the CFPB, the Dodd-Frank Act gave the CFPB authority to pursue administrative proceedings or litigation for violations of federal consumer financial laws.  In these proceedings, the CFPB could obtain cease and desist orders (which could include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief) and monetary penalties ranging from a maximum of $5,000 per day for minor violations of federal consumer financial laws (including the CFPB's own rules) to $25,000 per day for reckless violations and $1 million per day for knowing violations.  If the Company were subject to such administrative proceedings, litigation, orders, or monetary penalties, this could have a material adverse effect on its operations and financial performance.

37.     Also, where a company was found to have violated Title X of the Dodd-Frank Act or CFPB regulations under Title X, the Dodd-Frank Act empowered state attorneys general and state regulators to bring civil actions for the kind of cease and desist orders available to the CFPB (but not for civil penalties).  If the CFPB or one or more state officials found that Regional Management had

violated the foregoing laws, they could exercise their enforcement powers in ways that would have a material adverse effect on the Company's operations and financial performance.

38.     Though Regional Management had been a profitable, privately-held company since 1987, fresh on the heels of the enactment of the Dodd Frank Act and the creation of the CFPB, Defendants Palladium, Parallel, Godley and Quattlebaum, and the other Original Owners, determined to take the Company public so that they could cash out.  Prior to August, 2011, Defendants filed the Company's initial confidential registration statement under the Securities Act with the SEC on Form S-1, and proceeded to amend that registration statement several times in response to comments from the SEC.

39.     According to the initial registration statement filed in preparation for the IPO, the Company stated it intended to use the IPO proceeds to repay the entire $25.8 million then outstanding on the mezzanine loan then due March 2015 (held primarily by Defendants Palladium and Godley), plus accrued and unpaid interest (no interest had ever been paid), and to make a $1.1 million one-time payment to Defendants Palladium, Parallel and the Original Owners to terminate their consulting and advisory agreements.

40.     The Shareholders Agreement was amended and restated in its entirety in connection with the IPO to reflect the following voting agreement going forward:

- if the parties to the amended and restated shareholders agreement hold more than 50% of our outstanding stock entitled to vote for the election of directors, then such parties will collectively have the right to designate the smallest whole number of directors that constitutes a majority of the board;

- if the parties to the amended and restated shareholders agreement hold 50% or less, but more than 25%, of our outstanding stock entitled to vote for the election of directors, then such parties will collectively have the right to designate the number of directors that is one fewer than the smallest whole number of directors that constitutes a majority of the board; and

- if the parties to the amended and restated shareholders agreement hold 25% or less of our outstanding stock entitled to vote for the election of directors, such parties will

have no right to designate directors except that each of (1) Palladium, (2) Parallel and (3) a representative of the individual owners will have the right to designate one director if such stockholder or group of stockholders holds at least 5% of the outstanding stock entitled to vote for the election of directors.

41.   And the director designation rights were reallocated among the Original Owners as follows following the IPO:

- for so long as the individual owners in the aggregate continue to hold at least 5% of the outstanding stock entitled to vote for the election of directors, one director will be designated by a representative of the individual owners; and

- all of the remaining directors to be designated by the parties to the shareholders agreement will be divided between Parallel and Palladium in the ratio that most nearly matches the ratio of their ownership of shares of common stock; provided that, unless and until the ratio of the number shares of common stock held by Parallel to the number of shares of common stock held by Palladium is less than such ratio immediately following this offering, the number of directors to be designated by Parallel will not be fewer than one fewer than the number of directors to be designated by Palladium.

42.   The amended and restated Shareholders Agreement also provided Palladium and Parallel with demand registration rights and provided incidental registration rights to the Original Owners.

43.   In January 2012, President Obama appointed Richard Cordray as director of the CFPB and on January 5, 2012, the CFPB launched a federal supervision program for all nonbanks that offered or provided consumer financial products or services.  Under the CFPB's nonbank supervision program, the CFPB began conducting individual examinations and requiring reports from affected lenders, including Regional Management, in order to determine what businesses required greater focus by the CFPB.  The frequency and scope of those examinations depended on the CFPB's analysis of risks posed to consumers based on factors such as the particular nonbank's volume of business, types of products or services, and the extent of state oversight.

44.   Almost immediately thereafter, on March 23, 2012, Regional Management and its underwriters asked the SEC to declare the IPO registration statement they filed in August 2011

effective and on March 27, 2012 the SEC declared it effective.  On March 29, 2012, Regional Management priced its IPO at $15 per share (down considerably from the $17-$19 range it and its underwriters originally provided).  Regional Management sold 3.15 million shares in the IPO, raising $63 million in proceeds, and another 1.68 million shares were sold for $25.2 million in proceeds by a group of "Selling Stockholders" that included Defendants Palladium (which sold 808,886 shares), Parallel (which sold 461,542 shares), Defendant Quattlebaum (who sold 32,942 shares) and persons and entities related to or affiliated with Defendant Godley (who collectively sold 843,242 shares, including 137,952 shares sold by Defendant Godley, 585,999 shares sold by the 2005 Godley Trust, 32,942 shares sold by the 2012 Godley Trust, 6,454 shares sold by Defendant Godley's son William T. "Tyler" Godley, 74,285 shares sold by the Tyler Godley 2011 Irrevocable Trust (the "2011 Godley Trust") and 5,600 shares sold by by Vanessa Bailey Godley, the widow of another of Defendant Godley's sons).

45.     In the IPO, Palladium reduced its ownership stake to 31.5%, from 48.1%, while Parallel reduced its ownership stake to 18%, down from 27.5%.  Underwriter Defendants Stephens, JPM and BMO served as underwriters in the IPO, sharing more than $4 million in fees.

46.     In connection with the CFPB's ongoing nonbank supervision program, on April 24, 2013, the CFPB issued a "White Paper of Initial Data Findings" entitled "Payday Loans and Deposit Advance Products" ("White Paper").  The White Paper "summarize[d] the initial findings of the CFPB's analysis of payday loans and deposit advances," explaining, in pertinent part, as follows:

> The CFPB recognizes that demand exists for small dollar credit products.  These types of credit products can be helpful for consumers if they are structured to facilitate successful repayment without the need to repeatedly borrow at a high cost.  *However, if the cost and structure of a particular loan make it difficult for the consumer to repay, this type of product may further impair the consumer's finances.  A primary focus is on what we term "sustained use"—the long-term use of a short-term high-cost product evidenced by a pattern of repeatedly rolling over*

*or consistently re-borrowing, resulting in the consumer incurring a high level of accumulated fees.*

*The findings reported in this white paper indicate that these risks exist for a sizable segment of consumers who use these products.*[1]

47.     Among other things, the CFPB's payday lending White Paper found that the users of payday loan services were largely very low income consumers:

**Figure 2: Distribution of income reported at application**



Note: Annualized income based on pay period amount and pay frequency reported at the time of payday application.

and that those in the lowest income brackets were often recipients of public assistance:

---

[1]        Unless otherwise indicated, all emphasis has been added.



Figure 4: Distribution of income reported at application by source

Note: Percentages represent share of borrowers in each income range within each income source category.

48.     The CFPB's payday lending White Paper also demonstrated that usage of payday loans was concentrated amongst consumers who had taken out seven or more loans during the period reviewed, and that three-quarters of all loan fees generated by consumers in that sample came from those with more than 10 transactions during the sample period:



Figure 5: Distribution of loan use, volume, and fees

49. The CFPB payday lending White Paper also demonstrated that the majority of transactions conducted by consumers with at least 7 transactions a year were taken on a nearly continuous basis:



Figure 6: Share of transactions initiated within 14 days of a previous transaction

Note: The total height of each bar represents the mean number of transactions a borrower in each usage category conducted over 12 months. The height of each sub-category represents the mean number of transactions per consumer in the 12-month period that were conducted on the same day, within 1-7 days, or within 8-14 days of the close of a previous loan, as well as a sub-category that represents initial loans and new loans opened 15 days or longer after a previous loan was repaid.

50. The CFPB's payday lending White Paper stated, in conclusion, that it would expand its investigation to cover *all* "*small dollar lending products*," including installment loans, stating, in pertinent part, as follows:

> Our findings thus raise substantial consumer protection concerns. *The CFPB intends to continue its inquiry into small dollar lending products to better understand the factors contributing to the sustained use of these products by many consumers and the light to moderate use by others. We will analyze the effectiveness of limitations, such as cooling-off periods, in curbing sustained use and other harms*.

51. Soon after the release of the CFPB payday lending White Paper, on or about August 7, 2013, Regional Management filed with the SEC a second registration statement, this time on Form S-3 (File No. 333-190453), which would later be utilized for the Offerings (hereinafter the "Registration Statement"). By filing the Registration Statement on Form S-3, Regional Management

claimed to be a seasoned, well-capitalized and well-followed issuer. The Registration Statement also indicated that the shares being registered for resale would be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, permitting the Company to incorporate by reference certain SEC filings into the Registration Statement and all SEC filings the Company made subsequent to the Registration Statement being declared but prior to the Offerings being completed.

52.     On August 19, 2013, the SEC declared the Registration Statement effective and on August 20, 2013, the Company issued a Prospectus registering for resale nearly all of the remaining shares then held by Defendants Palladium, Parallel, and Quattlebaum, and of the 2005 Godley Trust, the 2011 Godley Trust, the 2012 Godley Trust, the Pamela Denise Godley Revocable Trust dated November 3, 2011, and certain other pre-IPO investors who were parties to the Shareholders Agreement. Notably, the August 20th Prospectus stated the shares would be "***offered for sale from time to time by the*** . . . '***Selling Stockholders***'" identified therein, ***not by underwriters***.

53.     However, rather than selling those shares now registered for resale under the Securities Act of 1933 themselves, soon thereafter, Defendants Palladium, Parallel, Godley and Quattlebaum instead caused the Company to enlist the services of the Underwriter Defendants to undertake two underwritten secondary stock offerings in September and December 2013 designed to formally market the shares being sold in the Offerings.

54.     On or about September 20, 2013 and December 5, 2013, respectively, Regional Management and the Underwriter Defendants priced the 9/13 SPO and the 12/13 SPO and filed the final Prospectuses for the Offerings, which form part of the Registration Statement (collectively, the "Registration Statement"). Both Prospectuses expressly incorporated by reference the Company's "Annual Report on Form 10-K for the year ended December 31, 2012, filed with the SEC on March

18, 2013," its "Quarterly Reports on Form 10-Q for the fiscal quarter ended March 31, 2013, filed

with the SEC on May 13, 2013, and for the fiscal quarter ended June 30, 2013, filed with the SEC on

August 9, 2013," and its "Current Reports on Form 8-K filed with the SEC on February 26, 2013,

March 21, 2013, April 4, 2013, April 29, 2013, May 14, 2013 and September 16, 2013." The 12/13

SPO Prospectus also incorporated by reference the "Quarterly Report on Form 10-Q . . . for the

fiscal quarter ended September 30, 2013, filed with the SEC on November 8, 2013" and the "Current

Reports on Form 8-K filed with the SEC on . . . September 20, 2013, September 25, 2013, October

30, 2013, November 18, 2013, and December 2, 2013."

55.     The Registration Statement was negligently prepared and, as a result, contained

untrue statements of material facts or omitted to state other facts necessary to make the statements

made not misleading and was not prepared in accordance with the rules and regulations governing its

preparation.

56.     Detailing the purportedly high caliber of the Company's branch-level oversight of its

loan portfolio and collections efforts, the Registration Statement stated that Regional Management

"operate[d] an integrated branch model in which nearly *all loans*, regardless of origination channel,

*[were] serviced through [its] branch network, providing [it] with frequent in-person contact with*

*[its] customers, which [it] believe[d] improve[d] [its] credit performance and customer loyalty*."

The Registration Statement further emphasized, in pertinent part, as follows:

> *Integrated Branch Model Offers Advantages Over Traditional Lenders.*  Our
> branch network, with 263 locations across eight states as of June 30, 2013, serves as
> the foundation of our multiple channel platform and the primary point of contact with
> our over 265,000 active accounts. *By integrating underwriting, servicing, and*
> *collections at the branch level, our employees are able to maintain a relationship*
> *with our customers throughout the life of a loan*. . . . In addition, nearly all loans,
> regardless of origination channel, are serviced and collected through our branches,
> *which allows us to maintain frequent, in-person contact with our customers. We*
> *believe this frequent-contact, relationship-driven lending model provides greater*

*insight into potential payment difficulties and allows us to more effectively pursue payment solutions, which improves our overall credit performance.*

\*        \*        \*

*Consistent Portfolio Performance.* . . . Portfolio performance is improved by our *regular in-person contact with customers at our branches*, which helps us to anticipate repayment problems before they occur, and *allows us to proactively work with customers to develop solutions prior to default*, using repossession only as a last option. *In addition, our centralized management information system enables regular monitoring of branch portfolio metrics*. Our state operations vice presidents and district supervisors *monitor loan* . . . *delinquencies*, and charge-offs of each branch in their respective regions *on a daily basis*. In addition, the compensation received by our branch managers and assistant managers has a *significant performance component and is closely tied to* credit quality, among other *defined performance targets*.

*Experienced Management Team.* . . . We believe our executive management team's experience has allowed us to consistently grow our business while . . . *carefully managing our credit risk*. . . . Our management team has also . . . *improved the data monitoring that we apply across our business*, including for our direct mail campaigns and *our branch location analysis*. . . .

57.     Detailing the purportedly strong underwriting standards then in effect, the Registration Statement stated that the Company's "goal [was] to *consistently and soundly grow [its] finance receivables and manage [its] portfolio risk*. . . ." The Registration Statement further emphasized, in pertinent part, as follows:

*Integrated Branch Model Offers Advantages Over Traditional Lenders.* . . . For loans originated at a branch, underwriting decisions are typically made by our local branch manager. *Our branch managers combine our sound, Company-wide underwriting standards and flexibility within our guidelines to consider each customer's unique circumstances*. This tailored branch-level underwriting approach allows us to both *reject certain marginal loans that would otherwise be approved solely based on a credit report or automated loan approval system*, as well as to selectively extend loans to customers with prior credit challenges who might otherwise be denied credit. . . .

\*        \*        \*

*Multiple Channel Platform.* . . . We believe that our multiple channel platform provides us with a competitive advantage by giving us broader access to our existing customers and multiple avenues for attracting new customers, enabling us to grow

our finance receivables, revenues, and earnings *while we maintain consistent credit performance through our integrated branch model*.

*     *     *

*Demonstrated Organic Growth.* . . . Historically, our branches have rapidly increased their outstanding finance receivables during the early years of operations *and generally have quickly achieved profitability*.

*     *     *

*Consistent Portfolio Performance.*   Through over 26 years of experience in the consumer finance industry, *we have established conservative and sound underwriting and lending practices to carefully manage our credit exposure* as we grow our business, develop new products, and enter new markets.  We generally do not make loans to customers with less than one year with their current employer and at their current residence, although we also consider numerous other factors in evaluating a potential customer's creditworthiness, such as unencumbered income and a credit report detailing the applicant's credit history.  *Our sound underwriting standards focus on our customers' ability to affordably make loan payments out of their discretionary income with the value of pledged collateral serving as a credit enhancement rather than the primary underwriting criterion*. . . . Our state operations vice presidents and district supervisors *monitor loan underwriting* . . . in their respective regions on a daily basis.  In addition, the compensation received by our branch managers and assistant managers has a significant performance component and *is closely tied to credit quality*, among other defined performance targets.

*Experienced Management Team.* . . .We believe our executive management team's experience has allowed us to consistently grow our business while . . . carefully managing our credit risk. . . . Our management team has also strengthened our underwriting procedures. . . .

58.   Concerning the Company's strategy to "*[c]ontinue to Focus on [its purportedly]*

*Sound Underwriting and Credit Control*," the Registration Statement went on to represent that:

*We intend to continue to leverage our core competencies in sound underwriting and credit management* developed through over 26 years of lending experience as we seek to *profitably grow our share of the consumer finance market.  Our philosophy is to emphasize sound underwriting standards focused on a customer's ability to affordably make loan payments, to work with customers experiencing payment difficulties*, and to use repossession only as a last option.  For example, we permit customers to defer payments or refinance past due loans under certain circumstances, although we do not offer customers experiencing payment difficulties the opportunity to modify their loans to reduce the amount of principal or interest

- 22 -

that they owe.  A deferral extends the due date of the loan by one month and allows the customer to maintain his or her credit rating in good standing.

*　　*　　*

*In recent years, we have implemented several new programs to continue improving our underwriting standards and loan collection rates, including our branch "scorecard" program that systematically monitors a range of operating, credit quality, and performance metrics.  Our management information system enables us to regularly review loan volumes, collections, and delinquencies.  We believe this central oversight, combined with our branch-level servicing and collections, improves credit performance.*

59.     Concerning the extent of the Company's practices of refinancing small installment loans, the Registration Statement stated, in pertinent part, as follows:

In addition to deferrals, we also allow customers to refinance loans.  While we typically only allow customers to refinance if their loan is current, *we allow customers to refinance past due loans on a limited basis if those customers otherwise satisfy our credit standards* (other than with respect to the delinquency). *We believe that refinancing past due loans for certain deserving customers who have made periodic payments allows us to help customers to resolve temporary financial setbacks and to repair or sustain their credit.*  During 2012, we refinanced only $4.2 million of past due loans, representing approximately 0.6% of our total loan volume for fiscal 2012.  As of December 31, 2012, the outstanding gross balance of such refinancings was only $2.7 million, or less than 1.0% of gross finance receivables as of such date.

60.     Concerning the regulatory oversight Regional Management was then subject to, the Registration Statement explained the passage of the Dodd-Frank Act, the creation of the CFPB, Cordray's installment as Head of CFPB and *generally* disclosed the commencement of the CFPB's nonbank supervision program in 2012; however, the Registration Statement did not disclose that data the Company and other nonbank lenders had already supplied the CFPB since 2012 concerning small loan installment loan lending practices demonstrated that like the payday lenders, Regional Management too had been ensnarling borrowers in "debt traps" as they took out new loans to cover prior loans, such that 80% of loans were being rolled over or followed by another loan within 14 days, and 60% of borrowers were paying fees that exceeded the loan principle.  Instead the

Registration Statement stated that the Company then "believe[d] that the highly fragmented nature of the consumer finance industry and the evolving competitive, *regulatory*, and economic environment *provide[d] attractive opportunities for growth. . . .*"

61.  Concerning the Company's then-present sales and profit trends, the 9/13 SPO Prospectus stated, in pertinent part, as follows:

> As we approach the end of the third quarter of 2013, we continue to experience increased demand for our credit products *as a result of our diversified product offering and branch expansion strategy*. As of August 31, 2013, our total finance receivables were approximately $507.3 million compared with total finance receivables as of June 30, 2013 of $460.4 million, *an increase of approximately 10.2%. The growth in our finance receivables during this two-month period was driven in large part by successful direct mail marketing campaigns for the back-to-school season*. During the last week of June through the first week of August, we mailed more than one million convenience checks to pre-screened individuals who were able to enter into a loan by depositing these checks. The weighted average coupon for loans originated in these campaigns helped increase our total yield for the fourth consecutive month. Our total yield during the two-month period increased to approximately 35.9% as compared to 35.5% for the second quarter of 2013.
>
> *We reserve against future credit losses when finance receivables are originated* and recognize interest and fee income largely in future quarters over the life of the loan. *Thus, the strong growth in finance receivables driven by the recent convenience check campaigns will drive a higher than anticipated provision for credit losses* and increased interest expense *in the current quarter* while most of the associated interest and fee income will be received and recognized in future quarters. The increased interest expense is due primarily to increased borrowings to fund the growth in finance receivables.

62.  The 12/13 SPO Prospectus similarly stated that "[t]he Company continue[d] to experience strong growth in its receivables *stemming from its diversified product offering, branch expansion strategy and convenience check campaigns*," such that "[a]s of November 30, 2013, total finance receivables were approximately $528.9 million compared to total finance receivables as of September 30, 2013 of $512.1 million, *an increase of approximately 3.3%*." The Company's Current Report on Form 8-K (attaching its quarterly financial results press release) and Quarterly

- 24 -

Financial Report on Form 10-Q for the quarter ended September 30, 2013 incorporated by reference into the 12/13 SPO Prospectus stated, in pertinent part, as follows:

> GAAP net income for the third quarter of 2013 was $7.6 million, ***a 9.1% increase from net income of $7.0 million in the prior-year period***.

> \*     \*     \*

> ***Asset Quality***. Our results of operations are highly dependent upon the quality of our asset portfolio. We recorded a $27.8 million provision for credit losses during 2012 (or 7.7% as a percentage of average finance receivables) and a $27.6 million provision for credit losses during the first nine months of 2013 (or 8.0% annualized as a percentage of average finance receivables). ***The quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio***.

> \*     \*     \*

> The allowance for small installment loans uses the net charge-off rate for the most recent eight months as a percentage of the most recent month-end balance of loans as a key data point in estimating the allowance. The allowance for each other loan type uses the net charge-off rate for the most recent twelve months as a percentage of the most recent month-end balance of loans as a key data point for estimating the allowance. ***We believe that the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct business. In addition, gasoline prices and the market for repossessed automobiles at auction are additional underlying factors that we believe influence the provision for credit losses for automobile purchase loans and, to a lesser extent, large installment loans. We monitor these factors, the monthly trend of delinquencies, and the slow file (which consists of all loans one or more days past due) to identify trends that might require an increased allowance, and we modify the allowance for credit losses accordingly***.

> \*     \*     \*

> ***The increase in 2013 revenues and net income is attributable to strong loan growth in existing branches, combined with the opening or acquisition of 51 additional branches since September 30, 2012***.

> \*     \*     \*

> ***Provision for Credit Losses***. Our provision for credit losses increased $8.6 million, or 45.6%, to $27.6 million in the nine months ended September 30, 2013, from $18.9 million in the comparable period of 2012. ***The increase in the provision occurred because of growth in the loan portfolio***, an increase in the amount of the over 180 day accounts, ***and the impact of a 2012 reduction in the estimated allowance on***

***automobile purchase loans***. Annualized net loans charged-off were 6.5% and 6.3% of average finance receivables for the nine months ended September 30, 2013 and 2012, respectively.

63.     Specifically addressing the Company's purportedly then-declining charge-off rate at the time of the 9/13 SPO, the 9/13 SPO Prospectus stated, in pertinent part, as follows:

> Notwithstanding the higher provision for credit losses, ***our credit quality remains consistent with recent history; annualized net charge-offs as a percent of average finance receivables for the two-month period declined to 6.4% as compared to 6.7% for the second quarter of 2013***.

64.     At the time of the 12/13 SPO, the Company's Current Report on Form 8-K (attaching its quarterly financial results press release) and Quarterly Financial Report on Form 10-Q for the quarter ended September 30, 2013 incorporated by reference into the 12/13 SPO Prospectus stated, in pertinent part, as follows:

> Annualized net charge-offs as a percentage of average finance receivables for the third quarter of 2013 was ***6.5%, comparable with the prior-year period***.
>
> *            *            *
>
> [O]ur annualized net charge-offs as a percentage of average finance receivables ***continued to remain consistent with prior periods***.

65.     In addition to incorporating by reference the Company's 2012 annual financial report to shareholders, the Registration Statement also contained a chart containing a "Summary Financial and Other Information," which stated the Company had earned interest and fee income and insurance income (net of other income), respectively, of $119.235 million and $16.811 million, and total revenues of $136.046 million and net income of $25.367 million in the fiscal year ended December 31, 2012.

66.     The statements referenced above in ¶¶56-65 were each inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the Offerings:

(a)   that during fiscal 2013, Regional Management had been increasing its refinancings of loans in an amount greater than the original loan amount, increasing the very "debt traps" the CFPB had been actively scrutinizing in the payday and small loan industries since 2012;

(b)   that during fiscal 2013, Regional Management's underwriting standards had deteriorated, leading to higher percentages of delinquencies and charge-offs, and the Company under-reserving for loan losses;

(c)   that during the past five months of 2013, the Company's branch offices were critically understaffed and were not able to effectively oversee the Company's loan portfolio and collections, leading to higher percentages of delinquencies and charge-offs and the Company under-reserving for loan losses;

(d)   that the higher percentages of delinquencies and charge-offs being experienced, coupled with the increased loan loss reserves they required the Company to create, had negatively impacted the Company's 2013 and first quarter 2014 net earnings; and

(e)   Regional Management had misstated its fourth quarter and fiscal 2012 financial reports, significantly overstating the Company's previously reported interest income, insurance premiums, revenues, net income and asset.

67.   Additionally, following the 9/13 SPO but prior to the 12/13 SPO, the Company was forced to disclose that at the time of the 9/13 SPO it had a "significant deficiency" in its internal controls that caused it to understate its franchise tax expenses when incurred by more than $600,000 during 2011 and 2012, which tax liability understated operating expenses and would reduce the Company's fourth quarter and fiscal 2013 net income when the Company was forced to pay its taxes due, with the Company disclosing, in pertinent part, as follows:

> In connection with its internal control implementation work, the Company discovered that non-income based franchise taxes in certain states were not properly

expensed when incurred.  Although $561,000 of the taxes have been paid and no taxes are past due, ***the Company will record in its financial results for the fourth quarter of 2013 an operating expense of approximately $607,000 relating to these franchise taxes, which will reduce fourth quarter diluted earnings per share by approximately $0.03***.  Approximately $310,000 of the operating expense relates to 2011 and 2012, with the remainder pertaining to 2013. . . . ***The Company, in consultation with its advisors, has determined that the Company's incorrect recording of the franchise taxes is a "significant deficiency" (as defined under standards established by the American Institute of Certified Public Accountants).***

68.     Additionally, following the 9/13 SPO but prior to the 12/13 SPO, the Company was also forced to disclose that "[i]n October 2013, [Regional Management] entered into a ten-year agreement with DHI Computing Service, Inc. d/b/a GOLDPoint Systems ('GOLDPoint') pursuant to which GOLDPoint [would] provide [it] with loan management software and related data processing services," stating it "expect[ed] that the full migration from the ParaData software to the GOLDPoint platform [would] take approximately one year, following which [it] expect[ed] that [it would] no longer use the ParaData software."  The Company further disclosed that its "transition to the GOLDPoint platform [would] be a ***lengthy and expensive process that [would] result in a diversion of resources from other operations."***  What the Company did not disclose then, and which would not be revealed until March 2014, was that the CFPB was conducting a probe of World Acceptance's business practices to determine whether World Acceptance (and the other payday lenders including Regional Management) had committed illegal acts involving marketing, offering , or extending credit, and that as of March 13, 2014, it was being rumored that World Acceptance, which by then had disclosed having received a Civil Investigative Demand ("CID"), would settle ensuing charges by the CFPB within 9-15 months.

69.     Under the rules and regulations governing the preparation of the Registration Statement, Regional Management was required to disclose at the time of the Offerings that its underwriting standards, credit quality and ability to oversee its loan portfolio and collections activities had significantly decreased, resulting in higher percentages of delinquencies and charge-

offs, and that it had been failing to take the required loan loss reserves, overstating its revenues and net income, and that at the time of the 09/13 SPO, the Company was operating with significant defects in its internal controls which rendered its financial reporting unreliable and would need to undertake an expensive effort to obtain new loan record management software and to switch over to the new software. The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the Offerings, the adverse events and uncertainties associated with the declining trends described above were reasonably likely to have a material impact on Regional Management' profitability, and, therefore, were required to be disclosed in the Registration Statement.

70.     The Offerings were successful for the Company, the Selling Stockholders and the Underwriter Defendants, with the Selling Stockholders selling 4,002,000 shares at $27.50 per share in the 9/13 SPO, raising approximately $110 million in gross proceeds ($105.1 million in net proceeds), and 2,346,074 shares at $31 per share in the 12/13 SPO, raising approximately $72.7 million in gross proceeds ($69.5 million in net proceeds). Indeed, Defendants Palladium and Parallel sold 100% of their remaining holdings of Regional Management common stock in the Offerings, as did the 2005 Godley Trust and the 2011 Godley Trust.

71.     At the time of the filing of this action, Regional Management stock is trading below $15 per share – roughly half of what it was sold at in the Offerings.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Regional Management common stock pursuant to the Registration Statement issued

in connection with the Offerings (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Regional Management or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the Securities Act
### Against All Defendants (Except Defendants Palladium, Parallel and Quattlebaum)

78.     Plaintiff incorporates ¶¶1-77 by reference.

79.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Defendants Palladium, Parallel and Quattlebaum.

80.     The Registration Statement for the Offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81.     The Defendants named herein are strictly liable to Plaintiff and the Class for the misstatements and omissions.

82.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

83.     By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, §11 of the Securities Act.

84.     Plaintiff acquired Regional Management common stock in the Offerings.

85.     Plaintiff and the Class have sustained damages.  The value of Regional Management common stock has declined substantially subsequent to and due to Defendants' violations.

86.     At the time of their purchases of Regional Management common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### For Violation of §12(a)(2) of the Securities Act
### Against All Defendants

87.     Plaintiff incorporates ¶¶1-86 by reference.

88.     By means of the defective Prospectus, Defendants promoted and sold Regional Management stock to Plaintiff and other members of the Class.

89.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and the other members of the Class who purchased Regional Management common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

90.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time it acquired Regional Management common stock.

91.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Regional Management common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants sued herein.  Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the Securities Act
### Against the Company, Defendants Palladium and Parallel, and the Individual Defendants

92.     Plaintiff incorporates ¶¶1-91 by reference.

93.     This Cause of Action is brought pursuant to §15 of the Securities Act [15 U.S.C. §77o] against the Company, Defendants Palladium and Parallel and the Individual Defendants.

94.     Defendants Palladium and Parallel each were control persons of Regional Management pursuant to their stock ownership, designees on the Board and the Shareholders Agreement.  The Individual Defendants each were control persons of Regional Management by virtue of their positions as directors and/or senior officers of Regional Management as well as some being parties to the Stockholders Agreement.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or

major shareholders of Regional Management, including Defendants Palladium and Parallel. The Company controlled the Individual Defendants and all of Regional Management's employees.

95. Defendants Palladium and Parallel and the Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Cause of Action above, based on their having signed, authorized or directed the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 30, 2014              ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                               SAMUEL H. RUDMAN
                               MARY K. BLASY

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

    1.    Plaintiff has reviewed a complaint and authorized its filing.

    2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

    3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

    4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

    5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Morris v. Smith Micro Software, Inc., et al.*, No. 8:11-cv-976 (C.D. Cal.)
*Waterford Township Police & Fire Ret. Sys. v. Ply Gem, et al.*, No. 14-cv-3577 (S.D.N.Y.)

    6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

REGIONAL MANAGEMENT

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _22_ day of ___MAY___, 2014.

WATERFORD TOWNSHIP POLICE &
FIRE RETIREMENT SYSTEM

By: _____

Its: _____Pension Chair_____

- 2 -

## SCHEDULE A

## SECURITIES TRANSACTIONS

### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/10/2013 | 1,328 | $21.16 |
| 06/11/2013 | 572 | $21.17 |
| 06/25/2013 | 1,400 | $20.98 |

### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 09/12/2013 | 115 | $15.99 |
| 09/13/2013 | 33 | $15.88 |
| 09/13/2013 | 1,587 | $15.92 |
| 09/16/2013 | 17 | $15.71 |
| 09/16/2013 | 291 | $15.80 |
| 09/17/2013 | 171 | $15.87 |
| 09/18/2013 | 217 | $16.04 |
| 09/19/2013 | 326 | $16.30 |
| 09/19/2013 | 543 | $16.46 |