UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

WATERFORD TOWNSHIP POLICE & FIRE  :   Civil Action No. 14 Civ. 3876 (LTS)(FM)
RETIREMENT SYSTEM, Individually and on  :
Behalf of All Others Similarly Situated,  :   <u>CLASS ACTION</u>
                                          :
                    Plaintiff,            :   AMENDED COMPLAINT FOR
                                          :   VIOLATION OF THE FEDERAL
          vs.                             :   SECURITIES LAWS
                                          :
REGIONAL MANAGEMENT CORP.,                :
PALLADIUM EQUITY PARTNERS III, L.P.,      :
PALLADIUM EQUITY PARTNERS III,            :
L.L.C., PARALLEL 2005 EQUITY FUND,        :
LP, PARALLEL 2005 EQUITY PARTNERS,        :   <u>DEMAND FOR JURY TRIAL</u>
LP, THOMAS F. FORTIN, C. GLYNN            :
QUATTLEBAUM, DONALD E. THOMAS,            :
DAVID PEREZ, ROEL C. CAMPOS,              :
RICHARD T. DELL'AQUILA, RICHARD A.        :
GODLEY, JARED L. JOHNSON, ALVARO          :
G. DE MOLINA, CARLOS PALOMARES,           :
ERIK A. SCOTT, STEPHENS INC., KEEFE,      :
BRUYETTE & WOODS, INC., BMO               :
CAPITAL MARKETS CORP., JMP                :
SECURITIES LLC and FBR CAPITAL            :
MARKETS & CO.,                            :
                                          :
                    Defendants.           :

——————————————————— x

## TABLE OF CONTENTS

<div align="right">**Page**</div>

NATURE OF THE ACTION ....................................................................................................1

JURISDICTION AND VENUE ..............................................................................................4

PARTIES ..................................................................................................................................5

STRUCTURE AND MONITORING OF THE COMPANY'S BRANCHES .............................13

FORMER EMPLOYEES OF REGIONAL MANAGEMENT ...................................................16

    Former Employee 1 ("FE1") ........................................................................................17

    Former Employee 2 ("FE2") ........................................................................................18

    Former Employee 3 ("FE3") ........................................................................................19

    Former Employee 4 ("FE4") ........................................................................................22

    Former Employee 5 ("FE5") ........................................................................................23

    Former Employee 6 ("FE6") ........................................................................................23

    Former Employee 7 ("FE7") ........................................................................................24

    Former Employee 8 ("FE8") ........................................................................................25

    Former Employee 9 ("FE9") ........................................................................................26

    Former Employee 10 ("FE10") .....................................................................................29

    Former Employee 11 ("FE11") .....................................................................................30

REGIONAL MANAGEMENT'S PROVISION FOR CREDIT LOSSES .................................31

APPLICABLE SEC RULES, REGULATIONS AND PROVISIONS .......................................34

    Item 303 of SEC Regulation S-K [17 C.F.R. §229.303] .................................................34

APPLICABLE GAAP PROVISIONS ......................................................................................35

SUBSTANTIVE ALLEGATIONS ..........................................................................................37

    A.      Background of the Company's Business ..............................................................37

             1.      The Company's Live Check Program....................................................40

**Page**

2. The Company's Provisions for Credit Losses and Net Charge-Offs ........42

3. Employee Staffing of the Company's Branches ......................................44

B. Defendants Palladium and Parallel Invest in Regional Management and the Consumer Financial Protection Bureau is Formed ...........................................47

C. Regional Management Completes its Initial Public Offering as the CFPB Begins Exercising its Regulatory Oversight .........................................................50

D. Regional Management Plans and Completes the Secondary Offerings ................53

Regional Management "Revises" its Financial Statements ...........................................55

Regional Management's Disclosure and Internal Controls Were Deficient .................................63

The Officer Defendants Signed False Sarbanes-Oxley Certifications ...........................................66

THE SECURITIES ACT ALLEGATIONS ..........................................................................68

A. Sound, Conservative, Strong and Consistent Underwriting Practices ..................69

B. "Success" and Underwriting Associated with the Live Check Program ..............72

C. Staffing and Success of the Company's Integrated Branch Model ......................74

D. Credit Quality, Credit Loss Provision and Net Charge-Off Levels ......................76

E. Accounting Errors and Financial Statements and Information ..............................77

F. Seasonality in the Company's Business .................................................................77

THE EXCHANGE ACT ALLEGATIONS ..........................................................................79

A. The May 2, 2013 Press Release and Earnings Conference Call ...........................79

B. The May 13, 2013 JMP Securities Conference and Form 10-Q ...........................83

C. The July 31, 2013 Press Release and Earnings Conference Call ..........................87

D. The August 9, 2013 Form 10-Q ...........................................................................92

E. The October 1, 2013 JMP Securities Conference .................................................93

F. The October 30, 2013 Press Release and Earnings Conference Call ...................94

**Page**

G.      The November 8, 2013 Form 10-Q ..................................................................98

H.      The December 2, 2013 Press Release ...............................................................99

I.       The March 11, 2014 Press Release and Earnings Conference Call ...................100

J.       The March 17, 2014 Form 10-K .......................................................................106

K.     The April 29, 2014 Press Release and Conference Call .....................................108

L.      The May 8, 2014 Form 10-Q .............................................................................115

M.    The July 2, 2014 Press Release ..........................................................................116

N.     The July 30, 2014 Press Release and Conference Call ......................................117

O.     The August 7, 2014 Form 10-Q ........................................................................121

P.      The September 25, 2014 Press Release ...............................................................122

Q.     The End-of-Class-Period October 30, 2014 Press Release and Conference
Call ...................................................................................................................122

R.     The November 10, 2014 Form 10-Q and November 20, 2014 Form 10-
Q/A ...................................................................................................................129

CLASS ACTION ALLEGATIONS ...................................................................................132

FRAUD ON THE MARKET PRESUMPTION OF RELIANCE .............................................134

LOSS CAUSATION/ECONOMIC LOSS ...........................................................................135

NO SAFE HARBOR .......................................................................................................135

COUNT I ......................................................................................................................135

For Violation of Section 11 of the Securities Act Against All Defendants (Except
Defendants Palladium, Parallel and Quattlebaum) ............................................135

COUNT II .....................................................................................................................137

For Violation of Section 12(a)(2) of the Securities Act Against All Defendants ............137

COUNT III ....................................................................................................................138

**Page**

For Violation of Section 15 of the Securities Act Against Regional Management,
Palladium and Parallel, and the Individual Defendants ......................................138

COUNT IV............................................................................................................................139

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against
Regional Management and the Officer Defendants.............................................139

COUNT V.............................................................................................................................140

For Violation of Section 20(a) of the Exchange Act Against the Individual
Defendants and Palladium and Parallel ...........................................................140

PRAYER FOR RELIEF .....................................................................................................141

JURY TRIAL DEMANDED ..............................................................................................141

Lead Plaintiffs Waterford Township Police & Fire Retirement System and City of Roseville Employees' Retirement System ("Plaintiffs") allege the following based upon the investigation of their counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Regional Management Corp. ("Regional Management" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and interviews with former employees of Regional Management, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a securities class action on behalf of all purchasers of the common stock of Regional Management: (i) pursuant and/or traceable to the Registration Statements and Prospectuses (the "Offering Documents") issued in connection with Regional Management's September 20, 2013 secondary public stock offering (the "9/13 SPO") and its December 5, 2013 secondary public stock offering (the "12/13 SPO") (collectively, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"); and (ii) between May 2, 2013 and October 30, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Regional Management is a consumer finance company that primarily operates as an installment lender to low credit customers.  As detailed herein, before the start of the Class Period, Regional Management and its officers named herein as defendants – including Chief Executive Officer ("CEO") Thomas F. Fortin ("Fortin") – embarked on a mission to increase the Company's small installment loan portfolio for the purpose of increasing revenues, raising the trading price of the common stock, and successfully consummating the Offerings.

3.      The Company's primary growth driver during the Class Period was the "live check" loan program.  To obtain new customers and lend additional funds to existing or previous borrowers, the Company sent checks to customers that, when cashed *anywhere*, became loans serviced by the Company's brick-and-mortar branches.  These loans then became part of the small installment loan portfolio, which represented a significant portion of the Company's total loan portfolio – as much as 53%, near the end of the Class Period.  Live checks then comprised approximately two-thirds of small installment loans.

4.      During the Class Period, Regional Management and its management represented that they employed rigorous underwriting standards when identifying creditworthy borrowers for the live check program.  However, as former employees have confirmed, and Regional Management has admitted, the Company did not employ such underwriting practices.  In fact, despite representations that the Company applied "thorough underwriting criteria" and "a proprietary model that assesses 27 different attributes of potential recipients," it merely bought lists from credit agencies and paid a vendor to mail checks.

5.      As the small loan portfolio exponentially grew during the Class Period, so too did the delinquencies stemming from live checks.  But the Company masked those delinquencies by failing to adequately provision for credit losses, while at the same time attributing any increase in the credit loss provision to favorable "growth" in the loan portfolio.  However, when describing such growth, it failed to disclose the poor underwriting practices that resulted in the demand for live check loans.

6.      The Company also failed to disclose that its branches were materially understaffed, which also significantly contributed to delinquencies.  As live check loans increased in volume, the demands on branch employees correspondingly increased because those employees were responsible for servicing and collecting on the loans.  With a serious shortage of properly trained staff, and an

insufficient numbers of employees to service these and other loans, delinquencies naturally rose and required charge-offs.

7.     Yet, the Company concealed staffing issues from investors until March 11, 2014, six months after the 9/13 SPO and three months after the 12/13 SPO.  In response, the stock price fell by nearly 20% over a three-day period, closing at $24.45 per share on March 14, 2014.  On April 29, 2014, the Company disclosed that the deficiencies were known no later than August 2013, which required an increase in the first quarter provision for credit losses that was 110% higher than the prior-year period – and, critically, the highest level in the Company's then-26 year history.  Now, the stock price declined by an astounding 30%, to close at $15.34 per share on April 30, 2014.

8.     The Company delayed the disclosure of credit issues associated with the live check underwriting problems even longer.  On October 31, 2014, the last day of the Class Period, the Company finally disclosed that check underwriting for at least the second and third quarters of 2014 was deficient.  The Company also revealed that delinquencies had become unmanageable; live check credit quality had deteriorated; staffing issues caused the postponement of the implementation of a new loan management system (GOLDPoint); and Fortin was forced out as CEO, replaced by a director of the Company who had served on the Board for only three months.

9.     In response to this news, the Company's stock price fell by more than 35%, closing at $11.66 per share on October 31, 2014.  Subsequently, in November 2014, the Company admitted that it had material weaknesses in its internal controls relating to monitoring and administering live check underwriting at least as of the second and third quarters of 2014 (*i.e.*, the periods ending June and September 30, 2014).  These admissions confirmed, however, that the Company experienced these issues far longer than it had led investors to believe.

10. By then, the Company's private equity sponsors had cashed out long ago, receiving hundreds of millions of dollars from divesting their holdings in the Offerings – which the Company arranged especially for them. The Offering Documents made no mention of staffing or underwriting problems, nor did they disclose the seasonality of the business or the extent of accounting errors that required adjustments to the financial statements. Thus, the Offering Documents were negligently prepared, at a minimum. Significantly, Fortin is the brother-in-law of the founder/managing director of one of the two private equity sponsors that participated in the Offerings, and Fortin previously served as an operating partner for that firm.

11. Accordingly, this action is intended to recover damages for investors who purchased stock in the Offerings pursuant to the materially misleading Offering Documents, or were defrauded during the Class Period as a result of the other misconduct described herein.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and SEC Rule 10b-5 promulgated under Section 10(b) of the Exchange Act [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act, and Section 27 of the Exchange Act.

13. Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). Defendants Palladium, Perez, Scott and the majority of the Underwriter Defendants (defined below) maintain their principal places of business in this District and the acts and conduct complained of herein occurred primarily in this District, including, among other things, the following:

(a)       Simpson Thacher & Bartlett LLP, headquartered in New York City (through Joshua Ford Bonnie, Esq. and Lesley Peng, Esq.), represented Regional Management in its 2012 initial public stock offering ("IPO") and Lesley Peng, Esq. acted as counsel to controlling shareholders Palladium and Parallel in the Offerings.

(b)       Alston & Bird LLP represented the Underwriter Defendants in the Offerings and the closings took place at the offices of Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016 at 10:00 a.m. on September 25, 2013 for the 9/13 SPO and on December 10, 2013 for the 12/13 SPO.

(c)       The underwriting agreements in connection with the Offerings expressly provided that they were to "be governed by . . . the . . . laws of the State of New York applicable to agreements made and to be performed in such state," that "[a]ny legal suit, action or proceeding arising out of or based upon [those] Agreement[s] or the transactions contemplated [t]hereby . . . may be instituted in the federal courts of the United States of America located in the Borough of Manhattan in the City of New York," that "each party irrevocably submit[ed] to the exclusive jurisdiction . . . of such court[s]," and that those agreements were "confirmed and accepted by the Representative [of each party thereto] in New York, New York," with the parties to those agreements being Fortin for Regional Management, Stephens for the Underwriter Defendants, and Palladium and Parallel.

14.       In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### PARTIES

15.       On August 25, 2014, the Court appointed Plaintiffs Waterford Township Police & Fire Retirement System and City of Roseville Employees' Retirement System as Lead Plaintiffs.

- 5 -

Plaintiffs purchased Regional Management common stock pursuant to the Offerings and as set forth in their attached Amended Certifications, and were damaged thereby.

16.     Defendant Regional Management is a consumer finance company that provides various loan products primarily to subprime borrowers with limited access to consumer credit from banks, thrifts, credit card companies, and other traditional lenders, including small and large installment loans; automobile purchase loans; furniture and appliance purchase loans; and payment protection insurance products, such as credit life, credit accident, health, involuntary unemployment, collateral protection collision, and property insurance. Regional Management stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RM."

17.     Defendants Palladium Equity Partners III, L.P., and its general partner Palladium Equity Partners III, LLC (collectively, "Palladium") are New York City-based private equity firms that were venture capital backers of Regional Management when it was a privately-held company. Palladium was a party to an amended shareholders agreement among Regional Management and certain of its founders and initial employees dated March 21, 2007, as amended on March 12, 2012, pursuant to which, among other things, certain of those stockholders had the right to put their stock back into the Company if an IPO did not occur by May 21, 2012 (the "Shareholders Agreement"). Pursuant to the Shareholders Agreement, Defendants David Perez ("Perez") and Erik A. Scott ("Scott") served on Regional Management's Board of Directors (the "Board") as designees of Palladium at the time of the Offerings and signed, or authorized their signatures on, the Registration Statement. Immediately prior to the 9/13 SPO, the parties to the Shareholders Agreement collectively held more than 61% of Regional Management's outstanding shares and Palladium held 29.5% of the Company's outstanding shares. Palladium sold 2,547,335 shares in the 9/13 SPO and

1,148,622 shares in the 12/13 SPO, receiving, respectively, approximately $70 million and $35.6 million in proceeds in those Offerings.

18.     Defendants Parallel 2005 Equity Fund, LP, and its general partner Parallel 2005 Equity Partners, LP, are and were at all relevant times affiliates of Parallel Investment Partners, LP (collectively referred to, unless otherwise indicated, as "Parallel"), a private equity firm.  Parallel's predecessor, SKM Growth Investors, changed its name to Parallel in 2005.

(a)     Parallel was a venture capital backer of Regional Management when it was privately held, initiating its investment in 2007.  Parallel was also a party to the Shareholders Agreement.  Defendants Jared L. Johnson ("Johnson") and Richard T. Dell'Aquila ("Dell'Aquila") served on the Board as designees of Parallel at the time of the Offerings and signed, or authorized their signatures on, the Registration Statements.  Immediately prior to the 9/13 SPO, Parallel held 16.7% of the Company's outstanding shares.  Parallel sold 1,454,665 shares in the 9/13 SPO and 658,232 shares in the 12/13 SPO, receiving, respectively, approximately $40 million and $20.4 million in proceeds in the Offerings.

(b)     In addition, Parallel played a significant role in orchestrating the IPO and Offerings for the purpose of divesting its interest in the Company at opportune times.  For example, in the "2011 Fall Update" portion of its website, Parallel provided a portfolio company update on Regional Management to its private equity fund investors, noting that the Company intended to complete the IPO and stating that it was "evaluating our timing in light of the recent market disruption[,]" as follows (with emphasis in original):

> Regional Management Corporation (RMC) has grown its store base significantly in 2011, opening **31 new branches** as the company continues to break its own records for annual new unit openings. In addition, the company continues to grow its auto, furniture and consumer durables lending businesses. RMC operates 2 branches dedicated to serving franchised auto dealers and serves as a financing source for customers of over 130 furniture and appliance dealers. On the heels of its strong

performance, RMC filed its S-1 in May for an initial public offering. The company's financial performance remains very strong, and we are evaluating our timing in light of the recent market disruption.

   (c)    In the "2012 Spring Update" section of its website, Parallel described the IPO

as follows (with emphasis in original), noting it "sold approximately 20% of our position" therein:

> Most recently, Regional Management Corp. <u>Regional Management Corp.</u> [sic] **completed its IPO** on March 28. RM has executed exceptionally well over the last three years. The company has significantly grown its unit base, entered new states and new local markets, introduced additional products, significantly enhanced the sophistication of its marketing efforts, and built the team, business processes, and systems to support continued aggressive growth. These initiatives have enabled RM to **grow net income at a CAGR in excess of 60% annually** over the last several years, making the company a highly attractive IPO candidate. We sold approximately 20% of our position in RM in the offering, retaining a significant equity stake that will allow us to participate in the company's continued value creation going forward. The combined realized and unrealized return on our investment currently represents 2.9x invested capital on a net basis.

   (d)    And, finally, in the "2013 Year in Review" section of its website, Parallel

confirmed that the Offerings were instrumental in "providing full liquidity to our investors," stating,

in pertinent part, as follows (with emphasis in original):

> In early December, we worked with <u>Regional Management Corp</u> (NYSE: RM) to complete the second of two secondary offerings completed by RM in the second half of 2013 from which we were successful providing full liquidity to our investors. Since completing our investment in RM in early 2007, we have **returned over 4.6x capital** invested in RM to investors in our most recent fund.

   19.    Defendant Thomas F. Fortin ("Fortin") was, during the Class Period, Chief Executive

Officer ("CEO") and a member of the Board.  As alleged further herein, Fortin resigned from his

positions as CEO and director on or about October 30, 2014, coincident with the Company's

issuance of its financial results for the third quarter ended September 30, 2014.  Nevertheless, as set

forth below, Fortin maintained significant ties to Parallel and its predecessor(s) that influenced his

management of the Company during his tenure, including the following:

(a)     Fortin was appointed CEO of Regional Management in March 2007, at or about when Parallel made its investment in the Company and presumably at Parallel's direction, and was elected as a Director in March 2012.

(b)     Fortin served as an Operating Partner of Parallel and its predecessor(s) from at least June 2003 until March 2007 and is the brother-in-law of F. Barron Fletcher, III, the founder and Managing Director of Parallel and the managing member of Parallel 2005 Equity Partners, LLC.

(c)     Fortin previously served as a director, together with Johnson, of Senex Financial Corp. ("Senex"), a Parallel portfolio company.  Fortin was purportedly also an operating partner of Senex.

(d)     Additionally, from 1998 to 2005, Fortin was Vice President, Development, for EJB Group, Inc. ("EJB"), a private investment holding company that made a co-investment in the $6 million recapitalization and growth investment of Senex in May 2004.  Parallel's predecessor led this transaction and retained EJB to assist in the pre-close diligence as well as post-close management of the transaction.

(e)     Fortin formed Cogent Strategic Advisors, LLC in 2001 to provide advisory services to institutional investors, including Parallel.

20.     Defendant C. Glynn Quattlebaum ("Quattlebaum"), who co-founded the Company in 1987 with Defendant Richard A. Godley ("Godley"), was, during the Class Period, its President and Chief Operating Officer ("COO") and a party to the Shareholders Agreement.  Since March 2007, Quattlebaum has served as the Company's President and COO; from 1998 to 2007, he served as the Company's Senior Vice President, Operations; from 1987 to 1998, he served in other capacities at the Company; and from 1974 to 1987, he worked in various capacities at World Acceptance Corp. ("World Acceptance"), the Company's largest competitor both during the Class Period and now.

Immediately prior to the 9/13 SPO, Quattlebaum held 3% of the Company's outstanding shares.  He sold 30,000 shares in the 12/13 SPO, receiving $930,000 in proceeds.  On July 2, 2014, the Company announced that the Board was expanded from five directors to eight and that Quattlebaum was appointed to the Board as its Vice Chairman, but that he had resigned from his positions as President and COO.

21.     Defendant Donald E. Thomas ("Thomas") is, and was during the Class Period, Executive Vice President ("VP") and Chief Financial Officer ("CFO") of Regional Management.

22.     Defendant Godley, who co-founded the Company, is, and was at the time of the Offerings, a member of the Board.  Godley served as the Company's President and CEO from 1987 until January 2006 and as the Chairman of the Board from January 2006 until March 2007.  Immediately prior to the 9/13 SPO, Godley held 5% of the Company's outstanding shares.  Godley is the trustee of The Richard A. Godley, Sr. Revocable Trust dated August 29, 2005 (the "2005 Godley Trust"), which is a party to the Shareholders Agreement.  Pamela Denise Godley, Godley's wife, is the trustee of the Tyler Godley Children 2012 Irrevocable Trust, dated December 17, 2012 (the "2012 Godley Trust"), which is also a party to the Shareholders Agreement.  The 2005 Godley Trust and the 2012 Godley Trust sold 329,220 and 180,000 shares, respectively, in the 12/13 SPO, receiving $10.2 million and $5.6 million in proceeds, respectively.  Prior to founding Regional Management, Godley was senior vice president at World Acceptance.

23.     Defendant Perez was, at the time of the Offerings, Chairman of the Board and a managing director of Palladium.  Perez served on the Board at the discretion of Parallel and Palladium.  Following the sale by Parallel and Palladium of all of their shares in the Offerings, Perez did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders.  Perez is a resident of New York City.

24.     Defendant Dell'Aquila was, at the time of the Offerings, a member of the Board and a managing director of Parallel.  Dell'Aquila served on the Board at the discretion of Parallel and Palladium.  Following the sale by Parallel and Palladium of all of their shares in the Offerings, Dell'Aquila did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders.

25.     Defendant Johnson was, at the time of the Offerings, a member of the Board and a managing director of Defendant Parallel.  Johnson served on the Board at the discretion of Parallel and Palladium.  Following the sale by Parallel and Palladium of all of their shares in the Offerings, on December 30, 2013, Johnson resigned his directorships at Regional Management and Parallel.

26.     Defendant Erik A. Scott ("Scott") was, at the time of the Offerings, a member of the Board and a managing director of Palladium.  Scott served on the Board at the discretion of Palladium.  Following the sale by Parallel and Palladium of all of their shares in the Offerings, Scott did not stand for reelection at the Company's April 23, 2014 annual general meeting of shareholders. Scott is a resident of New York.

27.     Defendant Alvaro G. de Molina ("de Molina") is, and was at the time of the Offerings, a member of the Board.  On April 23, 2014, de Molina became Chairman of the Board when Perez did not run for reelection on the Board.

28.     Defendant Carlos Palomares ("Palomares") is, and was at the time of the Offerings, a member of the Board.

29.     Defendant Roel C. Campos ("Campos") is, and was at the time of the Offerings, a member of the Board.

30.     The individual defendants named above are referred to herein collectively as the "Individual Defendants."   Defendants Fortin, Quattlebaum and Thomas are sometimes referred to herein collectively as the Officer Defendants.

31.     Defendant Stephens Inc. ("Stephens") is an Arkansas-based financial services firm with a substantial New York City presence and practice that acted as an underwriter and Joint Book Running Manager of the Offerings, helping to draft and disseminate the Offering Documents.

32.     Defendant Keefe, Bruyette & Woods, Inc. ("Keefe") is a New York City-based financial services firm that acted as an underwriter and Joint Book Running Manager of the Offerings, helping to draft and disseminate the Offering Documents.

33.     Defendant BMO Capital Markets Corp. ("BMO") is a Canadian financial services firm with a substantial New York City presence and practice that acted as an underwriter and Joint Book Running Manager of the 9/13 SPO, helping to draft and disseminate the Offering Documents related to the 9/13 SPO.

34.     Defendant JMP Securities LLC ("JMP") is a New York City-based financial services firm that acted as an underwriter and Joint Book Running Manager of the 9/13 SPO, helping to draft and disseminate the Offering Documents related to the 9/13 SPO.

35.     Defendant FBR Capital Markets & Co. ("FBR") is a Virginia-based financial services firm with a substantial New York City presence and practice that acted as an underwriter and Co-Manager of the Offerings, helping to draft and disseminate the Offering Documents.

36.     The underwriter defendants named above are referred to herein collectively as the "Underwriter Defendants."  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents, including for the following reasons:

(a)      the Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities.  They served as the underwriters of the Offerings and shared approximately $8.2 million in fees collectively.  Together with Regional Management representatives, the Underwriter Defendants solicited investors to participate in the Offerings;

(b)      the Underwriter Defendants also assisted Regional Management and the Individual Defendants in planning the Offerings, and purportedly conducted an investigation of the business and operations of Regional Management, an undertaking known as "due diligence."  During the course of their "due diligence," the Underwriter Defendants had access to confidential corporate information concerning Regional Management's operations and financial prospects; and

(c)      the Underwriter Defendants assisted in pricing the Company's common stock in connection with the Offerings, as well as in drafting and preparing the Offering Documents and causing the Offering Documents to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Classes (defined below).

37.    All Defendants named above are referred to herein collectively as "Defendants."

### STRUCTURE AND MONITORING OF THE COMPANY'S BRANCHES

38.    Every branch has one branch manager, who is largely responsible for managing the branch, performing underwriting, and approving loan applications.  Indeed, as the Company stated in its March 17, 2014 Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K"): "For loans originated at a branch, underwriting decisions are typically made by our local branch manager."

39.    Each branch also has one or two assistant branch managers and a customer service representative.  The assistant branch manager contacts delinquent customers and performs other loan

servicing tasks, reviews loan applications, and prepares operational reports.  The customer service representative takes loan applications; processes loan applications, renewals and payments; and assists in preparing operational reports, collection efforts, and marketing activities.

40.    Branch managers report to district (or area) supervisors, and each district supervisor has a number of branch managers reporting to him or her.  The district supervisor is generally responsible for the operation of individual branch offices, which includes hiring, firing, training, monitoring employees, and promoting the team to meet goals.

41.    District supervisors report to a State VP who generally performs the same functions as the district supervisor, except on the state level.  During the Class Period, each state had a single VP except for Texas, which had two (one each for North Texas and South Texas).  The State VPs report to Fortin and Quattlebaum.

42.    At least once per year, each branch undergoes an audit by the Company's internal auditors.  According to the 2013 Form 10-K, these audits include an examination of cash balances and compliance with loan approval, review and collection procedures, as well as state and federal laws and regulations.

43.    Additionally, in 2009, Regional Management introduced a "scorecard" program to systematically monitor a range of operating metrics at each branch.  During the Class Period, the scorecard system tracked 15 different dimensions of operations, including the performance and compliance of each branch on a series of underwriting metrics.  Additionally, according to the 2013 Form 10-K, each branch was part of an information network designed to permit the Company to maintain adequate cash inventory, reconcile cash balances on a daily basis, and report revenues and expenses to headquarters.

44.     Moreover, as reported in the 2013 Form 10-K, the Company's headquarters and senior management team monitors branch performance largely on a daily basis, including as follows:

- "Our headquarters staff provides central oversight by reconciling on a daily basis all account payments, cash balances, and bank deposits for each of our branches."

- "Senior management receives daily delinquency, loan volume, charge-off, and other statistical reports consolidated by state and has access to these daily reports for each branch."

- "On at least a quarterly basis district supervisors audit the operations of each branch in their geographic area and submit standardized reports detailing their findings to senior management."

- "State vice presidents meet with the executive management team once per quarter to review branch scorecard results as well as to discuss other operational and financial performance results against our targets and historical standards. Remedial plans are put in place to correct any underperformance."

45.     Further, according to the 2013 Form 10-K, the Company's executive management team has "centralized" certain "business procedures," including those related to the live checks (which are part of the "direct mail" campaign), as follows:

Our executive management team has centralized a number of business procedures, such as marketing and direct mail campaigns, which were formerly conducted at each branch, allowing us to enhance control over our individual branches. Our management team has also strengthened our underwriting procedures and improved the data monitoring that we apply across our business, including for our direct mail campaigns and our branch location analysis.

46.     As set forth elsewhere herein, the Company engaged in other monitoring practices in connection with evaluating delinquencies, establishing and maintaining provisions for credit losses, and executing charge offs.  Indeed, as the Company represented in the 2013 Form 10-K: "We have extensive oversight structures and procedures in place to ensure compliance with our operational standards and policies and the applicable regulatory requirements in each state."

- 15 -

**FORMER EMPLOYEES OF REGIONAL MANAGEMENT**

47.     The factual allegations herein, as well as the inferences arising from those allegations, are corroborated by information obtained from former employees of Regional Management ("FEs") with knowledge of its business and operations.  The following chart sets forth the job description, location and tenure of each FE, further described below:

| FE | Job Description | Location | Tenure |
|----|-----------------|----------|--------|
| 1 | Assistant Branch Manager | North Carolina | December 2011 – September 2013 |
| 2 | Assistant Branch Manager | North Carolina | April 2011 – May 2014 |
| 3 | Branch Manager, Assistant Branch Manager | Tennessee | December 2011 – February 2014 |
| 4 | Assistant Branch Manager, Branch Manager | South Carolina | April 2011 – January 2014 |
| 5 | Branch Manager | Oklahoma | May 2013 – January 2014 |
| 6 | Assistant Branch Manager, Branch Manager | South Carolina | November 2010 – October 2013 |
| 7 | Branch Manager | Tennessee | July 2012 – May 2013 |
| 8 | Assistant Branch Manager, Branch Manager | South Carolina | 2001 – 3Q 2013 |
| 9 | Internal Auditor | South Carolina (Headquarters); Covered Several States | September 2012 – July 2014 |
| 10 | Assistant Branch Manager, Branch Manager | North Carolina/Tennessee | May 2013 – July 2014 |
| 11 | Branch Manager | Alabama | July 2013 – May 2014 |

48.     Except in a single instance, no FE worked at the same branch as another FE at the same time, if at all.

49.     As detailed below, the FEs variously confirmed, among other things, that during the Class Period:

        (a)     personnel working in the Company's branch offices did not engage in sound underwriting practices and recklessly, if not consciously, disregarded the credit risks associated with initiating new loans, refinancing and/or renewing loans, and servicing and collecting loans;

        (b)     the live check program dramatically increased the Company's exposure to the riskiest of small installment loans, because the home office did not apply sound underwriting criteria in selecting recipients of the checks;

- 16 -

(c)      the live check program was the principal catalyst for the enormous number of loan delinquencies that the Company experienced;

(d)      the Company carried, and delayed charging off, delinquencies for a period and in a manner that was inconsistent with industry standards; and

(e)      the Officer Defendants and/or others whose intent can be imputed to Regional Management recklessly disregarded or knew – and, in some cases, directed – the poor underwriting and loan issuance practices that adversely affected the Company.

50.      Upon information and belief, Plaintiffs believe that additional employees of Regional Management will further corroborate these matters given a reasonable opportunity for discovery.

### Former Employee 1 ("FE1")

51.      FE 1 worked for the Company as an assistant branch manager in North Carolina from December 2011 until September 2013.  During that time, according to FE1, Regional Management had a practice of refinancing or renewing loans, whenever possible.

52.      FE1, who claimed never to have received any true training on underwriting while at Regional Management, described the practice as follows: "hey, tell him to make a payment, we'll renew the loan and then, hey, guess what, they're not delinquent anymore."  In FE1's opinion: "we were refinancing and renewing loans for the sole purpose of making that person report on credit up to date and report to our shareholders that our delinquency wasn't as bad as maybe it really was."

53.      In fact, according to FE1, it was a usual practice at Regional Management to refinance a loan after a few payments were made.  Although FE1 acknowledged that certain internal guidelines applied to refinancing and/or renewing loans, and FE1 was generally instructed to stay within those guidelines, FE1's regional supervisor preached "renew it up to date, renew it up to date."

### Former Employee 2 ("FE2")

54.     FE2 worked for the Company as an assistant branch manager in North Carolina from April 2011 until May 2014.

55.     FE2's responsibilities included issuing approval for small loans of up to $2,500 and attempting to obtain payment from delinquent borrowers.  To obtain payment from delinquent borrowers, FE2 would review a delinquency report and knock on the doors of the people on this list. According to FE2, the objective of going to customers' homes was to get them to come into the office to make a payment or speak with someone to work on getting the account "caught up."  FE explained that if there was money available on the loan, the loan would be renewed: if "anything available showed in the flashing screen, even if it was a dollar, then it could be renewed."  The customer paid fees and insurance, as further described below, on the renewal. By FE2's estimate, nearly 40% of delinquent loans were rolled over into new loans.

56.     Furthermore, FE2 believed that a large number of borrowers were paying fees that exceeded the principal of the loan, which is why many customers did not want to refinance or renew loans: "Once they got to the point to where they knew that that's what it was that they were doing, they didn't want to do it anymore."  It was FE2's job to convince customers to take out the new loan; FE2 was successful about 50% of the time.  Additionally, FE2 indicated that the Company required customers to obtain personal property insurance on collateral when renewing a loan.  Although customers questioned why they had to take property insurance when it was supposed to be optional, FE2 stated: "It was optional but it wasn't optional."

57.     Additionally, FE2 explained that proper staffing was crucial for the Company.  As FE2 confirmed, during the peak season – October to December – and also during tax season, the number of borrowers increased and if Regional Management was down a person, a lot of customer

information was not completed and verifications may not be done.  According to FE2, however, as long as the customer's income "looked ok," the Company would approve the loan application without verification.

58.     FE2 noted that there were about two weeks of underwriting training, but it was not very formal, explaining: "they give you a manual and they tell you to read it but then they don't want you to take it out of the office and you're learning while you're on the job but while you're on the job you're taking applications and the day is so busy with taking applications over the phone, pulling applications off of the computer, you don't have time to read the manual."

59.     FE2 stated that the ParaData Financial System was "the oldest system known to man" and would sometimes freeze up for hours, delaying loan processing.

### Former Employee 3 ("FE3")

60.     FE3 worked for the Company as a branch manager, and then as an assistant branch manager, in Tennessee from December 2011 until February 2014.

61.     FE3 believed the live check campaign was problematic for Regional Management. FE3 indicated that the marketing department, which operated out of corporate headquarters, was responsible for screening live check customer leads and performing underwriting on them.  FE3 explained that the marketing department would inform branches when a live-check drop was planned for their area, as well as how many checks would be sent to customers on behalf of each branch.

62.     Although the live check campaign grew progressively larger during FE3's tenure, the campaign remained the same: Regional Management would send live checks to customers each month in small batches, and two to three times a year in larger batches.  According to FE3, the branches had no involvement in the live check campaign until the customer cashed the check and thereby obtained a loan, after which the branch would service the loan.  Consequently, when a loan

became delinquent, it was the branch's responsibility to engage in collection efforts via telephone or field visit to the borrower's job or home.

63.    FE3 noted the Company was not achieving favorable returns on the live check campaign and that the charge-off rate associated with live checks was extremely high.  In fact, FE3 was brought in to replace a branch manager who was fired due to delinquency controls.  In 2012, the branch charged off approximately $69,000 in live check loans, but only about $4,000 in loans issued by the branch.  By the time FE3 left in 2013, there was also a high charge off rate.  As FE3 stated: "The whole problem stemmed from the live-checks."

64.    FE3 believed the problem originated from the marketing department and was not sure how well customer leads were screened when purchased for the live check program, explaining: "I know offhand that there were several of those that were made that never should have been made." As FE3 noted, live check recipients received loans they would not have received had they applied at a branch.  For example, FE3 saw customers who received a $2,000 live check who, based on their underwriting criteria, would only have gotten $600 from a branch; FE3 also saw people on fixed incomes receiving live checks with no way to pay them back.

65.    According to FE3, when the Company reviewed the live check credit criteria, around August or September 2013, it was not where it needed to be.  FE3 became aware of this when observing that the delinquency rate was increasing, stemming from the live-check campaign, in May or June 2013.  Additionally, FE3 was aware of a review, conducted by either the district or regional manager, of the credit quality of several live check customers in June or July 2013.  FE3 believed the results were given to the marketing department and that the problem affected several branches in the national area.

66.     As FE3 explained, there was constant communication between the branch and the district manager regarding the problems associated with live check customers.  FE3 discussed the problem with live checks with the district manager, who "was fully aware of it" and the large charge-off numbers for live check loans in 2012 and 2013.  Additionally, FE3 was aware that other branches had the same issues with the live check loans, including the Antioch branch, which also had exceptionally high charge offs due to live checks.

67.     FE3 added that the Company was "fully aware that they were going to have higher charge offs with those [*i.e.*, live checks] just because of the nature of the product."  As FE3 related, there tends to be a lot of fraud with live checks.  Further, Regional Management did not send out monthly billing statements, nor did it allow web payments or offer debit card payments. Instead, customers could only pay by cash or check mailed or delivered to the branch.

68.     FE3 confirmed that the Company provided no formal training regarding underwriting. Instead, FE3 was given a book and told to ask questions of another branch manager, if necessary. When FE3 first started, FE3 had the authority to approve loans of up to $1,000; subsequently, FE3 received authority to approve loans of up to $5,000.  If FE3 could not approve a loan due to the limit, FE3 was required to request the district manager – whose availability varied by day – to approve the loan.  Nevertheless, as FE3 stated, Regional Management portrayed itself as having a very "liberal" credit policy, and as long as a customer was not bankrupt multiple times or had a credit score below 600, he or she could probably obtain a loan.

69.     Further, once borrowers, delinquent or not, gained equity in their loan, they were encouraged to take out a new one; however, doing so would cause the customer to incur a new finance charge of 10%.  FE3 was expected to issue or refinance approximately 120 to 200 loans per

month; the percentage of these that were renewals was "quite high."  The Company encouraged the renewal of delinquent loans so as to drive down delinquency numbers.

70.     Additionally, FE3 expressed the belief that branches were inadequately staffed to manage their portfolios of loans.  FE3 believed this issue originated from the district manager, who looked for employees with stellar credit and clean records but did not want to pay them.  As FE3 related, other consumer finance companies paid assistant branch managers $13 to $15 an hour, but Regional Management only paid $12 an hour.  Because Regional Management did not offer pay that was competitive in the industry, it could not obtain quality employees when necessary.  Indeed, until early 2012, FE3 managed 400 accounts despite that, by FE3's account, accounts per employee were supposed to be 250.

### Former Employee 4 ("FE4")

71.     FE4 worked for the Company as an assistant branch manager, and then branch manager, in South Carolina from April 2011 until January 2014.

72.     According to FE4, there was a big push to loan money that started around the middle of 2013.  FE4 and other employees were told that the Company was not growing fast enough and needed to increase the ledger.  FE4 performed underwriting for the branch, and, according to FE4, the directive of the district manager was to "loan the money.  If they come in with a pulse . . . they qualify for a loan."  FE4 was also told by the district manager to "renew them until they charge off or die . . . don't lose a customer."  According to FE4, these directives came down through the "chain of command" – presumably, from the home office.  FE4 estimated that about 70% of branch customers continually renewed loans.

73.     FE4 confirmed that new customer underwriting for the live check program was done in the home office.  FE4 also indicated that the ParaData Financial System was "horrible" and not sufficient for what Regional Management was "trying to do with it."

### Former Employee 5 ("FE5")

74.     FE5 worked for the Company as a branch manager in Oklahoma from May 2013 until January 2014.

75.     According to FE5, there were issues with the live check program: there was a lot of "hit and miss."  As FE5 related, the majority of losses came from live check customers and it seemed that underwriting for the live check program did not adhere to the same standards as underwriting in the branches.  FE5 stated there were live check customers who probably would not have qualified for a loan, or a loan of the size they received, had they applied at a branch.

### Former Employee 6 ("FE6")

76.     FE6 worked for the Company as an assistant branch manager, and then branch manager, in South Carolina from in or about November 2010 until October 2013.

77.     FE6 expressed the belief that the reason for Regional Management's increased loan loss reserves was that it issued "a bunch of checks" to customers.  FE6 explained that as soon as the Company went public, it sent out "live checks" to people without any knowledge of whether the money would be paid back.  FE6 also believed that the Company was able to use these live checks to artificially inflate its ledger, by making it appear as though the loan portfolio was growing for the first month or two because it took time for a loan to be recognized as a bad loan.

78.     When FE6 first started with Regional Management, the Company issued far fewer checks on behalf of FE6's branch than after the Company went public, when it sent out around 100 or 150 checks per month.  According to FE6, the increase was exponential.  The checks also went

from $1,000 or less to $1,500, $1,800 or even $2,500.  And the dramatic increase in live checks placed stress on the branch.  As FE6 indicated, it caused employees to work twice as hard because all of a sudden they had borrowers unknown to the branch; in fact, the branch only had an address for the customer that may or may not be right, and at times, the person named on the check was not even the person who cashed it.

79.     FE6 believed that these issues were not concerns to the corporate office because the live check program was showing huge ledger growth.  FE6 believed that Fortin and Quattlebaum were "pulling the strings on everything."

### Former Employee 7 ("FE7")

80.     FE7 worked for the Company as a branch manager in Tennessee from July 2012 until May 2013.

81.     FE7 explained that after the recipient of a live check cashed the check, the branch oversaw the loan.  But the branch was not given any information on the borrowers, and there was no collateral on live check loans.  The absence of contact information – such as addresses and telephone numbers – prevented FE7 and other employees from tracking down the borrowers.

82.     Yet, FE7 observed that many recipients cashed the checks and filed for bankruptcy, while many others simply took the money and never paid it back.  According to FE7, there were a large number of delinquencies related to the live check program, and checks were sent to people who should not have received them.  As a result, branch managers "fussed and fussed" about live check issues because the problems adversely affected their bonuses, despite the fact that branch managers had no control over which customers received a live check.[1]

---

[1]     As the Company confirmed in the 2013 Form 10-K: "the compensation received by our branch managers and assistant managers has a significant performance component and is closely tied to credit quality, among other defined performance targets."

83.     As FE7 explained, a district supervisor told FE7 that the live check program was intended to raise the Company's revenue.  Additionally, FE7 indicated that the issuance of live checks steadily increased during FE7's tenure.  Indeed, when FE7 began working for the Company in July 2012, not many live checks were issued; by January 2013, however, the number of live checks had significantly increased.  With the number of live checks increasing, the number of defaulting borrowers also increased.  It would be four months later that Regional Management would begin to write off the defaulting loans.

84.     According to FE7, Quattlebaum had "a big part in every decision . . . because his name is on everything."

### Former Employee 8 ("FE8")

85.     FE8 worked for the Company as an assistant branch manager, and then a branch manager, in South Carolina from 2001 until the third quarter of 2013.

86.     According to FE8, when the live check program began, the manager was responsible for deciding who would receive a live check, *i.e.*, good customers.  As time went on, the Company started to issue live checks based on credit reports and checks went to people with good credit.  In the last few years of FE8's tenure, however, live checks were sent to people with "delinquent credit."  Thus, FE8 believed people received live checks that should not have.  For example, checks were sent to people who did not pay on their accounts, people with charge-off accounts, and people who would not have received a loan had they applied in person.  FE8 said that it seemed live checks were sent to "anybody."  As FE8 explained, the live checks were sent from the home office.

87.     FE8 rolled over loans to take them out of delinquency, and converted live check and tax loans into regular loans.  FE8 would also renew delinquent loans up to date.  FE8 was instructed to combine multiple loans into another loan to bring customers up to date if they were experiencing

financial difficulties.  As FE8 explained, you were allowed to renew a loan up to date if a delinquent customer had money available on the loan.  Additionally, the Company occasionally automatically increased loans for existing customers if the customer was paying well and had a good history with the Company.

### Former Employee 9 ("FE9")

88.     FE9 worked for the Company as an internal auditor at headquarters in South Carolina from September 2012 through July 2014.

89.     Responsible for performing audits of over 70 branches located in several states, FE9 spent the majority of time traveling within those regions and spent approximately one week at each of the branches visited.  Although FE9 did not visit each branch within those regions every year, FE9 audited compliance with various policies and procedures, including branch operations and cash controls.  Additionally, FE9 audited delinquencies and determined whether employees adhered to underwriting policies.

90.     FE9 saw an increase in delinquencies after the holiday season each year, following a live check campaign.  In FE9's opinion, delinquencies rose because of substandard underwriting associated with the checks.  Additionally, FE9 related that the Company had anticipated that consumers would pay off their loans with their tax refunds, which did not occur in many cases.

91.     According to FE9, the Company used lists of consumer information from credit bureaus to determine the recipients of checks, as well as the value of the checks.  As FE9 noted: "A lot of the consumers out there that received live checks . . . had incomplete social security numbers, and so therefore you were getting a lot of multiple checks to the same borrower that couldn't, that basically could not afford to repay the in-sum total of the loans."  As FE9 related, this also caused state and federal violations in many different states.

- 26 -

92.     Additionally, FE9 understood that the Company purchased the lists at the beginning of every fiscal year and sent out checks throughout the year.  By December, when working from a list purchased in January, FE9 noted that "the creditworthiness of many of those consumers had changed and there is [sic] no additional searches performed or verifications performed."

93.     According to FE9, the executive team – including Fortin and Quattlebaum, as well as the marketing manager and the Board – established criteria that others used to determine who would receive the checks.  Although FE9 did not attend those meetings, FE9 was aware that the executive team established the parameters used to determine live check recipients because members of the team regularly spoke about the next live check campaign, provided information regarding the campaign to employees, discussed the plans for the quarter, and urged employees to collect on the loans.

94.     FE9 heard "many" times that the live check campaign was the primary driver of Regional Management's marketing efforts and growth.  Among other times, this message was conveyed at a February 2014 meeting that Fortin and Quattlebaum attended.  Also at the meeting, the participants discussed the delinquency issues arising from the live check program.  FE9 recalled that the Company was evaluating the program, but no definite decisions were made.  From that date until FE9 left Regional Management, FE9 was unaware of any changes to the live check program. According to FE9, branch managers constantly complained about delinquency issues they had with the live check program and how it affected their month-end bonuses.

95.     Critically, FE9 stated that there were issues with each batch of live checks disseminated: "It would be a very distinctive pattern . . . . If you're reviewing monthly financials you would be able to see it, and typically it was always a month after the release, a month to two months later."  FE9 also added that Regional Management carried delinquencies for a "ridiculous" amount

of time, "well over the industry standards." In fact, FE9 recalled some loans that were well over 265 days past due. According to FE9, the Company carried these delinquencies to make its loan balance appear favorable; the ledger balance is larger if loans are not charged off.

96.     FE9 indicated that the Company would typically incur its largest charge-offs after the first of the year because it was diluted by the influx of cash flow from people paying off loans with their tax refunds. Accordingly, there was a gradual buildup of delinquencies from January to December.

97.     FE9 also confirmed that underwriting standards became looser during FE9's tenure at the Company, noting the unwritten policy that "if there's an ability for them to repay, do the loan." According to FE9, there was a big push to produce loans, and this mentality ramped up generally during FE9's tenure but certainly toward the end of the year to hit projections. FE9 noted that there was always a bigger push in the last quarter of the year to place more loans on the books.

98.     Furthermore, FE9 stated that the Company pushed renewals heavily: "Basically after a customer made their second monthly payment, the idea was to renew them immediately and always keep them keep renewing, and they really pushed heavily on renewal volume." With renewals there was an acquisition charge (varying by state) and, if the state allowed insurance products, the insurance premium would be charged again upon renewal of the loan. According to FE9: "There was always a push to always renew with insurance and to always increase the loan so that way they could increase the insurance premiums." As FE9 noted: "It is very unusual for a consumer to come in and just do a onetime loan and walk away."

99.     FE9 indicated that the majority of loans were rolled over, noting renewals were pushed because they were taken into account when awarding employee bonuses. According to FE9, bonuses were based on growth (new loans and renewals) and delinquency control (keeping

delinquency down by collecting).  As FE9 observed, one way to extinguish delinquencies was to aggressively renew delinquent customers (a delinquent renewal was coded in the system as a "PBD").  But some branches failed to follow the underwriting standards applicable to renewing delinquent loans.  Specifically, employees were supposed to re-verify borrower employment and run a new credit report.  Additionally, if an automobile served as collateral for a loan, the vehicle was to be re-evaluated to determine if it still had value.

100.    Finally, FE9 personally noted several times that customers were renewed on loans even where their only source of income was unemployment, and that authorization for the renewal came from "a higher up."  These instances were noted in FE9's audit reports.  According to FE9, Company executives "would visit and they would basically strongly encourage the employees to underwrite poorly written, poorly structured loans."  This information was "pretty consistently" confirmed by branch managers FE9 visited, who relayed that Fortin and Quattlebaum visited the branches and advised those managers to issue loans to borrowers that would not otherwise qualify for a loan.  FE9 provided the names of several branch managers who, FE9 claims, corroborate this account.

### Former Employee 10 ("FE10")

101.    FE10 worked for the Company as an assistant branch manager in North Carolina, and then as a branch manager in Tennessee, from May 2013 through July 2014.

102.    According to FE10, Regional Management aggressively promoted loan renewals: "That was the whole business . . . you're always push, push, push[ing] for loans."  As FE10 stated, loans were rolled over "every chance you had"; it was a measure of success at the Company.  In fact, FE10 was encouraged to convince customers to refinance their loans.  Indeed, as soon as a customer had money available on the loan, which was usually after the third payment, even if it was only $10,

Regional Management wanted to get the customer back in to refinance or renew the loan. To renew a loan, a customer simply needed to provide a pay check stub and driver's license.

103.     Nevertheless, according to FE10, live checks caused the most delinquencies. FE10 believed that the home office determined recipients of live checks by doing a "soft pull" of people's credit scores without pulling their credit. After the recipients cashed the checks, the branch was responsible for collecting and otherwise servicing the loan.

104.     Live checks were sent out in FE10's branch territory every month directly from the home office in South Carolina. Additionally, large live check drops occurred in August and before Christmastime, around November. FE10 complained almost daily to the district manager and state VP about the delinquencies resulting from the live check program.

105.     These delinquencies were such a problem that FE10 recalled attending a Company-wide meeting on or about January 6, 2014 held at the Omni Hotel in Nashville, Tennessee, at which the live check program was specifically discussed. Typically, Regional Management held an annual meeting with personnel, including management and branch managers, area supervisors and state VPs; the January 2014 meeting, however, was broken down by state, so there were several meetings.

106.     FE10 met Quattlebaum at the January 2014 meeting, at which it was announced that the Company intended to shut down the live check program in some branches and speed it up in others; FE10 had not heard about plans to shut down any portion of the live check program prior to the meeting.

**Former Employee 11 ("FE11")**

107.     FE11 worked for the Company as a branch manager in Alabama from July 2013 through May 2014.

108.    FE11 has a lengthy history working in finance.  In FE11's experience at different companies, loans delinquent for 120 days were charged off.  At the Company, however, there were accounts delinquent for 200, 300 or even 400 days.  As FE11 explained, carrying these delinquencies adversely affected FE11's prospects for receiving a compensation-based bonus.

109.    It was odd to FE11 that the Company held delinquent loans for so long, so FE11 raised the issue with other branch managers; their response: "that's the way" the Company does it.

**REGIONAL MANAGEMENT'S PROVISION FOR CREDIT LOSSES**

110.    According to the 2013 Form 10-K, Regional Management "maintain[s] an allowance for credit losses for all loans we make."  Additionally, Regional Management expressly recognizes the link between its provision for credit losses, its credit loss allowance, and its estimated credit losses, as follows:

> Our provision for credit losses fluctuates so that we maintain an adequate credit loss allowance that accurately reflects our estimates of losses in our loan portfolio. Therefore, changes in our charge-off rates may result in changes to our provision for credit losses. While management uses the best information available to make its evaluation, future adjustments to the allowance may be necessary if there are significant changes in economic conditions or portfolio performance.

111.    Note 1 to the Company's Consolidated Financial Statements (entitled Nature of Business and Significant Accounting Policies) ("Note 1"), set forth in the 2013 Form 10-K, further states: "Provisions for credit losses are charged to income as losses are estimated to have occurred and in amounts sufficient to maintain an allowance for credit losses at an adequate level to provide for losses on the finance receivables.  Credit losses are charged against the allowance when management believes the finance receivable is no longer collectible."

112.    As disclosed in the 2013 Form 10-K, the Company's estimate of credit loss reserves is based on various factors that the Company regularly tracks, monitors and evaluates: "To estimate the appropriate level of credit loss reserves, we consider known and relevant internal and external

factors that affect loan collectability, including the total amount of loans outstanding, historical loan charge-offs, our current collection patterns, and economic trends. Our methodology for establishing our reserves for credit losses is based in large part on our historic loss experience."

113.   Likewise, Note 1 to the 2013 Form 10-K states: "The factors used to determine whether a finance receivable is uncollectible are the age of the account, supervisory review of collection efforts, and other factors such as customers relocating to an area where collection is not practical. Subsequent recoveries, if any, are credited to the allowance."  According to the 2013 Form 10-K, "[l]oss experience, effective loan life, contractual delinquency of finance receivables by loan type, the value of underlying collateral, and management's judgment are factors used in assessing the overall adequacy of the allowance and the resulting provision for credit losses."

114.   As the Company represented in the 2013 Form 10-K, "loans within each loan product are homogenous and it is not possible to evaluate individual loans," so the Company "evaluate[s] losses in each of the four categories of loans in establishing the allowance for credit losses."  Yet, the Company purportedly "believe[s] that the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct business."  Additionally, the Company believes that "gasoline prices and the market for repossessed automobiles at auction are additional underlying factors that . . . influence the provision for credit losses for automobile purchase loans and, to a lesser extent, large installment loans."

115.   Regional Management "monitor[s] these factors, the monthly trend of delinquencies, and the slow file (which consists of all loans one or more days past due) to identify trends that might require an increased allowance, and we modify the allowance for credit losses accordingly."  Indeed, in evaluating the portfolio, the "trend of contractual delinquencies" and the status of the Company's

so-called "slow file" are of critical significance, as the following excerpt from the 2013 Form 10-K indicates:

> In making an evaluation about the portfolio, we consider the trend of contractual delinquencies and the slow file. The slow file consists of all loans that are one or more days past due. We evaluate delinquencies and the slow file by each state and by supervision district within states to identify trends requiring investigation. Historically, loss rates have been affected by several factors, including the unemployment rates in the areas in which we operate, the number of customers filing for bankruptcy protection, and the prices paid for vehicles at automobile auctions. Management considers each of these factors in establishing the allowance for credit losses.

116.    Moreover, during an April 29, 2014 conference call with analysts and investors, held to discuss Regional Management's first quarter 2014 financial results for the period ended March 30, 2014, CFO Thomas represented that the Company "continue[d] to monitor delinquency daily, resolve branch-specific APE [accounts per employee] issues, and take other actions, as necessary, to reduce delinquency as quickly as possible."  By acknowledging that the Company *continued* to monitor and address those matters, Thomas confirmed that the Company regularly monitored and addressed those matters during the Class Period.

117.    Nevertheless, according to the 2013 Form 10-K, the Company "establishes a full valuation allowance for a finance receivable at the date that it is contractually delinquent 180 days." Stated differently, the 2013 Form 10-K provides: "We fully reserve on our financial statements for accounts upon 180 days of contractual delinquency."  In turn, "[a] finance receivable is considered impaired by the Company when it is 180 or more days contractually delinquent, at which time a full valuation allowance is established for such finance receivable within the allowance for credit losses."

118.    By its own admission, the Company's credit loss provisions may materially affect its results of operations.  Indeed, as the Company represented in the 2013 Form 10-K: "Maintaining the

adequacy of our allowance for credit losses may require that we make significant and unanticipated increases in our provisions for credit losses, which would materially affect our results of operations." Thus, "if actual credit losses are materially greater than our credit loss reserves, [the Company's] financial condition and results of operations could be adversely affected."

## APPLICABLE SEC RULES, REGULATIONS AND PROVISIONS

### Item 303 of SEC Regulation S-K [17 C.F.R. §229.303]

119.     Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosures are required to be made by an issuing company in its SEC Form 10-K and 10-Q filings and registration statements filed in connection with public stock offerings, including the Offerings.

120.     On or about May 18, 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

<div align="center">*     *     *</div>

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

121.     Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

122.    As alleged herein, Regional Management and the Officer Defendants knew or should have known that delinquencies were trending upward and, based on the poor underwriting practices associated with the live check program and staffing deficiencies, the delinquencies were reasonably likely to require an extraordinary increase in loan loss and credit provisions that could have a detrimental impact on the Company's revenues and results of operations.  Indeed, as the Company recognized in the Offering Documents: "if actual credit losses are materially greater than our credit loss reserves, our financial condition and results of operations could be adversely affected."

## APPLICABLE GAAP PROVISIONS

123.    The Company's management is responsible for the preparation, integrity, accuracy, and fair presentation of its consolidated financial statements and the other financial data included in the Company's public SEC filings.  During the Class Period, Regional Management represented that its financial statements were presented in conformity with generally accepted accounting principles in the United States ("GAAP").

124.    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices.  Compliance with GAAP is a fundamental obligation of publicly traded companies.  Indeed, as set forth in Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).

125.    The Financial Accounting Standards Board ("FASB") has established the Accounting Standards Codification (the "ASC") as the source of authoritative accounting principles recognized by FASB to be applied by nongovernmental entities in the preparation of financial statements in conformity with GAAP.

126.    ASC Topic 450 ("ASC 450") requires the *accrual* of a loss contingency by a charge against income when: (i) it is probable (*i.e.*, likely) that a contingent liability or potential loss has been incurred; and (ii) the loss can be reasonably estimated.  Where a contingent liability or potential loss does not satisfy both conditions, ASC 450 requires *disclosure* of the contingency when there is at least a reasonable possibility (*i.e.*, a greater than slight chance) that a loss or additional loss may have been incurred.[2]

127.    The following factors required disclosure, if not accrual, of losses associated with the small installment loan portfolio: (i) the Company had originated a material amount of live check loans by applying substandard underwriting practices, thereby extending loans to non-creditworthy borrowers; (ii) branches were significantly understaffed, and therefore could neither appropriately underwrite new loans nor service existing loans, including live check loans; (iii) as a result of these issues, delinquencies were rising and were reasonably, if not certainly, likely to materially increase; and (iv) based on the actual and reasonably anticipated and/or probable increase in delinquencies, the Company's credit loss provision during the Class Period was not sufficient to cover the resulting, and reasonably estimable, losses.

128.    Accordingly, the Company's provision for credit losses was materially understated and the Company's income was therefore materially overstated, because the Company did not timely or properly accrue losses, when necessary.

---

[2]      ASC Topic 310, which referenced ASC 450, requires the recognition of impairment of receivables where it is probable that a loss has been incurred.

## SUBSTANTIVE ALLEGATIONS

### A.      Background of the Company's Business

129.     Founded in 1987 by Godley and Quattlebaum, Regional Management is a specialty consumer finance company providing a range of loan products primarily to subprime customers with limited access to consumer credit from banks, thrifts, credit card companies and other traditional lenders.  The Company has a branch network throughout the Southeast and Southwestern U.S.  Each loan product is typically secured, structured on a fixed rate/fixed term basis with fully amortizing equal monthly installment payments, and repayable at any time without penalty.

130.     Regional Management's loans are sourced through its multiple channel platform, including in its branches, through direct mail campaigns (such as live check loans), independent and franchise automobile dealerships, online credit application networks, furniture and appliance retailers and its consumer website.  According to the 2013 Form 10-K, loans range from $300 to $27,500 and all loans, regardless of origination channel, are serviced and collected through 264 Company branches, requiring frequent contact with customers to properly oversee the loan portfolio and to undertake collections activities to preserve its assets.

131.     As Thomas reported during the Company's March 11, 2014 earnings conference call, in which the Company's financial results for the fourth quarter and year ended December 31, 2013 were discussed, the Company's loan portfolio at the end of 2013 was comprised of approximately 53% in small installment loans (including live check loans), 33% in automobile purchase loans, 8% in large installment loans and 6% in retail purchase loans.  In the 2013 Form 10-K, the Company generally described these loan products as follows:

(a)      small installment loans range from $300 to $2,500 and are offered through branches as well as the convenience (or "live") check program; are payable in fixed rate, fully amortizing equal monthly installments with terms of up to 36 months; and are secured by non-

essential household goods.  As of December 31, 2013, the Company had approximately 271,900 small installment loans outstanding, representing $289 million in finance receivables.  The Company earned a 44% weighted average yield on these loans in 2013.

(b)     large installment loans range from $2,500 to $20,000 and are offered through branches; are payable in fixed rate, fully amortizing equal monthly installments with terms of 18 to 60 months; and are secured by a vehicle, as well as certain non-essential household goods.  As of December 31, 2013, the Company had approximately 12,300 large installment loans outstanding, representing $43.3 million in finance receivables.  The Company earned a 27.6% weighted average yield on these loans in 2013.

(c)     automobile purchase loans are offered in amounts of up to $27,500 through a network of dealers in the Company's geographic footprint; are payable in fixed rate, fully amortizing equal monthly installments with terms generally of 36 to 72 months; and are secured by the financed vehicle.  As of December 31, 2013, the Company had approximately 19,300 automobile purchase loans outstanding, representing $181.1 million in finance receivables.  The Company earned a 20.3% weighted average yield on these loans in 2013.

(d)     retail purchase loans are offered in amounts of up to $7,500 offered through a network of retailers within and, to a limited extent, outside of the Company's geographic footprint; are payable in fixed rate, fully amortizing equal monthly installments with terms generally of 6 to 48 months; and are secured by the purchased item.  As of December 31, 2013, the Company had approximately 31,200 retail purchase loans outstanding, representing $31.3 million in finance receivables.  The Company earned an 18.1% weighted average yield on these loans in 2013.

132.    Accordingly, small installment loans represented the majority of loans comprising Regional Management's portfolio as of December 31, 2013.  In fact, as alleged further herein, small

installment loans always comprised the largest percentage of the Company's portfolio during the

Class Period (and beyond), fueled in large part by the live check campaign.  The following chart

tracks the rise of the Company's small installment loans as a percentage of the loan portfolio, along

with the small loan allowance (which is a projection of the percentage of small loans that may be

uncollectible, based on past performance), for quarterly periods ended December 31, 2010 through

September 30, 2014:[3]

|  | Small Loan Allowance | Small Loan % of Total |
|---|---|---|
| December 31, 2010 | 7.6% | 47.6% |
| March 31, 2011 | 7.0% | 45.0% |
| June 30, 2011 | 6.9% | 41.1% |
| September 30, 2011 |  | 41.3% |
| December 31, 2011 | 6.8% | 42.5% |
| March 31, 2012 | 7.4% | 34.6% |
| June 30, 2012 | 7.9% | 35.1% |
| September 30, 2012 | 6.9% | 39.9% |
| December 31, 2012 | 6.0% | 43.5% |
| March 31, 2013 | 6.0% | 42.4% |
| June 30, 2013 | 6.0% | 44.9% |
| September 30, 2013 | 5.8% | 50.1% |
| December 31, 2013 | 5.3% | 53.1% |
| March 31, 2014 | 7.2% | 50.8% |
| June 30, 2014 | 7.0% | 53.2% |
| September 30, 2014 | 9.3% | 57.1% |

133.    As detailed herein, the Company's live check program accounted for a substantial

percentage of small installment loans, ratcheting up the Company's exposure to inherently risky and

otherwise poorly underwritten loans.  And although the Company's loan delinquencies, provision for

credit losses, and net charge-offs correspondingly increased along with the Company's increasing

exposure to these small loans, the Officer Defendants misrepresented the cause of the delinquencies

and the true nature of the problems facing the Company.

---

[3]     Information for the small loan allowance was not available for the quarter ended September 30, 2011.

### 1.      The Company's Live Check Program

134.    In the 2013 Form 10-K, the Company stated: "The quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio."  However, live check loans comprised a significant portion of the small loan portfolio – as much as two-thirds, by the end of the Class Period.  As multiple FEs confirmed, the Company failed to apply sound underwriting standards in connection with the live check program and employee staffing was insufficient to service the loans – accounts corroborated by the Officer Defendants' Class Period admissions.

135.    As the FEs indicated, the Company purchases customer lists and mails checks to prospective borrowers.  If a borrower cashes the check, he or she has a loan from the Company that is serviced at a branch within the vicinity of where the check was issued.  During the May 2, 2012 first quarter earnings conference call before the Class Period, Fortin noted that the Company has conducted the live check program since 1999 and gave the following description of it, corroborating the description by the FEs:

> A live check is a negotiable instrument that we send to a consumer on a prescreened basis by purchasing perspective customer names from the three national credit bureaus. When the customer receives the offer, they can endorse the check, cash it at a bank or check cashing establishment and instantly enter into a loan with Regional.

136.    As the Company disclosed in its 2013 Form 10-K, the live check program is and was integral to the Company's business model, and the Company placed increasing dependence on the program to bolster the size of its small loan portfolio and increase revenues:

> We intend to continue to increase our use of convenience checks to grow our loan portfolio by adding new customers and increasing volume at our branches, creating opportunities to offer new loan products to our existing customers.  In addition, we mail convenience checks in new markets shortly before opening new branches, which we believe helps our new branches more quickly develop a customer base and build finance receivables.  Other than with respect to the State of Georgia, the use of

convenience checks is not subject to substantial regulation in the states in which we currently operate but is subject to regulation in other jurisdictions.

137. As the Company further explained in the 2013 Form 10-K, live check "campaigns are often timed to coincide with seasonal demand for loans to finance vacations, back-to-school needs, and holiday spending."

138. As the Company reported in the 2013 Form 10-K: "Gross loan originations from our convenience check program have grown from $40.6 million in 2009 to $200.0 million in 2013, a CAGR [compound annual growth rate] of 49%, as we have increased the volume and sophistication of our convenience check marketing campaigns." Indeed, the Company "more than triple[d]" the number of checks it has "mailed since 2007." In 2013 alone, the Company "mailed over 3 million convenience checks as well as over 95,000 invitations to apply for loans."

139. Aside from emphasizing the purported success of the live check program (as further detailed below), the Company emphasized both the rigorous underwriting standards it supposedly applied before issuing checks to borrowers and the processes in place to service the loans. For example, as the Company represented in the 2013 Form 10-K:

> Each individual we solicit for a convenience check loan has been pre-screened through a major credit bureau to meet our thorough underwriting criteria. In addition to screening each potential convenience check recipient's credit score and bankruptcy history, we also use a proprietary model that assesses 27 different attributes of potential recipients. When a customer enters into a loan by cashing or depositing the convenience check, our personnel gather additional contact and other information on the borrower to assist us in servicing the loan and offering other products to meet the customer's financing needs.

140. In contrast to these representations, however, the FEs confirmed that the Company applied questionable underwriting standards when issuing live checks. Although "underwriting" for the live check program was handled at the Company's headquarters, where prospective borrowers were selected, the checks were issued on behalf of, and serviced by, individual branches. As alleged

herein, those FEs with exposure to the live check program confirmed that checks were frequently issued: (i) to borrowers who would not have qualified for a loan, had they applied in person; (ii) in amounts that exceeded what the borrowers would have received, had they applied in person; (iii) multiple times to the same borrower; (iv) without proper address or other information for borrowers, which frustrated – if not precluded – collection efforts; and (v) to the worst credit risks, including those who filed for bankruptcy protection soon after cashing the check and those who already had charged-off accounts with the Company.

141.    Further, the FEs indicated that the Company's increasing loan delinquencies primarily resulted from these issues.  Notably, at the end of the Class Period, the Officer Defendants linked the extraordinary level of delinquencies not only to the small installment loan category generally, but to the live check program specifically – a segment of its business that the Officer Defendants had previously claimed was performing well and of high credit quality.

### 2.    The Company's Provisions for Credit Losses and Net Charge-Offs

142.    As detailed herein, the Company emphasized the importance of maintaining an appropriate allowance for credit losses for all loans, as well as estimating and managing net charge-offs.

143.    Before and during the Class Period, the Company's provision for credit losses – a key metric – steadily increased both in amount and as a percentage of revenue, which reflected its growing exposure to small installment loans and a spike in delinquencies at the end of the Class Period, as the following chart demonstrates (with the Class Period represented in gray shading):

| Quarterly Period (Ending Month) | Provision for Credit Losses | As % of Revenue | Difference from Prior Quarter |
|---|---|---|---|
| 1Q12 (March 31, 2012) | $5.6 million | 17.8% | |
| 2Q12 (June 30, 2012) | $5.9 million | 18.5% | $0.3 million |
| 3Q12 (September 30, 2012) | $7.4 million | 20.8% | $1.5 million |
| 4Q12 (December 31, 2012) | $8.8 million | 23.9% | $1.4 million |
| 1Q13 (March 31, 2013) | $8.1 million | 20.9% | ($0.7 million) |
| 2Q13 (June 30, 2013) | $8.4 million | 21.3% | $0.3 million |
| 3Q13 (September 30, 2013) | $11.1 million | 24.9% | $2.7 million |
| 4Q13 (December 31, 2013) | $11.6 million | 24% | $0.5 million |
| 1Q14 (March 31, 2014) | $16.9 million | 34.2% | $5.3 million |
| 2Q14 (June 30, 2014) | $13.6 million | 28.7% | (3.3 million) |
| 3Q14 (September 30, 2014) | $22.5 million | 41.8% | $8.9 million |

144.     Likewise, the Company's annualized net charge-offs as a percentage of finance receivables – also a key metric – spiked upward at the end of the Class Period, as the following chart demonstrates (with the Class Period again represented in gray shading):

| Quarterly Period (Ending Month) | Annualized Net Charge-Offs as % of Finance Receivables |
|---|---|
| 1Q12 (March 31, 2012) | 6.4% |
| 2Q12 (June 30, 2012) | 6.1% |
| 3Q12 (September 30, 2012) | 6.5% |
| 4Q12 (December 31, 2012) | 7.1% |
| 1Q13 (March 31, 2013) | 6.5% |
| 2Q13 (June 30, 2013) | 6.7% |
| 3Q13 (September 30, 2013) | 6.5% |
| 4Q13 (December 31, 2013) | 7.8% |
| 1Q14 (March 31, 2014) | 9.7% |
| 2Q14 (June 30, 2014) | 10.5% |
| 3Q14 (September 30, 2014) | 10.3% |

145.     As detailed further herein, given the Company's policies for establishing a provision for credit losses and charging off delinquent loans, the Officer Defendants knew, or were reckless in not knowing, that delinquencies would drastically increase at the end of the Class Period long before the Company reported the increase in the provision for credit losses and net charge-offs.

146.     In fact, during the October 30, 2014 conference call, CFO Thomas admitted that the Company had applied less rigorous standards in charging-off delinquent loans than it had led investors to believe.  Contrary to representations that the Company adhered to a policy during the

- 43 -

Class Period of charging off loans delinquent for 180 days or less, Thomas revealed that the Company's policy was, in fact, "to charge off [loans] no later than 365 days" delinquent. This fact was revealed when Thomas explained that in September 2014, the Company had changed the time-based element of its charge-off policy *from* "no later than" 365 days *to* "no later than" 180 days (*i.e.*, instead of from 180 days to some lesser number). As Thomas indicated, the change was intended to bring the Company's charge-off policy "in step with industry practice" and to "provide greater transparency with respect to our charge-offs going forward."

### 3.   Employee Staffing of the Company's Branches

147.   During the Class Period, the Company consistently emphasized the importance of adequate employee staffing at the branch level. In the 2013 Form 10-K, for example, the Company disclosed that its "integrated branch model" is dependent on forging personal relationships between employees and borrowers. According to the Company, these relationships bolster its underwriting practices and its ability to originate and service loans. As the 2013 Form 10-K provides:

> By integrating underwriting, servicing, and collections at the branch level, our employees are able to maintain a relationship with our customers throughout the life of a loan. For loans originated at a branch, underwriting decisions are typically made by our local branch manager. Our branch managers combine our sound, company-wide underwriting standards and flexibility within our guidelines to consider each customer's unique circumstances. This tailored branch-level underwriting approach allows us to both reject certain marginal loans that would otherwise be approved solely based on a credit report or automated loan approval system, as well as to selectively extend loans to customers with prior credit challenges who might otherwise be denied credit. In addition, nearly all loans, regardless of origination channel, are serviced and collected through our branches, which allows us to maintain frequent, in-person contact with our customers. We believe this frequent-contact, relationship-driven lending model provides greater insight into potential payment difficulties and allows us to more effectively pursue payment solutions, which improves our overall credit performance. It also provides us with frequent opportunities to assess the borrowing needs of our customers and to offer new loan products as their credit profiles evolve.

148.     In the 2013 Form 10-K, the Company also expressed the belief that "our frequent-contact, relationship-driven lending model, combined with regular monitoring and alignment of employee incentives, improves our overall credit performance."  More specifically, the Company stated in the 2013 Form 10-K that it "believe[s] that the development and continual reinforcement of personal relationships with customers improves our ability to monitor their creditworthiness, reduces credit risk, and generates opportunities to offer new loan products to our customers as their credit profiles evolve."

149.     Thus, employee involvement is crucial to performing adequate loan underwriting and servicing.  For example, employees must, among other things: (i) meet with prospective borrowers who request a small or large installment loan or automobile loan; (ii) process and review loan applications; (iii) examine and evaluate collateral pledged for loans; (iv) conduct credit checks and perform other underwriting-related tasks; and (v) service loans, by following up with borrowers by telephone and in-person, as necessary, to obtain and process payments and prevent or address loan delinquencies.

150.     In discussing employee collection efforts during the April 29, 2014 quarterly earnings conference call, for example, Fortin described the work as follows: "Our collectors spend each morning making about 150 phone calls. It's the standard. They'll spend most afternoons calling by phone and then in the field, driving a route, visiting either the home or workplace of a borrower."

151.     Additionally, employees must market and sell loan products, including insurance, to customers, and interface with customers concerning refinancing and/or renewing loans.

152.     The following excerpts from the 2013 Form 10-K illustrate the types of matters that Regional Management requires its branch employees to perform:

- 45 -

- ▪ "Each of our branches is equipped to perform immediate background, employment, and credit checks, and approve small installment loan applications promptly while the customer waits."

- ▪ "Our employees verify the applicant's employment and credit histories through telephone checks with employers, other employment references, supporting documentation, such as paychecks and earnings summaries, and a variety of third-party credit reporting agencies."

- ▪ "When a customer enters into a loan by cashing or depositing the convenience check, our personnel gather additional contact and other information on the borrower to assist us in servicing the loan and offering other products to meet the customer's financing needs"

- ▪ "Our branch employees will perform an in-person appraisal of the collateral pledged for a large installment loan . . . ."

- ▪ "Our corporate policies also include encouraging customers to visit our branches to make payments. Encouraging payment at the branch allows us to maintain regular contact with our customers and further develop our overall relationship with them."

- ▪ "Branch employees also promptly contact customers following the first missed payment due date and thereafter remain in close contact with such customers, including through phone calls and letters."

- ▪ "Our branch employees also contact a delinquent customer at his or her home or place of employment and contact other references listed on the customer's loan application."

153.     As the Company grew during the Class Period, its exposure to borrowers from a more diverse geographic mix also increased, increasing the importance of sufficient staffing for branches servicing those regions.  The following chart from the 2013 Form 10-K sets forth the composition of Regional Management's finance receivables for small installment loans by state at December 31 of each year from 2009 through 2013:

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| | | | AT DECEMBER 31, | | |
| South Carolina | 47% | 43% | 40% | 31% | 26% |
| Texas | 27% | 29% | 29% | 31% | 29% |
| North Carolina | 21% | 20% | 21% | 21% | 16% |
| Tennessee | 4% | 5% | 6% | 7% | 8% |
| Alabama | 1% | 3% | 4% | 9% | 14% |
| Oklahoma | — | — | — | 1% | 5% |
| New Mexico | — | — | — | — | 2% |
| Georgia | — | — | — | — | — |
| **Total** | 100% | 100% | 100% | 100% | 100% |

154.    As the loan volume has increased in any given state, the importance of staffing – and sound and rigorous loan underwriting, and effective collections – at the branch level and otherwise has correspondingly increased.  During the Class Period, however, the Company was experiencing staffing issues and difficulty hiring and retaining a sufficient number of employees to perform these functions.  By the end of the Class Period, the Officer Defendants were forced to admit that staffing issues, coupled with inadequate underwriting of live checks, directly and adversely resulted in a marked increase in delinquencies, credit loss provisions, and charge-offs.

B.    **Defendants Palladium and Parallel Invest in Regional Management and the Consumer Financial Protection Bureau is Formed**

155.    In March 2007, Palladium and Parallel acquired the majority of the Company's outstanding common stock, paying $4.16 per share.  In connection with that transaction, Regional Management also issued $25 million of mezzanine debt at an interest rate of 18.375%, plus related fees, which the Company refinanced in 2007 and again in 2010 with Palladium and certain of its prior individual owners and employees (including Godley) (collectively, the "Original Owners").  Additionally, the Company began paying Palladium and Parallel aggregate annual advisory fees of $675,000, and the Original Owners aggregate annual consulting fees of $450,000, plus expenses.

156.    Between 2007 and 2011, the small installment loan industry grew exponentially.  The Company's own loan portfolio and number of branches almost doubled and its cash flow from operations more than doubled during this same period:

- 47 -

| | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 2007[1] | 2008 | 2009 | 2010 | 2011 |
| | (Dollars in thousands, except for per share amounts) | | | | |
| Selected Operational Data: | | | | | |
| Average finance receivables[7] | $146,265 | $178,159 | $192,981 | $216,022 | $264,012 |
| Number of branches (at period end) | 96 | 112 | 117 | 134 | 170 |
| Cash flow from operations | $ 17,990 | $ 26,654 | $ 31,232 | $ 41,215 | $ 41,048 |

157.    Meanwhile, Regional Management's revenue from interest, fees, insurance and other income, increased exponentially to $105.2 million in 2011, from $86.8 million in 2010, $72.8 million in 2009, $66.7 million in 2008 and $56.6 million in 2007.  Net income also rose to $21.2 million in 2011, from $16.4 million in 2010, $9.87 million in 2009, $6.5 million in 2008 and $3.1 million in 2007.

158.    However, in 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") was enacted, authorizing the newly created Consumer Finance Protection Bureau (the "CFPB") to adopt rules to address the sprawling short-term consumer loan industry.  Title X of the Dodd-Frank Act established the CFPB, which became operational on July 21, 2011.

159.    Under the Dodd-Frank Act, the CFPB obtained regulatory, supervisory, and enforcement powers over providers of consumer financial products that the Company offers, including explicit supervisory authority to examine and require registration of installment lenders such as Regional Management.  Included in the powers afforded to the CFPB was the authority to adopt rules describing specified acts and practices as being "unfair," "deceptive," or "abusive," and hence unlawful.  Specifically, the CFPB obtained the express authority to declare an act or practice abusive if it, among other things, materially interfered with the ability of a consumer to understand a term or condition of a consumer financial product or service, or took unreasonable advantage of a lack of understanding on the part of the consumer of the product or service.

160.    Although the Dodd-Frank Act did not provide the CFPB with authority to establish usury limits, consumer advocacy groups were then advocating that the CFPB adopt rules making

certain forms of alternative consumer finance products, such as installment loans, materially less profitable or impractical. The CFPB could also target specific features of loans or loan practices, such as refinancings, by rulemaking that could cause the Company to cease offering certain products or engaging in certain practices such as continuous refinancings (where the borrower never catches up).

161.    The CFPB could also adopt rules that specifically restricted refinancings of existing loans. Regional Management's refinancings of existing loans was divided into three categories: (i) refinancings of loans in an amount greater than the original loan amount, (ii) renewals of existing loans that were current, and (iii) renewals of existing loans that were past due, which represented 15.0%, 32.4%, and 0.6%, respectively, of the Company's loan originations in 2012 and would represent 17.9%, 31.2%, and 0.6%, respectively, of its loan originations in 2013. Any such rules would have a material adverse effect on the Company's operations and financial performance. The Dodd-Frank Act also gave the CFPB the authority to examine and regulate entities it classified as a "larger participant of a market for other consumer financial products or services."

162.    In addition to the Dodd-Frank Act's grant of regulatory powers to the CFPB, the Dodd-Frank Act gave the CFPB authority to pursue administrative proceedings or litigation for violations of federal consumer financial laws. In these proceedings, the CFPB could obtain cease and desist orders (which could include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief) and monetary penalties ranging from a maximum of $5,000 per day for minor violations of federal consumer financial laws (including the CFPB's own rules) to $25,000 per day for reckless violations and $1 million per day for knowing violations. If the Company were subject to such administrative proceedings, litigation, orders, or monetary penalties, this could have a material adverse effect on its operations and financial performance.

163.     Also, where a company was found to have violated Title X of the Dodd-Frank Act or

CFPB regulations under Title X, the Dodd-Frank Act empowered state attorneys general and state

regulators to bring civil actions for the kind of cease and desist orders available to the CFPB (but not

for civil penalties).  If the CFPB or one or more state officials found that Regional Management had

violated the foregoing laws, they could exercise their enforcement powers in ways that would have a

material adverse effect on the Company's operations and financial performance.

### C.     Regional Management Completes its Initial Public Offering as the CFPB Begins Exercising its Regulatory Oversight

164.     Though Regional Management had been a profitable, privately-held company since

1987, fresh on the heels of the enactment of the Dodd Frank Act and the creation of the CFPB,

Palladium, Parallel, Godley and Quattlebaum, and the other Original Owners, determined to take the

Company public.  On May 16, 2011, Defendants filed the Company's initial confidential registration

statement under the Securities Act with the SEC on Form S-1 (File No. 333-174245), and proceeded

to amend that registration statement several times in response to comments from the SEC.

165.     According to the initial registration statement filed in preparation for the IPO, the

Company stated it intended to use the IPO proceeds to repay $25.8 million then outstanding on the

mezzanine loan then due March 2015 (held primarily by Palladium and Godley), plus accrued and

unpaid interest (no interest had ever been paid), and to make a $1.15 million one-time payment to

Palladium, Parallel and the Original Owners to terminate their consulting and advisory agreements.

166.     The Shareholders Agreement was amended and restated in its entirety in connection

with the IPO to reflect the following voting agreement going forward:

> ▪     if the parties to the amended and restated shareholders agreement hold more than 50% of our outstanding stock entitled to vote for the election of directors, then such parties will collectively have the right to designate the smallest whole number of directors that constitutes a majority of the board;

- if the parties to the amended and restated shareholders agreement hold 50% or less, but more than 25%, of our outstanding stock entitled to vote for the election of directors, then such parties will collectively have the right to designate the number of directors that is one fewer than the smallest whole number of directors that constitutes a majority of the board; and

- if the parties to the amended and restated shareholders agreement hold 25% or less of our outstanding stock entitled to vote for the election of directors, such parties will have no right to designate directors except that each of (1) Palladium, (2) Parallel and (3) a representative of the individual owners will have the right to designate one director if such stockholder or group of stockholders holds at least 5% of the outstanding stock entitled to vote for the election of directors.

167.    Further, the director designation rights were reallocated among the Original Owners following the IPO:

- for so long as the individual owners in the aggregate continue to hold at least 5% of the outstanding stock entitled to vote for the election of directors, one director will be designated by a representative of the individual owners; and

- all of the remaining directors to be designated by the parties to the shareholders agreement will be divided between Parallel and Palladium in the ratio that most nearly matches the ratio of their ownership of shares of common stock; provided that, unless and until the ratio of the number shares of common stock held by Parallel to the number of shares of common stock held by Palladium is less than such ratio immediately following this offering, the number of directors to be designated by Parallel will not be fewer than one fewer than the number of directors to be designated by Palladium.

168.    The amended and restated Shareholders Agreement also provided Palladium and Parallel with demand registration rights and provided incidental registration rights to the Original Owners.

169.    In January 2012, President Obama appointed Richard Cordray as director of the CFPB and on January 5, 2012, the CFPB launched the nation's first federal supervision program for all nonbanks that offered or provided consumer financial products or services.  Under the CFPB's nonbank supervision program, the CFPB began conducting individual examinations and requiring reports from affected lenders in order to determine what businesses required greater focus by the

CFPB.  The frequency and scope of those examinations depended on the CFPB's analysis of risks posed to consumers based on factors such as the particular nonbank's volume of business, types of products or services, and the extent of state oversight.

170.     Almost immediately thereafter, on March 23, 2012, Regional Management and its underwriters asked the SEC to declare effective the IPO registration statement (as amended) and, on March 27, 2012, the SEC did so.  On March 29, 2012, Regional Management priced its IPO at $15 per share (down considerably from the $17-$19 range it and its underwriters originally provided).  In the IPO, Regional Management sold 3.15 million shares for $47.25 million in proceeds, and another 1.68 million shares were sold for $25.2 million in proceeds by "Selling Stockholders" that included: (i) Palladium, which sold 808,886 shares; (ii) Parallel, which sold 461,542 shares; (iii) Quattlebaum, who sold 32,942 shares; and (iv) persons and entities affiliated with Godley, which collectively sold 843,242 shares (including 137,952 shares sold by Godley; 585,999 shares sold by the 2005 Godley Trust; 32,942 shares sold by the 2012 Godley Trust; 6,454 shares sold by Godley's son, William T. "Tyler" Godley; 74,285 shares sold by the Tyler Godley 2011 Irrevocable Trust (the "2011 Godley Trust"); and 5,600 shares sold by Vanessa Bailey Godley, the widow of another of Godley's sons).

171.     In the IPO, Palladium reduced its ownership stake from 48.1% to 31.7%, while Parallel reduced its ownership stake from 27.5% to 18%.  Stephens, JPM and BMO served as underwriters of the IPO, sharing more than $4 million in fees.

172.     In connection with the CFPB's ongoing nonbank supervision program, on April 24, 2013, the CFPB issued a "White Paper of Initial Data Findings" entitled "Payday Loans and Deposit Advance Products" ("White Paper").  The White Paper "summarize[d] the initial findings of the CFPB's analysis of payday loans and deposit advances," explaining, in pertinent part, as follows:

> The CFPB recognizes that demand exists for small dollar credit products.  These types of credit products can be helpful for consumers if they are structured to

facilitate successful repayment without the need to repeatedly borrow at a high cost. However, if the cost and structure of a particular loan make it difficult for the consumer to repay, this type of product may further impair the consumer's finances. A primary focus is on what we term "sustained use"—the long-term use of a short-term high-cost product evidenced by a pattern of repeatedly rolling over or consistently re-borrowing, resulting in the consumer incurring a high level of accumulated fees.

The findings reported in this white paper indicate that these risks exist for a sizable segment of consumers who use these products.

173.    Among other things, the White Paper found that the users of payday loan services were largely very low income consumers and often recipients of public assistance. The White Paper also showed that usage of payday loans was concentrated among consumers who had taken out seven or more loans during the period reviewed, and that three-quarters of all loan fees generated by consumers in that sample came from those with more than 10 transactions during the sample period.

174.    The White Paper stated, in conclusion, that the CFPB would expand its investigation to cover all "small dollar lending products," including installment loans, stating, in pertinent part, as follows:

Our findings thus raise substantial consumer protection concerns. The CFPB intends to continue its inquiry into small dollar lending products to better understand the factors contributing to the sustained use of these products by many consumers and the light to moderate use by others. We will analyze the effectiveness of limitations, such as cooling-off periods, in curbing sustained use and other harms.

175.    Thus, the writing was on the wall: the CFPB could exercise its regulatory oversight of the small installment loan industry at any time, which would place Regional Management and other industry participants in the CFPB's crosshairs.

**D.    Regional Management Plans and Completes the Secondary Offerings**

176.    Soon after the release of the White Paper, on or about August 7, 2013, Regional Management filed with the SEC a second registration statement, this time on Form S-3 (File No. 333-190453), which would later be used for the Offerings. By filing the Registration Statement on

Form S-3, Regional Management claimed to be a seasoned, well-capitalized and well-followed

issuer.  The Registration Statement indicated that shares registered for resale would be offered on a

delayed or continuous basis pursuant to Rule 415 under the Securities Act, permitting the Company

to incorporate by reference certain SEC filings, including those made subsequent to the effective

date but prior to the completion of the Offerings.

177.   On August 19, 2013, the SEC declared the Registration Statement effective and on

August 20, 2013, the Company issued a Prospectus registering for resale nearly all of the remaining

shares then held by Palladium, Parallel, and Quattlebaum, the 2005 Godley Trust, the 2011 Godley

Trust, the 2012 Godley Trust, the Pamela Denise Godley Revocable Trust dated November 3, 2011,

and certain other pre-IPO investors who were parties to the Shareholders Agreement.  The August

20, 2013 Prospectus represented that shares would be "offered for sale from time to time by the . . .

'Selling Stockholders'" identified therein, not by underwriters.

178.   However, rather than selling those shares registered for resale under the Securities

Act themselves, Palladium, Parallel, Godley and Quattlebaum soon thereafter caused the Company

to enlist the Underwriter Defendants to underwrite the Offerings in September and December 2013

and to formally market the shares sold.

179.   On or about September 20, 2013 and December 5, 2013, respectively, Regional

Management and the Underwriter Defendants priced the 9/13 SPO and the 12/13 SPO and filed the

final Prospectuses for the Offerings, which formed part of the Registration Statements associated

with the Offering Documents.

180.   The Offering Documents for both Offerings expressly incorporated by reference the

"Annual Report on Form 10-K for the year ended December 31, 2012, filed with the SEC on March

18, 2013," its "Quarterly Reports on Form 10-Q for the fiscal quarter ended March 31, 2013, filed

with the SEC on May 13, 2013, and for the fiscal quarter ended June 30, 2013, filed with the SEC on August 9, 2013," and its "Current Reports on Form 8-K filed with the SEC on February 26, 2013, March 21, 2013, April 4, 2013, April 29, 2013, May 14, 2013 and September 16, 2013."

181.    Additionally, the 12/13 SPO Prospectus incorporated by reference the "Quarterly Report on Form 10-Q . . . for the fiscal quarter ended September 30, 2013, filed with the SEC on November 8, 2013" and the "Current Reports on Form 8-K filed with the SEC on . . . September 20, 2013, September 25, 2013, October 30, 2013, November 18, 2013, and December 2, 2013."

182.    As set forth in detail herein, the Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

183.    Nevertheless, the Offerings were successful for the Company, Selling Stockholders and Underwriter Defendants, with the Selling Stockholders selling 4,002,000 shares at $27.50 per share in the 9/13 SPO, raising approximately $110 million in gross proceeds ($105.1 million in net proceeds), and 2,346,074 shares at $31 per share in the 12/13 SPO, raising approximately $72.7 million in gross proceeds ($69.5 million in net proceeds).  Indeed, Palladium and Parallel sold 100% of their remaining holdings of Regional Management common stock in the Offerings, as did the 2005 Godley Trust and the 2011 Godley Trust.

### Regional Management "Revises" its Financial Statements[4]

184.    On December 2, 2014, the Company issued a press release announcing the launch of the 12/13 SPO.  In the press release, the Company acknowledged that it had "provided an update on its implementation of internal controls over financial reporting as required by the Sarbanes–Oxley

---

[4]    All footnotes are omitted from the Company financial data reproduced in this section.

Act of 2002, stating that it expects to be fully compliant by the end of this year." Nevertheless, the Company also represented that it had "discovered that non-income based franchise taxes in certain states were not properly expensed when incurred." The press release provided, in pertinent part, as follows:

> Although $561,000 of the taxes have been paid and no taxes are past due, the Company will record in its financial results for the fourth quarter of 2013 an operating expense of approximately $607,000 relating to these franchise taxes, which will reduce fourth quarter diluted earnings per share by approximately $0.03. Approximately $310,000 of the operating expense relates to 2011 and 2012, with the remainder pertaining to 2013. Management does not believe the amounts related to any quarter or any year are material; therefore, no restatement of the Company's prior financial statements is necessary. The Company, in consultation with its advisors, has determined that the Company's incorrect recording of the franchise taxes is a "significant deficiency" (as defined under standards established by the American Institute of Certified Public Accountants). Management has identified and has implemented the necessary corrections to its accounting and internal control structure to fully remediate the significant deficiency, and expects that it will be able to certify in its 2013 annual report on Form 10-K that its internal controls over financial reporting are effectively designed, in place and functioning properly as of December 31, 2013.

185. The Company included the same disclosure regarding the franchise tax issue in the Offering Documents associated with its 12/13 SPO.

186. Accordingly, although the Company identified this discrepancy regarding franchise taxes as a "significant deficiency," it nevertheless represented that management did "not believe the amounts related to any quarter or any year are material" and that "no restatement . . . is necessary."

187. Three months later, on March 11, 2014, Regional Management issued a press release announcing its fiscal 2013 fourth quarter and full year results. In the press release, the Company represented that it "will certify in its 2013 annual report on Form 10-K that its internal controls over financial reporting were effective as of December 31, 2013, thus being in compliance with requirements under the Sarbanes-Oxley Act of 2002."

188.     Nevertheless, the Company revealed that it had "revised" its financial statements for the three months and full year ended December 31, 2012 included in the press release, purportedly "to correct immaterial errors relating to interest income, insurance premiums, compensated absences, state franchise taxes, and income taxes."  As the Company further disclosed:

> Following a materiality assessment in accordance with the Securities and Exchange Commission Staff Accounting Bulletin No. 99, *Materiality*, and Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, the Company concluded that the prior period errors were immaterial to the previously issued financial statements and those financial statements can continue to be relied upon.

189.     Despite the representation that prior "financial statements can continue to be relied upon," and the December 2, 2014 assurance that "no restatement of the Company's prior financial statements is necessary," Regional Management presented "revised" financial data in its March 11, 2014 press release.  Specifically, noting that "[c]ertain period amounts have been reclassified to conform to the current presentation," the Company "revised" its consolidated statements of income for the three- and 12 months ended December 31, 2012, as follows:

| | Consolidated Statements of Income | | | | | |
| | Three Months Ended December 31, 2012 | | | Twelve Months Ended December 31, 2012 | | |
| | As Reported (1) | Revised | Change | As Reported (1) | Revised | Change |
|---|---|---|---|---|---|---|
| Interest and fee income | $  32,902 | $ 32,849 | $   (53) | $  119,235 | $119,025 | $ (210) |
| Insurance income, net | 2,663 | 2,606 | (57) | 10,820 | 10,681 | (139) |
| Total revenue | 37,000 | 36,890 | (110) | 136,046 | 135,697 | (349) |
| Personnel | 8,622 | 8,631 | 9 | 33,453 | 33,492 | 39 |
| Other | 3,027 | 3,084 | 57 | 10,413 | 10,644 | 231 |
| Total expenses | 26,803 | 26,869 | 66 | 96,114 | 96,384 | 270 |
| Income before income taxes | 10,197 | 10,021 | (176) | 39,932 | 39,313 | (619) |
| Income taxes | 3,560 | 3,552 | (8) | 14,565 | 14,561 | (4) |
| Net income | $   6,637 | $  6,469 | $(168) | $   25,367 | $  24,752 | $(615) |
| Net income per common share: | | | | | | |
| Basic | $     0.53 | $    0.52 | $ (0.01) | $     2.17 | $    2.12 | $(0.05) |
| Diluted | $     0.52 | $    0.51 | $ (0.01) | $     2.12 | $    2.07 | $(0.05) |

190.     Additionally, the Company "revised" its consolidated balance sheet as of December 31, 2012, as follows:

| | Consolidated Balance Sheet | | |
| | December 31, 2012 | | |
| | As Reported (1) | Revised | Change |
|---|---|---|---|
| Less unearned finance charges, insurance premiums, and commissions | $ (92,024) | $ (92,376) | $ (352) |
| Finance receivables | 439,826 | 439,474 | (352) |
| Net finance receivables | 416,210 | 415,858 | (352) |
| Other assets | 7,483 | 7,361 | (122) |
| Total assets | 434,991 | 434,517 | (474) |
| Accounts payable and accrued expenses | 6,096 | 6,987 | 891 |
| Total liabilities | 304,422 | 305,313 | 891 |
| Retained earnings | 49,162 | 47,797 | (1,365) |
| Total stockholders' equity | 130,569 | 129,204 | (1,365) |
| Total liabilities and stockholders' equity | $ 434,991 | $ 434,517 | $ (474) |

191.     On March 17, 2014, Regional Management filed its 2013 Form 10-K with the SEC. In the 2013 Form 10-K, Regional Management disclosed: "as the Company completed the close of its year-end accounting, it identified other errors related to interest income, insurance premiums, compensated absences, and income taxes.  Collectively, the errors result in an overstatement of net income for the years ended December 31, 2010 through December 31, 2012."

192.     In the 2013 Form 10-K, the Company also recognized these issues, and the franchise tax issue, as "significant deficiencies," stating: "[T]he Company's incorrect recording of franchise tax expense, compensated absence expense, and insurance premium revenue are, individually and in the aggregate, 'significant deficiencies' (as defined under standards established by the American Institute of Certified Public Accountants)."  Despite this confluence of errors, the Company claimed that "management believes that the Company maintained effective internal control over financial reporting as of December 31, 2013."

193.     Furthermore, although the Company represented that it had evaluated SEC guidance and "concluded that the errors were immaterial to the previously issued financial statements and those financial statements can continue to be relied upon," it nevertheless acknowledged that the claimed errors required "corrections to its previously filed financial statements" and that "[f]uture filings that include prior periods will be revised, as needed, when filed."

194.    In connection with these issues, the Company "revised" its consolidated statements of income and cash flows for the three- and nine-month periods ended September 30, 2013, as follows:

| | Consolidated Statements of Income | | | | | |
|---|---|---|---|---|---|---|
| | Three Months Ended September 30, 2013 | | | Nine Months Ended September 30, 2013 | | |
| | As Reported | Revised | Change | As Reported | Revised | Change |
| Insurance income, net | $ 3,000 | $ 2,839 | $ (161) | $ 8,906 | $ 8,575 | $ (331) |
| Total revenue | 44,466 | 44,305 | (161) | 122,418 | 122,087 | (331) |
| Personnel | 9,589 | 9,681 | 92 | 29,409 | 29,786 | 377 |
| Other | 3,633 | 3,703 | 70 | 10,338 | 10,556 | 218 |
| Total expenses | 32,363 | 32,525 | 162 | 88,753 | 89,348 | 595 |
| Income before income taxes | 12,103 | 11,780 | (323) | 33,665 | 32,739 | (926) |
| Income taxes | 4,478 | 4,539 | 61 | 12,456 | 12,330 | (126) |
| Net income | $ 7,625 | $ 7,241 | $ (384) | $ 21,209 | $ 20,409 | $ (800) |
| Net income per common share: | | | | | | |
|    Basic | $ 0.61 | $ 0.58 | $ (0.03) | $ 1.69 | $ 1.63 | $ (0.06) |
|    Diluted | $ 0.59 | $ 0.56 | $ (0.03) | $ 1.65 | $ 1.59 | $ (0.06) |

| | Consolidated Statements of Cash Flows | | |
|---|---|---|---|
| | Nine Months Ended September 30, 2013 | | |
| | As Reported | Revised | Change (1) |
| Net income | $ 21,209 | $ 20,409 | $ (800) |
| Accretion of discounts on purchased receivables | (369) | (414) | (45) |
| Increase in other assets | (2,054) | (639) | 1,415 |
| Increase (decrease) in other liabilities | (872) | (399) | 473 |
| Net cash provided by operating activities | 49,323 | 50,366 | 1,043 |
| Net originations of finance receivables | (96,422) | (96,414) | 8 |
| Net cash used in investing activities | (101,027) | (101,019) | 8 |
| Payments for debt issuance cost | — | (1,051) | (1,051) |
| Net cash provided by (used in) financing activities | 56,335 | 55,284 | (1,051) |

195.    The Company also "revised" its consolidated statements of income and cash flows for the three- and six-month periods ended June 30, 2013, as follows:

| | Consolidated Statements of Income | | | | | |
|---|---|---|---|---|---|---|
| | Period Ended June 30, 2013 | | | | | |
| | Three Months Ended June 30, 2013 | | | Six Months Ended June 30, 2013 | | |
| | As Reported | Revised | Change | As Reported | Revised | Change |
| Insurance income, net | $ 2,973 | $ 2,772 | $ (201) | $ 5,906 | $ 5,736 | $ (170) |
| Total revenue | 39,383 | 39,182 | (201) | 77,952 | 77,782 | (170) |
| Personnel | 9,787 | 9,882 | 95 | 19,820 | 20,105 | 285 |
| Other | 3,341 | 3,413 | 72 | 6,707 | 6,855 | 148 |
| Total expenses | 28,818 | 28,985 | 167 | 56,390 | 56,823 | 433 |
| Income before income taxes | 10,565 | 10,197 | (368) | 21,562 | 20,959 | (603) |
| Income taxes | 3,909 | 3,793 | (116) | 7,978 | 7,791 | (187) |
| Net income | $ 6,656 | $ 6,404 | $ (252) | $ 13,584 | $ 13,168 | $ (416) |
| Net income per common share: | | | | | | |
|    Basic | $ 0.53 | $ 0.51 | $ (0.02) | $ 1.08 | $ 1.05 | $ (0.03) |
|    Diluted | $ 0.52 | $ 0.50 | $ (0.02) | $ 1.06 | $ 1.03 | $ (0.03) |

| | Consolidated Statements of Cash Flows Six Months Ended June 30, 2013 | | |
| --- | --- | --- | --- |
| | As Reported | Revised | Change (1) |
| Net income | $ 13,584 | $ 13,168 | $ (416) |
| Accretion of discounts on purchased receivables | (787) | (330) | 457 |
| Increase in other assets | (2,342) | (1,247) | 1,095 |
| Decrease in other liabilities | (1,166) | (817) | 349 |
| Net cash provided by operating activities | 29,119 | 30,604 | 1,485 |
| Net repayment (originations) of finance receivables | (36,359) | (36,806) | (447) |
| Net cash used in investing activities | (40,330) | (40,777) | (447) |
| Payments for debt issuance cost | — | (1,038) | (1,038) |
| Net cash provided by (used in) financing activities | 10,844 | 9,806 | (1,038) |

196.    Likewise, the Company "revised" its consolidated statements of income and cash flows for the three-month period ended March 31, 2013, as follows:

| | Consolidated Statements of Income Three Months Ended March 31, 2013 | | |
| --- | --- | --- | --- |
| | As Reported | Revised | Change |
| Insurance income, net | $ 2,933 | $ 2,964 | $ 31 |
| Total revenue | 38,569 | 38,600 | 31 |
| Personnel | 10,033 | 10,223 | 190 |
| Other | 3,366 | 3,442 | 76 |
| Total expenses | 27,572 | 27,838 | 266 |
| Income before income taxes | 10,997 | 10,762 | (235 |
| Income taxes | 4,069 | 3,998 | (71 |
| Net income | $ 6,928 | $ 6,764 | $ (164 |
| Net income per common share: | | | |
| Basic | $ 0.55 | $ 0.54 | $ (0.01 |
| Diluted | $ 0.54 | $ 0.53 | $ (0.01 |

| | Consolidated Statements of Cash Flows Three Months Ended March 31, 2013 | | |
| --- | --- | --- | --- |
| | As Reported | Revised | Change (1) |
| Net income | $ 6,928 | $ 6,764 | $ (164 |
| Accretion of discounts on purchased receivables | — | (7) | (7 |
| Decrease in other assets | 2,773 | 2,730 | (43 |
| Increase (decrease) in other liabilities | (1,709) | (1,487) | 222 |
| Net cash provided by operating activities | 16,761 | 16,769 | 8 |
| Net repayment of finance receivables | 71 | 81 | 10 |
| Net cash provided by (used in) investing activities | (872) | (862) | 10 |
| Payments for debt issuance costs | — | (18) | (18 |
| Net cash used in financing activities | (18,330) | (18,348) | (18 |

197.    Additionally, the Company "revised" its consolidated statements of income for the fiscal years ended December 31, 2012 and 2011, as follows:

| | Consolidated Statements of Income Years Ended December 31, | | | | | | |
| | 2012 | | | 2011 | | | |
| | As Reported | Revised | Change | As Reported | Revised | Change | |
|---|---|---|---|---|---|---|---|
| Interest and fee income | $ 119,235 | $119,025 | $ (210) | $ 91,303 | $ 91,513 | $ 210 | |
| Insurance income, net | 10,820 | 10,681 | (139) | 9,247 | 9,155 | (92) | |
| Total revenue | 136,046 | 135,697 | (349) | 105,219 | 105,337 | 118 | |
| Personnel | 33,453 | 33,492 | 39 | 25,549 | 25,679 | 130 | |
| Other | 10,413 | 10,644 | 231 | 6,502 | 6,573 | 71 | |
| Total expenses | 96,114 | 96,384 | 270 | 71,806 | 72,007 | 201 | |
| Income before income taxes | 39,932 | 39,313 | (619) | 33,413 | 33,330 | (83) | |
| Income taxes | 14,565 | 14,561 | (4) | 12,169 | 12,290 | 121 | |
| Net income | $ 25,367 | $ 24,752 | $ (615) | $ 21,244 | $ 21,040 | $ (204) | |
| Net income per common share: | | | | | | | |
| Basic | $ 2.17 | $ 2.12 | $ (0.05) | $ 2.28 | $ 2.25 | $ (0.03) | |
| Diluted | $ 2.12 | $ 2.07 | $ (0.05) | $ 2.21 | $ 2.19 | $ (0.03) | |

198.    The Company also "revised" its consolidated balance sheet as of December 31, 2012, as follows:

| | Consolidated Balance Sheet December 31, 2012 | | |
| | As Reported | Revised | Change |
|---|---|---|---|
| Less unearned finance charges, insurance premiums, and commissions | $ (92,024) | $ (92,376) | $ (352) |
| Finance receivables | 439,826 | 439,474 | (352) |
| Net finance receivables | 416,210 | 415,858 | (352) |
| Other assets | 7,483 | 7,361 | (122) |
| Total assets | 434,991 | 434,517 | (474) |
| Accounts payable and accrued expenses | 6,096 | 6,987 | 891 |
| Total liabilities | 304,422 | 305,313 | 891 |
| Retained earnings | 49,162 | 47,797 | (1,365) |
| Total stockholders' equity | 130,569 | 129,204 | (1,365) |
| Total liabilities and stockholders' equity | $ 434,991 | $ 434,517 | $ (474) |

199.    Similarly, the Company "revised" its consolidated statements of stockholders' equity for fiscal years 2012, 2011, and 2010, as follows:

| | Consolidated Statements of Stockholders' Equity | | |
| | As Reported | Revised | Change |
|---|---|---|---|
| December 31, 2010 Retained earnings | $ 2,551 | $ 2,005 | $ (546) |
| Net income | 21,244 | 21,040 | (204) |
| December 31, 2011 Retained earnings | 23,795 | 23,045 | (750) |
| Net income | 25,367 | 24,752 | (615) |
| December 31, 2012 Retained earnings | 49,162 | 47,797 | (1,365) |

200.     And, the Company "revised" its consolidated statements of cash flows for fiscal years 2012 and 2011, as follows:

| | Consolidated Statements of Cash Flows Years Ended December 31, | | | | | |
| | 2012 | | | 2011 | | |
| | As Reported | Revised | Change | As Reported | Revised | Change |
|---|---|---|---|---|---|---|
| Net income | $  25,367 | $  24,752 | $  (615) | $  21,244 | $  21,040 | $  (204) |
| (Increase) decrease in other assets | (1,417) | (1,295) | 122 | — | — | — |
| Increase (decrease) in other liabilities | (1,351) | (1,048) | 303 | (521) | (169) | 352 |
| Net cash provided by operating activities | 57,912 | 57,722 | (190) | 41,345 | 41,493 | 148 |
| Net origination of finance receivables | (127,842) | (127,652) | 190 | (73,512) | (73,660) | (148) |
| Net cash used in investing activities | (159,201) | (159,011) | 190 | (79,074) | (79,222) | (148) |

201.     As noted above, the Offering Documents associated with the 9/13 SPO incorporated by reference: the 2012 Form 10-K; the Forms 10-Q for the fiscal quarters ended March 31, 2013 and June 30, 2013; and the Current Reports from February 26, 2013 through September 16, 2013.  These materials, however, incorporated inaccurate financial information resulting from the errors relating to franchise taxes, interest income, insurance premiums, compensated absences, and income taxes.  Moreover, at the time of the 9/13 SPO, the Company had not disclosed these errors or the required adjustments resulting from them.   Accordingly, the Offering Documents associated with the 9/13 SPO incorporated by reference or otherwise presented false and materially misleading financial data.

202.     Further, although the Company had disclosed the franchise tax issue no later than December 2, 2013 and had described the issue in the Offering Documents associated with the 12/13 SPO, it failed to apprise common stock purchasers in the 12/13 SPO of the other then-existing errors or the required adjustments resulting from them.  Indeed, it was not until March 11, 2014 that the Company disclosed additional "errors relating to interest income, insurance premiums, compensated absences . . . and income taxes," as well as the related adjustments required for periods ending, and as of, December 31, 2012.  Likewise, it was not until March 17, 2014, when the 2013 Form 10-K was issued, that the Company reported additional required adjustments, relating to these matters, for

other periods.  Therefore, the Offering Documents associated with the 12/13 SPO also incorporated by reference or otherwise presented false and materially misleading financial data.

### Regional Management's Disclosure and Internal Controls Were Deficient

203.    As the Company noted in the 2013 Form 10-K: "The Sarbanes-Oxley Act requires that we maintain effective disclosure controls and procedures and internal controls over financial reporting."

204.    However, because the Company qualified as an "emerging growth company" under the Jumpstart Our Business Startups Act, it was exempt from Sarbanes-Oxley's auditor attestation requirements.  Accordingly, as the Company disclosed in the 2013 Form 10-K: "McGladrey LLP, our independent registered public accounting firm, has not audited or issued an attestation report with respect to the effectiveness of our internal control over financial reporting as of December 31, 2013."  For this reason, the accuracy of the Company's representations regarding the effectiveness of its controls was incredibly important.

205.    During the Class Period, Regional Management's disclosure and internal controls were deficient and, therefore, ineffective.  Yet, the Company consistently misrepresented that its controls were effective.

206.    In late 2013, in connection with the implementation of internal controls over financial reporting as required by Sarbanes-Oxley, the Company reported that it had incorrectly accounted for state franchise taxes, as described above.  According to the 2013 Form 10-K, the Company did not properly expense non-income based franchise taxes in certain states when incurred.

207.    In early 2014, after completing the close of its year-end accounting, the Company reported additional errors related to interest income, insurance premiums, compensated absences, and income taxes, as described above.  According to the 2013 Form 10-K, the Company's "accrual

calculation for compensated absences was inconsistent with the compensated absences policy and that the Company was not appropriately deferring and recognizing certain insurance premiums over the period of risk of loss."

208.    These errors collectively required various corrections to the Company's financial statements, as set forth above.  Yet, the Company attempted to downplay the significance of these issues.  Indeed, instead of acknowledging the existence of material weaknesses in the Company's disclosure and internal controls, it reported in the 2013 Form 10-K that the issues were "significant deficiencies," as defined under standards established by the American Institute of Certified Public Accountants.[5]

209.    Further, as alleged herein, the Company was coping with increasing delinquencies during the Class Period associated, in large part, with the check campaign.  Moreover, complications resulting from the delinquencies were amplified by worsening staffing deficiencies during the Class Period.  Nevertheless, the Company concealed the staffing problems, falsely assured the public that the live check campaign was not the cause of increased delinquencies, and failed to appropriately disclose the existence of material control weaknesses until after the end of the Class Period.

210.    On November 10, 2014, the Company formally reported its financial results for the third quarter ended September 30, 2014 on Form 10-Q.  In the Form 10-Q, the Company disclosed that then-Interim CEO Michael Dunn ("Dunn") and CFO Thomas had "evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2014" and "concluded that, because a material weakness in the Company's internal control over financial reporting existed at September

---

[5]    The American Institute of Certified Public Accountants defines a "significant deficiency" as "a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance."  It defines a "material weakness," by contrast, as "a deficiency, or combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis."

30, 2014, the Company's disclosure controls and procedures were not effective as of September 30, 2014."  As the Company admitted:

> [W]e did not design and maintain effective controls over the credit risk associated with the origination of direct mail loans, resulting in a reasonable possibility that a material misstatement of our allowance for credit losses would not be prevented or detected on a timely basis. Controls were not effectively designed to apply sufficient scrutiny to the credit quality criteria used to identify direct mail recipients and to audit the resulting recipient list.

211.    Yet, the Company did not only disclose that it had identified a material weakness in these controls for the third quarter ended September 30, 2014.  Rather, the Company admitted that CEO Fortin and CFO Thomas had misrepresented the effectiveness of the internal controls for the second quarter ended June 30, 2014.  As the Company disclosed in the Form 10-Q:

> [O]n August 7, 2014, at the time we filed our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2014, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of June 30, 2014. However, our Interim CEO and our CFO have now concluded that our disclosure controls and procedures were not effective as of June 30, 2014 because of the material weakness in our internal control over financial reporting described above.

212.    As a result of the material weakness in the second quarter of 2014, the Company revealed that it would amend the Form 10-Q for that period accordingly.  Specifically, the Form 10-Q disclosed: "We will be amending our Quarterly Report on Form 10-Q for the second quarter of 2014 to reflect the conclusion that our disclosure controls and procedures were not effective as of June 30, 2014."  On November 20, 2014, the Company issued an amended Form 10-Q to disclose this material weakness for the second quarter.

213.    The multiple errors described above reflected – and exposed – material weaknesses in the Company's disclosure and internal controls.  The Company's failure to appropriately or timely disclose and/or remediate these weaknesses rendered false and misleading the representations, made

by the Company and the Officer Defendants in the Offering Documents and other materials, as to the adequacy and effectiveness of these controls.

**The Officer Defendants Signed False Sarbanes-Oxley Certifications**

214.     In quarterly and annual SEC filings during the Class Period, the Officer Defendants – CEO Fortin and CFO Thomas – each signed Sarbanes-Oxley certifications verifying the adequacy of Regional Management's disclosure controls and internal controls over financial reporting, and confirming the internal reporting of any "fraud, whether or not material . . . ."  Given that no outside auditor attested to the effectiveness of the Company's internal control over financial reporting, the Officer Defendants' certifications represented the sole attestation to the effectiveness of the controls and, therefore, assumed even more significance to investors.

215.     The certifications issued during the Class Period were included in the Forms 10-Q filed May 13, 2013 (for the first quarter ended March 31, 2013), August 9, 2013 (for the second quarter ended June 30, 2013), November 8, 2013 (for the third quarter ended September 30, 2013), May 8, 2014 (for the first quarter ended March 31, 2014), and August 7, 2014 (for the second quarter ended June 30, 2014).

216.     Additionally, certifications were included in the 2013 Form 10-K, filed March 17, 2014 and covering the fiscal 2013 fourth quarter and year ended December 31, 2013.  Further, the Offering Documents incorporated by reference the foregoing documents and, therefore, the certifications included therein.

217.     Specifically, in each of these Forms 10-Q and the Form 10-K, the Officer Defendants certified as follows:

I, [defendants Fortin and Thomas], certify that:

1.     I have reviewed this [quarterly report on Form 10-Q or annual report on Form 10-K] of Regional Management Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

218.    Additionally, the Officer Defendants represented that the applicable quarterly report on Form 10-Q or annual report on Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that the "information contained [therein] . . . fairly presents, in all material respects, the financial condition and results of operations of the Company on the dates and for the periods presented therein."

219.    These Sarbanes-Oxley certifications were false and misleading because the materials that included the certifications did not accurately reflect the Company's financial or operational conditions and other matters, and instead concealed material weaknesses in the Company's internal and disclosure controls for the covered periods.  Thus, the following attestation in the certifications was false and/or misleading when made: "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Moreover, the certifications were also false and misleading because they did not accurately portray the purported effectiveness of the Company's disclosure and internal controls.

### THE SECURITIES ACT ALLEGATIONS[6]

220.    The Offering Documents contained substantially similar, if not identical, descriptions of the Company's business and operations, largely because the Offerings occurred only three months

---

[6]    As alleged elsewhere herein, the Offering Documents incorporated by reference various materials that contained false and materially misleading statements and otherwise failed to disclose material information required to be stated therein.  These misstatements and omissions are detailed herein in other sections and incorporated by reference in this section.  However, any allegations of fraud in those sections are expressly disclaimed, and not incorporated by reference, in this section.

apart.  As relevant here, the Offering Documents contained representations regarding, among other things: (i) the Company's purportedly sound, conservative, strong and consistent underwriting practices, including with respect to the live check program; (ii) the claimed success and underwriting of the live check program, specifically; (iii) staffing and success of the Company's integrated branch model; and (iv) delinquency, credit loss provision and net charge-off levels.

221.    For the reasons set forth herein, statements in the Offering Documents concerning these matters were false and materially misleading when made, because they either affirmatively misrepresented or omitted to disclose true facts regarding such matters, as detailed below.  For these reasons, the Offering Documents were, at a minimum, negligently prepared.

222.    Additionally, the Offering Documents contained or otherwise incorporated inaccurate and materially misleading financial information, because the Company had committed accounting errors – related to state franchise taxes, interest income, insurance premiums, compensated absences, and income taxes – that required adjustments.

223.    These errors and adjustments were not disclosed until after the 9/13 SPO and were only partially disclosed prior to the 12/13 SPO.  For this reason also, the Offering Documents were, at a minimum, negligently prepared.

224.    Finally, the Offering Documents failed to disclose the purported seasonality in the Company's business, notwithstanding the timing of the Offerings in September and December 2013.

## A.    Sound, Conservative, Strong and Consistent Underwriting Practices

225.    Describing Regional Management's branch-level underwriting practices, the Offering Documents represented that branch managers apply "sound, Company-wide underwriting standards" and that the Company's "tailored branch-level underwriting approach" allows it to properly manage and mitigate credit risk, as follows:

Our branch managers combine our sound, Company-wide underwriting standards and flexibility within our guidelines to consider each customer's unique circumstances.  This tailored branch-level underwriting approach allows us to both reject certain marginal loans that would otherwise be approved solely based on a credit report or automated loan approval system, as well as to selectively extend loans to customers with prior credit challenges who might otherwise be denied credit.

226.    In describing Regional Management's "strategy" under the heading "***Continue to Focus on Sound Underwriting and Credit Control***," the Company invoked its "over 26 years of lending experience" to support the proposition that it intended to "continue to leverage . . . sound underwriting and credit management" – both of which the Offering Documents described as "core competencies."  Specifically, the Offering Documents stated, in pertinent part, as follows:

We intend to continue to leverage our core competencies in sound underwriting and credit management developed through over 26 years of lending experience as we seek to profitably grow our share of the consumer finance market. Our philosophy is to emphasize sound underwriting standards focused on a customer's ability to affordably make loan payments . . . .

227.    Under the heading "***Consistent Portfolio Performance***," the Company again cited its "over 26 years of experience in the consumer finance industry" to reinforce the notion that it has "established conservative and sound underwriting and lending practices" – and would use those practices "to carefully manage [its] credit exposure" as it continues to grow.  Specifically, the Offering Documents stated, in pertinent part, as follows:

Through over 26 years of experience in the consumer finance industry, we have established conservative and sound underwriting and lending practices to carefully manage our credit exposure as we grow our business, develop new products, and enter new markets.

228.    In the same paragraph of the Offering Documents, the Company also described the key components of its underwriting standards in an effort to reinforce the notion that it engages in sound underwriting practices, indicating that it "generally do[es] not make loans to customers with less than one year with their current employer and at their current residence," and that its "sound

- 70 -

underwriting standards focus on our customers' ability to affordably make loan payments out of their

discretionary income . . . ."  Specifically, the Offering Documents state, in pertinent part, as follows:

> We generally do not make loans to customers with less than one year with their
> current employer and at their current residence, although we also consider numerous
> other factors in evaluating a potential customer's creditworthiness, such as
> unencumbered income and a credit report detailing the applicant's credit history.
> Our sound underwriting standards focus on our customers' ability to affordably make
> loan payments out of their discretionary income with the value of pledged collateral
> serving as a credit enhancement rather than the primary underwriting criterion.

229.    The Company further represented that its management team had "strengthened our

underwriting procedures and improved the data monitoring that we apply across our business,

including for our direct mail campaigns and our branch location analysis."

230.    Furthermore, the Company represented in the Offering Documents that it "plan[ned]

to continue to develop strategies to further improve our sound underwriting standards and loan

collection rates as we expand."  In this respect, the Company again emphasized that it established,

maintained and applied "sound underwriting practices" – in all respects, and for every type of loan.

231.    The above-referenced statements regarding the Company's purportedly conservative

and sound underwriting and lending practices and standards were false and materially misleading

when made.  Indeed, according to the accounts of the FEs, branch-level employees frequently did

not apply sound underwriting standards when approving loans.  In fact, FE1 claimed never to have

received any training in underwriting, while FE2 indicated that the training received "was not very

formal," consisting of a manual that remained on premises – an account that FE3 corroborated.

232.    Moreover, during the Class Period, the Company failed to apply sound or reasonable

underwriting standards in determining live check recipients, which resulted in a significant rise in

loan delinquencies.  In fact, at the end of the Class Period (and as detailed herein), management was

forced to admit that the Company had a material weakness in its internal controls for at least the

second and third quarters of 2014 (*i.e.*, as of June 30 and September 30, 2014, respectively). These weaknesses related to the live check campaign and, more specifically, the manner in which check recipients were selected. As Regional Management reported in its November 20, 2014 amended Form 10-Q (covering the second quarter) and its November 10, 2014 Form 10-Q (covering the third quarter): "Controls were not effectively designed to apply sufficient scrutiny to the credit quality criteria used to identify direct mail recipients and to audit the resulting recipient list."

233.    Furthermore, the accounts of the FEs corroborate that fact that the Company failed to consistently apply sound or even reasonable underwriting standards. Although underwriting for the live check campaign was performed at the home office, the branches serviced the live check loans. According to FE3, FE5, FE6, FE7, FE8, and FE9, the underwriting on those loans was so poor that recipients regularly cashed the checks and disappeared. Thus, live check loans were the primary source of increasing delinquencies during the Class Period – contrary to the Company's positive representations concerning the purported "success" of the live check campaign (detailed herein), and the Officer Defendants' Class Period denials that the program gave rise to the delinquencies.

**B.    "Success" and Underwriting Associated with the Live Check Program**

234.    In the Offering Documents, the Company attributed its growth to the success of the live check segment of its direct mail campaign, noting: "For the six months ended June 30, 2013, loans initiated through live checks represented 36.6% of the value of our originated loans. We expect that live checks will represent a greater percentage of our small installment loans in the future."

235.    Indeed, in the Offering Documents for the 9/13 SPO, the Company represented that the check campaign was predominately responsible for the recent growth in its finance receivables, stating, in pertinent part, as follows:

As we approach the end of the third quarter of 2013, we continue to experience increased demand for our credit products as a result of our diversified product

offering and branch expansion strategy. As of August 31, 2013, our total finance receivables were approximately $507.3 million compared with total finance receivables as of June 30, 2013 of $460.4 million, an increase of approximately 10.2%. The growth in our finance receivables during this two-month period was driven in large part by successful direct mail marketing campaigns for the back-to-school season. During the last week of June through the first week of August, we mailed more than one million convenience checks to pre-screened individuals who were able to enter into a loan by depositing these checks.

236.     Likewise, in the Offering Documents for the 12/13 SPO, the Company represented that it "continues to experience strong growth in its receivables stemming from its diversified product offering, branch expansion strategy and convenience check campaigns."

237.     These statements, which tied the Company's growth to claimed "successful" check campaigns, were intended to convey, and did convey, that the Company was properly monitoring and managing the credit risks associated with the issuance of live checks as part of the direct mail marketing efforts.  These statements were false and materially misleading when made, however, in the absence of disclosure that the Company had an ongoing practice of failing to properly underwrite such checks.  And, at a minimum, once the Company broached the issue of the growth of its finance receivables and the supposed success of its check campaign, it was obligated to disclose the cause of such growth and ostensible success.

238.     The Company also extolled the virtues of its live check underwriting practices in the Offering Documents.  For example, under the heading "*Convenience Check Program*," the Offering Documents represented: "We continue to refine our screening criteria and tracking for direct mail campaigns, which we believe has enabled us to improve response rates and credit performance and allowed us to more than triple the annual number of convenience checks that we mailed since 2007." Likewise, under the heading "Multiple Channel Platform," the Offering Documents indicated that the Company had "further developed and refined our direct mail campaigns, including pre-screened convenience check mailings and mailings of invitations to apply for a loan, which enable us to

market our products to hundreds of thousands of customers on a cost-effective basis." Further, as noted above, the Company indicated that its management team had "strengthened our underwriting procedures and improved the data monitoring that we apply across our business, including for our direct mail campaigns and our branch location analysis."

239.    By representing that it had "further developed and refined" the check program, and "continue[d] to refine [its] screening criteria" for direct mail (and, hence, live checks), and that the management team had "strengthened underwriting procedures," the Company conveyed that it had improved live check underwriting beyond the basic standards it had established. Because live check underwriting was deficient as explained herein, however, these statements were false and materially misleading when made insofar as they represented – implicitly, if not explicitly – that the Company applied sound and conservative underwriting practices in connection with the live check program.

## C.    Staffing and Success of the Company's Integrated Branch Model

240.    In the Offering Documents, the Company also emphasized the success of its business model – *i.e.*, the integrated branch model. In so doing, however, the Company linked its purported success with branch-level employee staffing, "alignment of employee incentives," consistent annual net charge-offs since 2008, and "consistent portfolio performance," going so far as to claim that its "performance demonstrates the resiliency of our business model throughout economic cycles."

241.    Specifically, in the Offering Documents, Regional Management made the following statements regarding these matters:

> We believe our frequent-contact, relationship-driven lending model, combined with regular monitoring and alignment of employee incentives, improves our overall credit performance. Despite the challenges posed by the sharp economic downturn beginning in 2008, our annual net charge-offs since January 1, 2008 have remained consistent, ranging from 6.3% to 8.6% of our average finance receivables. In 2012, our net charge-offs as a percentage of average finance receivables were 6.5%. Our credit loss provision as a percentage of total revenue for 2012 was 20.4%. We

believe that our consistent portfolio performance demonstrates the resiliency of our business model throughout economic cycles.

242.    The Company also stated in the Offering Documents that it "maintain[ed] consistent credit performance through our integrated branch model."  As the Company further represented: "We operate an integrated branch model in which nearly all loans, regardless of origination channel, are serviced through our branch network, providing us with frequent in-person contact with our customers, which we believe improves our credit performance and customer loyalty."

243.    These statements concerning the success of the Company's integrated branch model were false and misleading when made, because, in actuality, the Company increased revenues and maintained net charge-off levels by engaging in conduct that violated its underwriting standards.

244.    Indeed, as otherwise set forth herein, the Company's net charge-offs, credit loss provision and portfolio performance were manipulated by virtue of, among other things: (i) the increase in the size of the small loan portfolio based on unsound underwriting practices, including with respect to the check program; and (ii) the failure to accurately or adequately disclose the nature, amount and cause of the delinquencies the Company was suffering during the Class Period.

245.    Furthermore, because the integrated branch model was dependent on an adequate level of employee staffing, the staffing deficiencies described herein – which were already occurring, and increasing, when the Offering Documents were issued – also rendered these statements false and misleading.  Indeed, as the Officer Defendants admitted several months before the end of the Class Period, the Company's branch offices were critically understaffed during the last five months of 2013 and were not able to effectively oversee the Company's loan portfolio and collections, leading to higher percentages of delinquencies and charge-offs.

246.    These issues undermined the accuracy of the Company's statements regarding the success of its integrated branch model.

- 75 -

**D.       Credit Quality, Credit Loss Provision and Net Charge-Off Levels**

247.      As alleged, the Offering Documents represented that the Company's loan portfolio had performed consistently as supported, in part, by two key metrics: the credit loss provision and net charge-offs.  Specifically, the Offering Documents provided, in part, as follows:

> Despite the challenges posed by the sharp economic downturn beginning in 2008, our annual net charge-offs since January 1, 2008 have remained consistent, ranging from 6.3% to 8.6% of our average finance receivables. In 2012, our net charge-offs as a percentage of average finance receivables were 6.5%. Our credit loss provision as a percentage of total revenue for 2012 was 20.4%. We believe that our consistent portfolio performance demonstrates the resiliency of our business model throughout economic cycles.

248.      Additionally, the Company disclosed: "During fiscal 2012, our provision for credit losses was $27.8 million, and we had net charge-offs of $23.4 million related to losses on our loans. As of June 30, 2013, our finance receivables were $460.4 million."

249.      Further, in the "recent developments" section of the Offering Documents associated with the 9/13 SPO, the Company disclosed that "strong growth" driven by the live check program would require a higher provision for credit losses, but that "credit quality remains consistent with recent history . . . ."  Specifically, the Company represented, in pertinent part, as follows:

> [T]he strong growth in finance receivables driven by the recent convenience check campaigns will drive a higher than anticipated provision for credit losses and increased interest expense in the current quarter while most of the associated interest and fee income will be received and recognized in future quarters. The increased interest expense is due primarily to increased borrowings to fund the growth in finance receivables. Notwithstanding the higher provision for credit losses, our credit quality remains consistent with recent history; annualized net charge-offs as a percent of average finance receivables for the two-month period declined to 6.4% as compared to 6.7% for the second quarter of 2013.

250.      Statements regarding the credit loss provision and net charge-offs were materially misleading in the absence of disclosure that Regional Management was experiencing an upsurge in delinquencies not because of strong growth in the small loan portfolio, but because its underwriting

practices were deficient and, as a result, the credit quality of its live check loans was poor.  Likewise, statements regarding the Company's "consistent portfolio performance" and "credit quality" were false and materially misleading in the absence of disclosure of deficient staffing and underwriting practices and actual credit quality.

### E.    Accounting Errors and Financial Statements and Information

251.    In various materials incorporated by reference in the Offering Documents, Regional Management represented that its financial statements were prepared in accordance with GAAP. Additionally, the Company was required and expected to present the financial information presented and/or referenced in the Offering Documents fairly, accurately and completely.

252.    As noted above, the Company did not publicly disclose the state franchise tax errors until December 2, 2013, almost three months after the 9/13 SPO; and it disclosed additional errors – relating to interest income, insurance premiums, compensated absences, and income taxes – on March 11, 2014, more than three months after the 12/13 SPO.

253.    Moreover, although Regional Management disclosed certain adjustments related to franchise taxes on December 2, 2013, before the 12/13 SPO, it did not disclose the full range of required accounting adjustments until the issuance of the 2013 Form 10-K, on March 17, 2014 – nearly six months after the 9/13 SPO and three months after the 12/13 SPO.

254.    By virtue of the foregoing, the Offering Documents contained materially misleading information, and, at a minimum, were negligently prepared.

### F.    Seasonality in the Company's Business

255.    In the August 9, 2013 Form 10-Q for the second quarter ended June 30, 2013, the Company disclosed, under the heading "**Seasonality**," that its "loan volume and corresponding finance receivables follow seasonal trends."   Specifically, as the Company disclosed, loan demand

was typically higher in the fourth quarter of the year and lower in the first quarter of the following year, as follows:

> Demand for our loans is typically highest during the fourth quarter, largely due to customers borrowing money for holiday spending. Loan demand has generally been the lowest during the first quarter, largely due to the timing of income tax refunds. During the remainder of the year, our loan volume typically grows from customer loan activity. In addition, we typically generate higher loan volumes in the second half of the year from our direct mail campaigns, which are timed to coincide with seasonal consumer demand. Consequently, we experience significant seasonal fluctuations in our operating results and cash needs.

256.    Notwithstanding the significance of these seasonal trends, the Offering Documents associated with the 9/13 SPO did not disclose such seasonality.  Without such disclosure, purchasers of the Company's common stock would not know that the Company's business could naturally experience a decline in the first quarter of 2014.  Instead, investors were provided with information regarding the Company's growth and prospects, which conveyed a misleadingly positive impression of the Company's business.

257.    Additionally, the Company also included a disclosure regarding seasonal trends in the November 8, 2013 Form 10-Q for the third quarter ended September 30, 2013.  Under the heading "**Seasonality**," the Company made the following disclosure, which added that demand typically increases in the fourth quarter of the year "largely" due to "back-to-school" needs as well as holiday spending, as follows:

> Our loan volume and corresponding finance receivables follow seasonal trends. Demand for our loans is typically highest during the third and fourth quarter, largely due to customers borrowing money for back-to-school and holiday spending. Loan demand has generally been the lowest during the first quarter, largely due to the timing of income tax refunds. During the remainder of the year, we typically experience loan growth from general operations. In addition, we typically generate higher loan volumes in the second half of the year from our direct mail campaigns, which are timed to coincide with seasonal consumer demand. Consequently, we experience significant seasonal fluctuations in our operating results and cash needs.

- 78 -

258.     Notwithstanding the significance of these seasonal trends, the Offering Documents associated with the 12/13 SPO did not disclose such seasonality and, for the reasons stated above, were materially misleading in the absence of such disclosure.

## THE EXCHANGE ACT ALLEGATIONS[7]

### A.     The May 2, 2013 Press Release and Earnings Conference Call

259.     The Class Period begins on May 2, 2013.  On that evening, Regional Management issued a press release announcing its financial results for the first quarter ended March 30, 2013. The Company reported revenues of $38.6 million (a 22.3% increase from the prior-year period), net income of $6.9 million (a 35.3% increase from GAAP net income in the prior-year period and a 2.4% increase from pro forma net income), diluted earnings per share of $0.54, finance receivables of $430.4 million (an increase of 35.6% from the prior-year period), and same-store revenue growth for the first quarter of 2013 of 14.4%.  The Company also reported that its "[p]rovision for credit losses in the first quarter of 2013 was $8.1 million versus $5.6 million in the prior-year period, primarily due to the increase in loan volume," and that "[a]nnualized net charge-offs as a percentage of average finance receivables for the first quarter of 2013 was 6.5%, an increase from 6.4% in the prior-year period."

260.     Commenting on these results, CEO Fortin stated "We were pleased with our first quarter performance, as we continue to see double-digit top line and same-store sales growth," adding "We conducted our first-ever first quarter live check campaign and were encouraged by the overall response we achieved."  Fortin also confirmed that the Company closely monitored its net charge-offs and efficiency ratio, stating: "We continue to keep an eye on our net charge-offs as a

---

[7]     The quarterly earnings press releases discussed herein were each filed by the Company with the SEC as an attachment to a Current Report on Form 8-K on the day of their issuance.

percentage of average finance receivables and our efficiency ratio to ensure they do not get ahead of our overall growth strategy."

261.    Fortin's statement tying the Company's growth to the first quarter check campaign, as well as his statement that the Company was "encouraged by the overall response" to the campaign, were misleading in the absence of disclosure that the Company had abandoned sound underwriting practices when issuing live checks.  In fact, as the accounts given by the FEs corroborate, Regional Management employed virtually no underwriting criteria to determine check recipients.  By failing to disclose this fact, the Company misled investors into believing not only that quarterly growth had occurred by cultivating customers who could repay the loans, but also that borrowers who cashed the live checks were creditworthy.  Had the Company revealed these facts, investors would have known that the live check campaign was a perennial source of delinquencies for Regional Management, as it continued to increase its exposure to small installment loans via the live check campaign.

262.    Additionally, Fortin's statement that the Company "continue[d] to keep an eye on our net charge-offs as a percentage of average finance receivables and our efficiency ratio to ensure they do not get ahead of our overall growth strategy," was false or misleading in the absence of disclosure that: (i) the live check campaign was likely to dramatically contribute to delinquencies that would offset the benefit of the Company's growth; and (ii) the Company was beginning to experience, if it was not already experiencing, staffing deficiencies that would prevent it from properly and timely servicing loans and collecting payments from small installment loan borrowers, whether associated with the live check campaign or otherwise.

263.    Following the Company's issuance of the May 2, 2013 press release, the Company held a conference call with analysts and investors to discuss its 2013 first quarter earnings.  Fortin

and Thomas participated in the call, in the call, which other members of the executive management team joined.

264.     In his introductory remarks, Fortin reviewed the Company's quarterly earnings results and commented favorably on the live check campaign, representing: "Regional conducted its first ever January and February live check direct mailings.  And, overall, we were quite pleased with the response we achieved . . . ."  Additionally, he stated: "While we experienced very little impact from IRS delays in tax returns, we feel that the incremental volume from our off-cycle direct mail live check programs were a net positive for us in the first quarter."

265.     In turn, Thomas, in his opening remarks, reiterated that "[t]he provision for credit losses in the first quarter of 2013 was $8.1 million versus $5.6 million in the prior year period, primarily due to growth in the portfolio," and that "[n]et charge-offs as a percentage of average finance receivables for the first quarter of 2013 was 6.5% on an annualized basis, a slight increase from 6.4% in the prior year period."  He also noted that at the end of the first quarter – *i.e.*, March 31, 2013 – approximately 49% of back-to-school live check loans, 80% of holiday live check loans, and 94% of January-issued live check loans remained in the portfolio.  As he noted, at that time, small installment loans represented 42% of the loan portfolio.

266.     Following Thomas's comments, Fortin ended introductory remarks on a highly positive note, singling out the live check campaign, as follows: "Our overall growth strategy for 2013, in terms of building de novo stores and targeting live check campaigns is clearly on track, and I am quite optimistic about Regional's potential."  Later, in response to an analyst's question, Fortin stated that the Company was "very encouraged by the focused Q1 live check campaigns" and "what we have achieved."  In turn, Thomas again confirmed that the check program was driving growth.

267.    In their remarks regarding the growth of the small loan portfolio and the success of the live check campaign, as well as the provision for credit losses and net charge-offs, the Officer Defendants failed to reveal the ongoing deficiencies in the underwriting process associated with issuing such checks.  Yet, according to the FEs, these deficiencies allowed the small loan portfolio to grow as quickly as it did.  Indeed, without focusing on conventional metrics to assess the credit quality of prospective borrowers for the check program, the Company could – and *did* – grow its finance receivables faster than it otherwise could have.  Accordingly, these statements were false and misleading when made.

268.    As the conference call progressed, Thomas positively described the credit quality of the loan portfolio, representing that the "slow file" – which he called "our leading indicator" – "has been improving for the last several months, which is always good."  As Thomas commented: "[If] [i]t's going the other way, you start getting concerned.  And so it is actually quite good at the end of March and probably one of the best readings we have seen in a long, long time, if not the very best.  So we feel good about that."  In fact, Thomas pointed out that late fees were "down," which he equated with "a higher quality credit portfolio"; and he stated, in response to an analyst question, that he could think of "[n]othing significant" that would indicate delinquency trends would worsen and require an increase in credit loss provisioning.

269.    Although these statements were intended to instill confidence in the credit quality of the loan portfolio, the Officer Defendants continued to fail to disclose the underwriting issues associated with the live checks.  As alleged herein, those issues were causing a dramatic increase in delinquencies, which would require a corresponding increase in the credit loss provision – and a concomitant need for charge-offs.

270.    For his part, Fortin continued to play up the supposedly targeted nature of the check program, while assuring that the Company had sufficient staffing in place to handle an increase in loan origination and servicing volume.  Specifically, Fortin represented that the Company was adept at targeting locations in which the Company planned to open new branches, stating: "we have taken a concerted focus on, certainly in the last vintage . . . really pre-marketing our stores prior to the opening with our live check programs."  As Fortin related: "we have gotten to the point with our marketing analytics where we are very precise in terms of how we really target households within our market catch basin."  But Fortin's statements regarding this "targeted approach" concealed the true nature of the check campaign: issuing checks to prospective borrowers, virtually without regard to their creditworthiness.

271.    Likewise, Fortin's statements regarding staffing were false and misleading when made.  Specifically, Fortin remarked: "the way we look at growth, is . . . people.  It's having the quality of people in the field to manage branches and keep control on the portfolio.  So we are confident with the 41 stores that we have announced that we have the right people in place to absorb that growth."  But these statements concealed the Company's staffing deficiencies and that this lack of staffing would prevent the Company from effectively managing the growth of the loan portfolio or servicing loans.

272.    In response to the May 2, 2013 first quarter earnings announcement and the positive representations made during the conference call, the price of the Company's stock increased $1.48 per share – or 6.75% – to close at $23.41 per share on May 3, 2013.

**B.    The May 13, 2013 JMP Securities Conference and Form 10-Q**

273.    On May 13, 2013, Fortin gave a presentation on behalf of Regional Management at the JMP Securities Research Conference, which Thomas also attended.  During the conference,

Fortin once again positively portrayed the Company's growth and the credit quality of its portfolio, stating: "[I]t was a year of considerable growth on virtually every metric in a positive way whether you look at it from asset growth, ensuing revenues, bottom-line profits, we were certainly able to perform and I think importantly control the quality of the portfolio."  In fact, Fortin compared the first quarter net charge-off figure with the Company's historical range to provide comfort as to the credit quality of the portfolio, as follows:

> [A]t the end of fiscal 2012, we had net charge-offs as a percentage of average receivables, the true industry metric for portfolio quality, of 6.5% compared to 6.3% from the prior fiscal year, fiscal 2011. Over the 26-year history of the Company, 1987 through the present, we have had that net charge-off to average receivables ratio ranging between 6.3% on the low-end and 8.9% on the high-end.

274.    Fortin further remarked that first quarter net charge-offs, which were at the lower end of the range of the Company's historical net charge-offs, were representative of the Company's ability to "grow in a controlled manner," stating as follows: "[W]ith that tight banding or bracketing if you will of net charge-off ratios over that 26-year history, we are certainly very proud of our performance. And that was really seen and carried through as well to Q1 which we announced last week or a week and a half ago on our earnings call . . . ."

275.    In further support of the premise that the Company was able to grow in a controlled manner, Fortin commented that the live check program "is how we continue to grow even our 25- and 26-year-old stores" and "is a very effective growth mechanism for us from both a response rate and a unit economic basis."  He later reiterated this message, stating: "Direct mail live check mailing programs continue to be a very productive source of growth for us, very highly scalable as well not only for prospective or new customers but to cross sell and upsell existing customers with our other products."

276.     Separately, Fortin represented – based on "flash metrics" that presumably consisted of interim financial data – that the Company was then experiencing positive trends in its business that built on first quarter portfolio performance, and that these trends continued to reflect favorable credit quality.  As Fortin commented:

> But again, all of the key metrics and trend lines that we look at whether it is growth in accounts, storefronts, average receivables under management, resulting revenues and obviously bottom-line, virtually every metric we performed extremely well and I would say as well, we continue to be very, very impressed with the quality of this portfolio. Certainly through the end of April, our flash metrics as we call them looking at the fundamentals of the portfolio are representative of this very strong trend in Q1.

277.     Further, Fortin indicated that the Company's prior financial results were the product of its "sound" underwriting practices, stating: "We are very sound in terms of our underwriting methodology and I think that is certainly expressed in terms of the downstream collection metrics that we have consistently posted and of course, that leads to attractive financials."

278.     Fortin's positive statements regarding the Company's loan quality and underwriting practices were false and materially misleading when made, based on the substandard underwriting and lending practices that were then occurring with respect to the live check campaign.  Fortin's statements regarding the effectiveness of the check program, and the Company's alleged controlled growth, were also false and materially misleading when made for the same reason.  Additionally, Fortin's attempt to provide comfort to the market by citing the Company's "26-year history" of net charge-offs, as well as the purportedly positive trend the Company was experiencing *after* the first quarter, conveyed the materially misleading impression that the Company had no undisclosed problems that could adversely affect current and future financial results.

279.     Also on May 13, 2013, the Company filed its Form 10-Q, which formally presented its financial results for the first quarter ended March 31, 2013.  In addition to reiterating the quarterly results reported May 2, 2013, the Company made statements regarding its business and operations.

280.     Specifically, under the heading "*Asset Quality*," the Company represented that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio."  As set forth herein, however, the Company did not employ sound underwriting practices, was suffering from staffing deficiencies, and had poor credit quality in small installment loans due to problems with live check loans.  Accordingly, the Company's statement regarding these matters was false and materially misleading when made.

281.     Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct business."  In truth, however, the Company's provision for credit losses was significantly influenced by the deterioration in the credit quality of the small loan portfolio, which, in large part, was a product of the underwriting practices used to issue live check loans.  Because the live check underwriting practices were worse than any others (as detailed herein), the provision for credit losses was more likely to require an increase based on the credit quality of live check borrowers – and that credit "quality" was a product of poor underwriting practices that were not designed to identify creditworthy borrowers.  Consequently, the "primary underlying factor driving the provision for credit losses" associated with small installment loans was not "general economic conditions," but the Company's questionable underwriting practices for live check loans.

282.     Furthermore, in representing that small installment loans had "increased by $72.5 million, or 65.9%, to $182.5 million at March 31, 2013, from $110.0 million at March 31, 2012," the Company attributed this growth to live checks, stating: "live check campaigns drove significant loan growth in existing and new branches."  Likewise, in comparing the provision for credit losses for the first quarter of 2013 and 2012, the Company represented: "The increase in the provision was made in recognition of growth in the loan portfolio."  These statements concerning the growth of the small loan portfolio and increase in the provision for credit losses were false and materially misleading when made, in view of the shoddy underwriting practices that enabled the Company to increase the size of the portfolio and required a corresponding increase in the provision for credit losses.

## C.     The July 31, 2013 Press Release and Earnings Conference Call

283.     On July 31, 2013, Regional Management issued a press release announcing its financial results for the second quarter and six-month period ended June 30, 2013.  The Company reported revenues of $39.4 million (a 23% increase from the prior-year period), net income of $6.7 million (a 0.5% increase from the prior-year period), diluted earnings per share of $0.52, finance receivables of $460.4 million (an increase of 33.3% from the prior-year period), and same-store revenue growth for the second quarter of 2013 of 17.2%.  The Company also reported that its "[p]rovision for credit losses in the second quarter of 2013 was $8.4 million versus $5.9 million in the prior-year period, primarily due to the increase in loan volume," and that "[a]nnualized net charge-offs as a percentage of average finance receivables for the second quarter of 2013 was 6.7%, an increase from 6.1% in the prior-year period."  Commenting on these results, Fortin stated that the Company's "strong top-line and same-store sales growth" was "a testament to the efforts of our entire Regional team . . . ."

284.    Following the issuance of the July 31, 2013 press release, the Company held a conference call with analysts and investors to discuss its 2013 second quarter earnings.  Fortin and Thomas participated in the call, which other members of the executive management team joined.

285.    In his opening remarks, Fortin continued to represent that Regional Management was experiencing positive trends – again, based on then as-yet undisclosed, interim financial information. Specifically, he stated:

> [A]s we sit here today as July comes to a close in the next couple of hours, we are ending this month July on a very positive note.  We finished our first month of the third quarter on a strong footing. In fact, our ledger for July has grown by more than $15 million over the previous month. And we still have a couple of hours of daylight left for business today. And I would point out that similarly our yield for July continues in upward, consistent and positive trajectory from our May and June results, indicating that our portfolio yield is trending in the right direction.

286.    In turn, Thomas noted that small loans made up 45% of the portfolio as of June 30, 2013, while Fortin indicated that live check loans from late 2012 and early 2013 still comprised a "sizable balance" of the portfolio, stating:

> Throughout the second quarter, we maintained a sizable balance of loans in our portfolio from our direct mail campaigns occurring in late 2012 and early 2013, which included the testing of higher credit score consumers with lower interest rates and larger loan amounts.

287.    Thomas then indicated that "[t]he provision for credit losses in the second quarter of 2013 was $8.4 million versus $5.9 million in the prior year period, primarily due to growth in the portfolio."  At the same time, he noted that a quarterly uptick in net charge-offs (as compared to the prior year period) was attributable to an increase in the auto and retail portfolios, as follows:

> Net charge-offs as a percentage of average finance receivables for the second quarter of 2013 was 6.7% on an annualized basis and increased from 6.1% in the prior year period. The company standard for our net charge-off rate is 7.5%. In our most recent history, we've been between 6% and 7%. The charge-off rate in the second quarter of 2013 increased primarily due to increases in our auto and retail portfolios.

288.    Nevertheless, Thomas explained that the Company completed a "large" live check campaign in June 2013, confirmed by the extraordinary increase in advertising costs for the second quarter: "$1.3 million, an increase of 213.3% from $632,000 in the prior year period."  As he stated: "The June campaign was a large campaign and while it mailed in June and we recorded its costs in that month, the downstream check-cashing didn't occur until early July."  To reinforce the notion that the Company intended to aggressively pursue live check customers, Thomas noted that "[t]he increase in our direct mail campaign is consistent with our 2013 plan."  Indeed, as Fortin himself put it: "by design and with the thought in mind of rebuilding . . . yield, we put proportionately more effort and capital into the direct mail campaigns."

289.    Additionally, in response to an analyst question, Fortin claimed that the Company had confirmed through "statistical sampling and modeling" that borrowers responded favorably to live check loans even at higher annual percentage rates ("APR"), which, in turn, supported an upward trend in yields for the small installment loan portfolio:

> We are seeing an upward trend and we principally attributed . . . to pricing power that we have in our direct mail campaigns. As you know, a good portion of those holiday 2012 direct mail pieces were sent out at lower APRs in certain instances as low as 29% APR to the end consumer and higher denominations. What we have seen and we've really demonstrated this through statistical sampling and modeling of our mail programs is that we see very little degradation in response to those checks from consumers at higher APRs. The factor that's most relevant and most important to the consumer is not so much the APR or the yield as it is the size of the monthly payment.

290.    In responding to a similar question, Fortin elaborated on his answer and claimed that internal information supported the conclusion that borrowers were receptive to live check loans with higher APRs, as follows:

> [W]hat we have seen, and we've been testing this through various recent direct mail campaigns, is there appears to be no degradation of any meaningful amount in response rates to our direct mail campaigns as we increase the APRs and I am looking at some statistics here, internal reports. We've actually been improving –

maintaining and improving our FICO scores in these direct mail campaigns throughout fiscal 2013.

291.    In fact, Fortin even claimed that more aggressively pursuing customers with check loans at higher APRs was *improving* the credit quality of the small loan portfolio, stating that "from a strategic perspective, if we can improve yields, if people are taking the offers and we're actually improving our credit quality of the respondents to those offers it makes a lot of sense to us to shift more of the capital allocation to the small installment loan category . . . ."

292.    Additionally, Fortin represented that the live check direct mail campaign was going so well that the Company planned to pursue "off-cycle mailings throughout the first and second quarter."  As he explained: "These would be continual mailings each month in varying amounts and pool sizes so that each month we're in the market.  And I think you'll see the – in the second half of the year, a continuation of that pattern."  Based on these plans, Fortin indicated that the Company expected "a considerable increase in the mail volume" by the end of 2013, adding they were "encouraged to continue increasing mail volumes in the latter half of the year due to strong results, shall we say, in the first half of the year with respect to response rates."  As he further stated with respect to the live check campaign, "we're seeing very good trends, very good uptake," noting separately that "we're seeing very strong demand and I think a lot of that mirrors our historical seasonal patterns."

293.    Finally, when asked about trends in credit quality and the condition of the slow file, Fortin answered: "what we're seeing generally from our customer base is across product lines, really across geographies, resilience, strong performance, our slow file remains well below our historical averages, the delinquencies and charge-offs that we reported, while a slight uptick to the prior year period, again, remain well below our 26-year historical standards."  As a result, he indicated that the Company "made no changes to our underwriting parameters."

294.     Despite Fortin's acknowledgement of the "slight uptick" in delinquencies and charge-offs, however, Thomas downplayed those issues – and distanced them from the small installment, and hence live check, loans – stating: "we had a little bit of tick up in charge-offs in Texas, and a little bit more in auto and retail, but it doesn't take a lot of dollars to drive that percent up a couple of ticks.  So, I don't look at it as a major change."

295.     Fortin's statements regarding the growth of, and customer response to, the live check campaign were false and misleading when made, in the absence of disclosure of the underwriting issues and the increasingly questionable credit quality of check recipients.  Indeed, by suggesting – implicitly, if not explicitly – that growth in the portfolio was fueled by a campaign to recruit more creditworthy and lower risk borrowers, his statements inaccurately and misleadingly portrayed: (i) the reason for the increase in loan volume; (ii) the nature of the borrowers solicited; (iii) the nature of the borrowers who cashed the checks, and thereby presumably "responded" to the campaign; and (iv) the risks associated with the campaign, which were coming to fruition (if they had not already).

296.     Moreover, by claiming to reference internal information regarding progress *after* the second quarter when discussing the live check program and credit quality, Fortin instilled a higher level of comfort for management's claimed convictions about those issues – and misled analysts and the investing public in doing so.  In truth, the degradation in underwriting standards in the general loan portfolio, coupled with the poor underwriting practices applied to live check recipients, posed a significant risk to the Company in that these practices were likely to cause an imminent uptick in delinquencies and charge-offs.  And, worsening staffing deficiencies were impacting the ability of the Company's branches to service loans – particularly live check loans, which frequently were issued to borrowers whose contact and other identifying information was incomplete or incorrect, thereby complicating (if not entirely impeding) collection efforts.

297.     In response to the positive representations made in the July 31, 2013 second quarter earnings announcement, the price of the Company's stock increased $2.65 per share – or 9.38% – to close at $30.91 per share that day.  Additionally, in response to the positive representations made during the conference call in the early evening of July 31, 2013, the price of the Company's stock increased $0.94 per share – or 3.04% – to close at $31.85 per share on August 1, 2013.

**D.     The August 9, 2013 Form 10-Q**

298.     On August 9, 2013, the Company filed its Form 10-Q, which formally presented its financial results for the second quarter ended June 30, 2013.  In addition to reiterating the quarterly results reported July 31, 2013, the Company made statements regarding its business and operations.

299.     Again, under the heading "***Asset Quality***," the Company stated that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio."  Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct business."  Finally, in representing that small installment loans had "increased by $86.0 million, or 71.2%, to $206.7 million at June 30, 2013, from $120.7 million at June 30, 2012," the Company attributed this growth to live checks, stating: "our direct mail campaigns drove significant loan growth in existing and new branches."  The Company also indicated that the $2.5 million quarterly increase in the provision for credit losses "was made in recognition of growth in the loan portfolio."

300.     As alleged with respect to the May 13, 2013 Form 10-Q, statements concerning asset quality, underwriting standards, provision for credit losses, and growth in small loans were false and materially misleading in the absence of disclosure regarding poor live check underwriting practices

and the questionable creditworthiness of live check customers.  Indeed, all of these matters were significantly influenced by the live check customers resulting from the Company's failure to apply sound underwriting criteria and practices.

### E.    The October 1, 2013 JMP Securities Conference

301.    On October 1, 2013, Fortin and Thomas gave a presentation on behalf of Regional Management at the JMP Securities Research Conference.  During the conference, Fortin stated that the live check campaign "is a big source of our growth" and noted the Company "typically send[s] out in excess of three million . . . checks per year" – an increase, he noted, from 60,000 checks per year when he joined the Company 6.5 years before.  Additionally, he indicated that the Company has historically received a response rate of between 1.5% and 5% to the live check campaign, and noted that the unit economics of landing check borrowers "are extraordinarily attractive."  Nevertheless, he claimed that the live check program is "a highly scalable, surgically precise way of presenting our offers to the most appropriate consumer," adding: "we've built up a considerable marketing analytics capability within our organization."

302.    In turn, Thomas indicated that "[i]n the first two months of the quarter, we had an increase in our loans of 10.2% primarily around increases in loans from our direct mail campaigns. The yield on that product is helping our overall yield move up."  He also linked the anticipated need for higher credit loss provisioning with respect to such loans to "higher growth," while pointing out that "annualized net charge-offs for the two-month period end[ing] August 31 was 6.4%, down a little bit from what we reported in the second quarter at 6.7% and near our historical lows . . . ."

303.    Fortin's statement that the check program was a "surgically precise way of presenting our offers to the most appropriate consumer" was false and materially misleading when made, because, in truth, the Company did not apply sound underwriting practices to determine live check

recipients.  Rather, the Company purchased customer lists and sent checks to prospective borrowers without engaging in reasonable efforts to ensure that such recipients were acceptable credit risks or could be reached for collections purposes.  In this way, the Company's implementation of the check program was not "surgical" at all, but rather scattershot in its approach.

304.    Likewise, Thomas's statements – which were intended to convey that higher credit loss provisioning was intended to address *growth* from live checks, not manifest *problems* with the poor credit quality of live check borrowers – were false and materially misleading in the absence of disclosure of the actual underwriting standards applied to the issuance of live checks.  Thomas's reference to historical net charge-offs was also materially misleading insofar as it was intended to convey the impression that the charge-off level reflected favorable credit quality, notwithstanding the concealed problems regarding live check underwriting and delinquencies.

### F.    The October 30, 2013 Press Release and Earnings Conference Call

305.    On October 30, 2013, after the close of trading, Regional Management issued a press release announcing its financial results for the third quarter ended October 30, 2013.  The Company reported revenues of $44.5 million (a 25.3% increase from the prior-year period), GAAP net income of $7.6 million (a 9.1% increase from net income of $7 million in the prior-year period), diluted earnings per share of $0.59, finance receivables as of September 30, 2013 of $512.1 million (an increase of 29% from the prior-year period), and same-store revenue growth of 16.1%, and same-store finance receivables growth of 16.5%.  The Company also reported that its "[p]rovision for credit losses in the third quarter of 2013 was $11.1 million versus $7.4 million in the prior-year period, primarily due to the increase in loan volume," and "[a]nnualized net charge-offs as a percentage of average finance receivables for the third quarter of 2013 was 6.5%, comparable with the prior-year period."

306.     Commenting on these results, Fortin attributed continued quarterly growth to the live check campaign, stating: "Bolstered by the considerable success of our back-to-school direct mail campaigns, we grew our loan portfolio by 11.2% on a sequential basis."  Additionally, he attempted to downplay the "higher than initially anticipated" provision for credit losses, indicating that it resulted from "strong growth in our finance receivables . . . ."  Again, these statements were false and materially misleading when made in the absence of disclosure of, at a minimum, the deficient underwriting practices associated with the live check campaign, which induced loan growth and required higher credit loss provisioning.  These statements were also false and materially misleading in the absence of disclosure of the increasing staffing deficiencies facing the Company's branches.

307.     Additionally, in the press release, the Company announced that intended to replace the ParaData software system with the GOLDPoint loan management system, and had entered into a contract with DHI Computing Service, Inc. (d/b/a GOLDPoint Systems) ("GOLDPoint") to provide "loan management software and related data processing services."  The Company indicated that "[t]he full transition to the new platform is expected to take approximately one year."

308.     Following the issuance of the October 30, 2013 press release, the Company held a conference call with analysts and investors to discuss its 2013 third quarter earnings.  Fortin and Thomas participated in the call, which other members of the executive management team joined.

309.     In his opening remarks, Fortin reiterated aspects of the earnings release, adding that the quarter was "defined" by, among other things, "consistently sound portfolio quality."  In fact, he made credit quality a theme of the call.  Stating that "direct mail campaigns continue to help drive our revenue performance and grow our business," Fortin claimed that the "higher than anticipated" third quarter provision for credit losses was "principally due to our strong growth in receivables,

which necessitated the higher provision.  However, he assured that "despite the higher provision, our credit quality remains consistent with recent history, as you can see in our net charge-off rates."

310.    Thomas also assured that the Company was undergoing *high quality* growth due to the increase in small installment loans resulting from the live check program.  As he noted: "The majority of our growth during the third quarter was in the small category, which increased from 45% of the mix to 50% of our portfolio. Our direct mail campaigns were a significant driver of the increase."  Stating that the provision for credit losses increased "primarily due to the significant growth in the portfolio," he nevertheless claimed: "Credit quality remains good as annualized net charge-offs were 6.5% of average finance receivables for the third quarter of 2013, which is comparable with the prior-year period. The 6.5% rate is toward the lower end of our most recent historical range of 6.3% to 8.6%."

311.    Further, Thomas attributed an increase in delinquencies to auto loans and "normal" seasonal trends, but claimed that "credit quality remains good . . . ."  Specifically, he stated:

> [I]t was auto delinquencies that increased more than the other categories in Q3. Just backing up in dealing this topic from a macro perspective, our delinquency trend is lowest just after income tax refunds are received. And it does rise some throughout the rest of the year until the next year's tax refunds are processed. So an increase in our delinquency rate at this time of year is fairly normal, and we believe our credit quality remains good as we move into Q4.

312.    In addition, in response to an analyst question regarding credit quality based on the uptick in delinquencies, Thomas claimed that the slow file was encouraging and that delinquencies were confined to the auto loan category.  Specifically, David Chiaverini of BMO Capital Markets asked whether the "blip up on the delinquencies" was "solely due to the loan mix, *i.e.*, smaller loans, which require more provisioning" or "something else . . . ."  In response, Thomas stated: "we're encouraged by the fact that the total slow file is actually down a little, even though the timing inside of our delinquencies is a little different. So we still think we've got a very good credit quality

- 96 -

portfolio." To drive home the point that delinquencies arose from auto loans, Thomas added: "there's a little bit higher delinquency that popped up around auto, more so than any other product categories. But if there's any movement, it's there, as opposed to the other categories."

313. Notwithstanding these explanations, analysts were befuddled. As Daniel Furtado of Jefferies observed during the call: "the delinquency statistics in the press release . . . are misleading in the standpoint that it looks [like] delinquencies are getting substantially worse, considering growth in the portfolio. But when you look at the entire contractual delinquencies of the entire slow file, it paints a much different picture." To placate these concerns, Thomas indicated that the allowance for credit losses as a percentage of related finance receivables was in the mid-5% range "for probably a few quarters now," stating: "that's not too bad a place to be." At that time, the Company reported that the allowance for credit losses as a percentage of total finance receivables was 5.6% as of September 30, 2013.

314. The Officer Defendants' conference call statements concerning the loan portfolio's credit quality, cause of growth, underwriting practices, need for increased credit loss provisioning, and delinquencies were false and materially misleading when made because, as in previous quarters, the small installment portion of the portfolio – the greatest contributor to loan volume – grew not by disciplined underwriting, but shoddy practices not reasonably calculated to identify creditworthy borrowers. Moreover, the branch employee staffing deficiencies were continuing to place pressure on the Company's ability to effectively service its loans, thereby increasing the number and severity of loan delinquencies.

315. In response to the positive representations made in the October 30, 2013 third quarter earnings press release and conference call, the price of the Company's stock remained artificially

inflated.  In addition, as the market digested the information, the price of the stock increased.  On November 1, 2013, the stock price increased 1.25% to close at $32.41 per share.

**G.     The November 8, 2013 Form 10-Q**

316.     On November 8, 2013, the Company filed its Form 10-Q, which formally presented its financial results for the third quarter ended September 30, 2013.  In addition to reiterating the quarterly results reported October 30, 2013, the Company made statements regarding its business and operations.

317.     Again, under the heading "*Asset Quality*," the Company stated that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio."  Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct business."  Finally, in representing that small installment loans had "increased by $98.1 million, or 62.0%, to $256.4 million at September 30, 2013, from $158.3 million at September 30, 2012," the Company attributed this growth to the live check program, stating: "[o]ur direct mail campaigns drove significant loan growth in existing and new branches."  The Company also indicated that the $3.7 million quarterly increase in the provision for credit losses "occurred because of growth in the loan portfolio, an increase in the accounts 180 or more days past due, and the impact of a 2012 reduction in the estimated automobile allowance for credit losses."

318.     As alleged with respect to the August 9, 2013 Form 10-Q, statements concerning asset quality, underwriting standards, provision for credit losses, and growth in small loans were false and materially misleading when made in the absence of disclosure regarding poor live check

underwriting practices, the questionable creditworthiness of live check customers, and the staffing deficiencies.

### H.      The December 2, 2013 Press Release

319.    On December 2, 2014, the Company issued a press release announcing the launch of the 12/13 SPO.  In the press release, the Company acknowledged that it had "provided an update on its implementation of internal controls over financial reporting as required by the Sarbanes–Oxley Act of 2002, stating that it expects to be fully compliant by the end of this year."  Nevertheless, the Company also reported that it had "discovered that non-income based franchise taxes in certain states were not properly expensed when incurred."  As the Company disclosed:

> [T]he Company discovered that non-income based franchise taxes in certain states were not properly expensed when incurred. Although $561,000 of the taxes have been paid and no taxes are past due, the Company will record in its financial results for the fourth quarter of 2013 an operating expense of approximately $607,000 relating to these franchise taxes, which will reduce fourth quarter diluted earnings per share by approximately $0.03. Approximately $310,000 of the operating expense relates to 2011 and 2012, with the remainder pertaining to 2013.

320.    Moreover, despite the fact that the issue qualified, at a minimum, as a "significant deficiency" from an accounting perspective, the Company represented that "[m]anagement does not believe the amounts related to any quarter or any year are material; therefore, no restatement of the Company's prior financial statements is necessary."

321.    Further, the Company continued to conceal the truth about the deficient live check underwriting practices and other issues that were then adversely affecting the Company.  In the same press release, the Company provided an unusual interim "update" on the growth of the loan portfolio during the fourth quarter, stating:

> The Company continues to experience strong growth in its receivables stemming from its diversified product offering, branch expansion strategy and convenience check campaigns. As of November 30, 2013, total finance receivables were

approximately $528.9 million compared to total finance receivables as of September 30, 2013 of $512.1 million, an increase of approximately 3.3%.

322.     The failure to disclose the true cause of the growth in the portfolio rendered false and materially misleading the statements concerning the update on portfolio growth.  Moreover, the Company failed to reveal the full scope of the accounting irregularities, which were later revealed to involve many more issues than merely state franchise tax.

323.     In response to the positive statements in the December 2, 2013 press release, the Company's stock remained artificially inflated.  However, the disclosure of the tax issue exposed a material weakness in internal controls, and that weakness, in turn, could portend even greater issues in other facets of the Company's business.  Accordingly, the stock price was negatively impacted, and, on December 3, 2013, it decreased by $2.15 per share – or 6.6% – to close at $30.45 per share.

## I.     The March 11, 2014 Press Release and Earnings Conference Call

324.     On March 11, 2014, after the close of trading, Regional Management issued a press release announcing its fourth quarter and fiscal 2013 financial results for the period ended December 31, 2013.  The Company reported fourth quarter 2013 revenues of $48.5 million (a 31.6% increase from the prior-year period), same-store revenue growth of 17.0%, same-store finance receivables growth of 11.5%,  finance receivables as of December 31, 2013 of $544.7 million (an increase of 23.9% from the prior-year period), GAAP net income of $8.4 million (a 29.6% increase from net income of $6.5 million in the prior-year period), and diluted earnings per share of $0.65.  The Company also reported that its "[p]rovision for credit losses for the fourth quarter of 2013 was 24.0% of revenue, comparable with the prior-year period"; "[a]nnualized net charge-offs as a percentage of average finance receivables was 7.8%, an increase from 7.1% in the prior-year period"; and "for the full year 2013, net charge-offs as a percentage of average finance receivables were 6.9%; an increase from 6.5% in the prior year."

325.     Commenting on these results, Fortin again claimed that quarterly growth in finance receivables stemmed from the live check campaign, which, in turn, caused an uptick of charge-offs. Specifically, he represented that growth "was bolstered by ongoing success from our direct mail campaigns" and that, "[d]ue in part to the successful campaigns and our small installment loan category comprising a larger share of our overall portfolio, we did see a tick-up in the fourth quarter of our annualized net charge-offs as a percentage of average finance receivables . . . ."  Again, however, he failed to disclose the underwriting issues that were then adversely affecting the credit quality of the small loan portfolio, which represented the majority of the Company's loan portfolio. In addition, as Thomas revealed in the call *following* the issuance of the press release, the increase in delinquencies during the fourth quarter resulted, at least in part, from staffing deficiencies.

326.     Moreover, in the March 11, 2014 press release, the Company disclosed additional accounting irregularities, as well as required adjustments to its fourth quarter and full year 2014 financial results.  Specifically, the Company disclosed that it had "revised" financial statements for the 2012 periods to not only address the franchise tax issue, but to also correct accounting "errors relating to interest income, insurance premiums, compensated absences . . . and income taxes." These revisions, as presented in the press release, affected the Consolidated Statements of Income for the three and 12 months ended December 31, 2012 and the Consolidated Balance Sheet as of December 31, 2012.

327.     Following the issuance of the March 11, 2014 press release, the Company held a conference call with analysts and investors to discuss its 2013 fourth quarter and full-year earnings. Fortin and Thomas participated in the call, which other members of the executive management team joined.  After representing the GOLDPoint implementation was "on track according to our plan," Fortin noted "direct mail campaigns continue to be a major factor in driving revenue and business

growth with our holiday campaigns particularly successful in the quarter."  Commenting on response to the campaign, he said: "Overall, for 2013, we mailed out more than 3 million convenience checks and we were very pleased with the overall response rate from our various campaigns. The direct mail campaigns will continue to be a key element of our growth strategy in 2014 and beyond."

328.    Nevertheless, in his opening remarks, Fortin conceded that the increase in small loan portfolio growth, spurred by the continuing live check campaign, had proved challenging during the quarter.  Indeed, as of December 31, 2013, small installment loans comprised 53% of the portfolio. In contrast to blaming auto loans for the increase in annualized net charge-offs as a percentage of finance receivables, Fortin now admitted that the quarterly charge-off increase was, in fact, due to small loans – evidently as a result of the supposed "successful" live check campaigns.  Specifically, he stated:

> If there was one challenge in the quarter, it was with our fourth-quarter annualized net charge-offs as a percentage of average receivable, which was 7.8%, an increase from 7.1% in the prior-year period. The increase was due in large part to the product mix shifting more towards small installment loans, which are typically the product with the highest charge-offs.

329.    In turn, Thomas acknowledged that the "majority of [our] growth during the fourth quarter was in the small loan category[,]" which made small loans the largest single component of total loans during the quarter, at 53% of the total portfolio (up from 50%).  And, Thomas explained that this growth "was primarily driven by our direct mail campaigns."  At the same time, however, he admitted that "[t]he provision for credit losses in the fourth quarter of 2013 was 32% higher than the prior year" – which, as in previous quarters, he attributed "primarily to growth in the portfolio." He also acknowledged that annualized net charge-off rate of 7.8% "is slightly above the middle of our five-year historical range of 6.3% to 8.6% with some small loan charge-offs increasing more than other loan categories."

330.     Critically, however, Thomas revealed for the first time that staffing deficiencies were responsible, in large part, for the increase in delinquencies during the quarter.  Specifically, he stated that "accounts per employee" – a metric not previously discussed in detail during the Class Period – increased to unacceptable levels.  Nevertheless, he continued to falsely deny that underwriting issues played no part in the increased delinquencies, stating, in pertinent part, as follows:

> Geographically, we had the largest increase in net charge-offs in the state of Texas, although all states except Alabama had increases. Our growth outpaced our hiring during Q4 2013 and we saw our accounts per employee move up, which was the primary reason for the increase in delinquencies. We have not found any delinquency issues that stem from our underwriting and are working hard to reduce our accounts per employee and expect delinquencies to come down as that happens.

331.     Later, during the question-and-answer session, Thomas provided color on the staffing deficiencies, explaining that the lack of sufficient staffing posed problems for servicing the loans, as follows:

> The vast majority of what we have seen from the delinquency analysis we have done is that we stretched ourselves a little thin. Our accounts per employee got a little too high. We have not found anything that tells us we have an issue with our underwriting loans. What we found is that we are having difficulty servicing them in the branch and so we have been about hiring employees and trying to reduce that account per employee statistic.

332.     Additionally, in response to a question as to whether the Company was augmenting its infrastructure to facilitate collections, Fortin stated that the Company has "historically followed a formulaic approach for staffing branches based on the number of accounts" and closely studied the issue to remedy the staffing deficiencies, as the following remarks reflect:

> We have historically followed a formulaic approach for staffing branches based on the number of accounts and as we attempt to gain more labor productivity, we have been pushing our branches in our various geographies higher on accounts per employee. That is not limitless. It doesn't go to infinity and beyond and I think what we have seen is there is a natural flattening to gains in labor productivity. It actually varies quite a bit by state just depending upon product mix. So the concrete actions that we are taking is we have gone through each and every branch, done a very granular analysis as to the adequacy of staffing, particular market conditions that are

- 103 -

going on and as Don [Thomas] had indicated in the prepared remarks, we have been and we continue to add to our labor force. And we expect to incur higher personnel costs associated with that additional hiring, but we have shown a very concrete correlation between collection performance and what we call APE, accounts per employee. So it stands to reason that with additional staffing, we will begin to get our arms around those collection issues.

333.     Fortin later expounded on efforts to address the staffing matter, revealing that the Company had "done a very deep dive into that topic branch by branch, market by market" and made adjustments.  He also represented that the Company would start feeling the "positive effects" of the staffing adjustments during the first and second quarter of 2014.  Specifically, Fortin stated:

[W]e have done a very deep dive into that topic branch by branch, market by market. We have already made adjustments and continue to make adjustments. That doesn't happen overnight in terms of onboarding new employees. I would anticipate that those effects, those positive effects on collections will be absorbed through certainly the first quarter into the second quarter. But it is – you don't turn the process that quickly.

334.     Also during the question-and-answer session, David Scharf of JMP Securities asked for detail on "some of the factors driving maybe the fourth-quarter loss rates, besides the product mix," and specifically asked for "[a]ny sense that the credit performance of the convenience check segment is running a little differently than maybe it historically has."  In response, Thomas stated that "convenience checks actually run slightly better than the rest of our small loans. We are screening those opportunities to a higher level because we don't see the customer and their data in front of us. And the end result is that they just perform better."  In fact, Thomas once again diverted the focus to auto loans, as reflected in the following statement: "What we have seen though is we have seen a certain amount of additional auto loan charge-offs in connection with our canned loans that have increased our overall charge-off in the quarter."

335.     Additionally, the Officer Defendants attempted to deflect attention away from the Company's live check program.  For example, Thomas claimed that the Company did not closely

track sources of loan origination, such that he could not answer with precision the portion of the small loan portfolio that originated from the check program. Indeed, based on $267 million in loan originations during the quarter, Thomas noted that approximately $215 million of that amount were small loans – while both he and Fortin, in turn, speculated that half of that amount came from live checks.

336.    Further, when pressed as to whether the number of loans originated by live checks would be "considerably north of 50%" in 2014, Fortin continued to distance the Company from its live check strategy, answering: "Not considerably, no. It will continue to be a strong element of our growth story, but . . . we are trying to more or less keep originations in 2014 in balance with those from 2013. Don't want to become overly reliant on direct mail." Later, Thomas confirmed that the Company sent approximately 840,000 live checks during the fourth quarter of 2013, as compared to 700,000 during the same period the prior year.

337.    When asked for guidance regarding the charge-off rate during 2014, Fortin attempted to also divert the focus away from underwriting. Specifically, he claimed that net charge-offs as a percentage of average receivables for the fourth quarter of 2013 were "just slightly above the 27 year historical average for the Company," adding: "I don't view this as cause for alarm." Then, without prompting, he *denied* that underwriting was a cause of the increase in fourth quarter charge-offs, representing: "I would say that we as a team feel very comfortable with our underwriting. We see no contributing factor to charge-offs that result from underwriting." Rather, he characterized the charge-off issue "as a back-end type process."

338.    Accordingly, although the Officer Defendants finally acknowledged the direct link between staffing deficiencies and the increase in delinquencies and charge-offs, they continued to conceal the full truth about the problems facing the Company. In fact, they specifically denied that

underwriting had any influence on delinquency and charge-off levels, notwithstanding the fact that the credit quality of small loans derived from live checks suffered from the Company's worst and most problematic underwriting practices, as detailed herein.  Thus, while the Officer Defendants' statements about the Company's loss provisioning, underwriting and delinquencies were false and misleading when made to the extent they assured, or implied, that poor underwriting of live checks was not prevalent or adversely affecting the Company, their disclosure of the staffing deficiencies represented the *partial* disclosure of the truth concerning the problems facing the Company and the increase in delinquencies, credit loss provisioning, and charge-offs.

339.    In response to the positive and negative news and other developments revealed in the March 11, 2014 press release and conference call, the price of the Company's stock continued to trade at artificially inflated levels but nevertheless declined in price as the artificial inflation partially dissipated due to the revelation of a portion of the truth.  On March 12, 2014, the price of the stock declined by $1.79 per share – or 5.83% – to close at $28.09 per share on higher-than-normal volume.

340.    Moreover, on March 13, 2014, as the market continued to digest this information , the Company's stock further declined by $2.78 per share, or 9.9%, to close at $25.31 per share on extraordinarily high trading volume.

341.    Given the significant nature of the cumulative news affecting the Company, the stock further declined in price on March 14, 2014 – this time, by $0.86 per share, or 3.4%, to close at $24.45 per share, again on elevated trading volume.

342.    Analysts *also* reacted negatively to developments revealed to the market on March 11, 2014, even expressing suspicion at the excuses management provided to explain the changing tide in the Company's business and the staffing deficiencies.  In a March 12, 2014 research report,

JMP Securities implied that the problems facing the Company might extend beyond staffing issues, given the performance of other participants in the auto and installment lending industries:

> Management insisted that the trend was related to pushing branch personnel too far in terms of accounts per employee, particularly after the huge 3Q direct mailing. They noted that underwriting, impacting gross loss rates, has not seen much deterioration, whereas collections/recoveries, impacting the reported net loss rate, has suffered (as of this writing, we do not have a breakdown between gross and net charge-offs). Given the "normalization" in loss rates that we have seen this reporting period from auto lenders (*i.e.*, Consumer Portfolio Services, CPSS, MO, $11 PT), card issuers (*i.e.*, Alliance Data Systems, ADS, MO, $280 PT), and installment lenders (*i.e.*, Springleaf Holdings, LEAF, MO, $26 PT), we are hesitant to attribute it entirely to staffing issues.

343.    Accordingly, the full truth regarding the Company's systemic problems remained concealed, and not even analysts could piece together a complete and accurate picture of the Company's true condition.

### J.    The March 17, 2014 Form 10-K

344.    On March 17, 2014, the Company filed the 2013 Form 10-K, which formally presented its financial results for the fourth quarter and full-year ended December 31, 2013.  In addition to reiterating the results reported March 11, 2014, Regional Management reported further adjustments to its financial results to address the accounting irregularities disclosed on December 2, 2013 and March 11, 2014, respectively (which adjustments are detailed elsewhere herein).  The Company also made statements regarding its business and operations.

345.    Under the heading "***Asset Quality***," the Company stated that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio." Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factor driving the provision for credit losses for each of these loan types is the same: general economic conditions in the areas in which we conduct

business."  Finally, in representing that small installment loans had "increased by $100.4 million, or 53.3%, to $289.0 million at December 31, 2013, from $188.6 million at December 31, 2012," the Company attributed this growth to the live check program, stating: "[o]ur direct mail campaigns drove significant loan growth in existing and new branches."  The Company also indicated that the $11.4 million full-year increase in the provision for credit losses "occurred because of growth in the loan portfolio and an increase in the amount of delinquent accounts."

346.    As alleged with respect to the Forms 10-Q, the statements concerning asset quality, underwriting standards, provision for credit losses, and growth in small loans continued to be false and materially misleading when made in the absence of disclosure regarding the poor live check underwriting practices, the questionable creditworthiness of live check customers, and the staffing deficiencies.

**K.    The April 29, 2014 Press Release and Conference Call**

347.    On April 29, 2014, after the close of trading, Regional Management issued a press release announcing its financial results for the first quarter ended March 31, 2014.  The Company reported revenues of $49.6 million (a 28.4% increase from the prior-year period), diluted earnings per share of $0.43 (or $0.36, when excluding $1.4 million of pre-tax benefit related to a one-time reversal of vacation pay liability), finance receivables of $501.7 million (an increase of 16% from the prior-year period), same-store revenue growth of 16.8%, and same-store finance receivable growth of 5.7%.

348.    Importantly, the Company also reported: GAAP net income of $5.6 million, a 17.1% *decrease*); that the "[p]rovision for credit losses in the first quarter of 2014 was $16.9 million versus $8.1 million in the prior-year period, primarily due to increased net charge-offs combined with elevated delinquency levels"; and that "[a]nnualized net charge-offs as a percentage of average

finance receivables for the first quarter of 2014 was 9.7%, an increase from 6.4% in the prior-year period." The Company also disclosed further detail on the staffing deficiencies that had plagued the Company for so long without mention, until the Officer Defendants cracked the surface in the March 11, 2014 conference call.

349.    Now, the Company disclosed that the staffing deficiencies had continued "through the last five months of 2013" – *i.e.*, *from at least August 2013* – "and most of the first quarter . . . ." Specifically, the Company represented as follows:

> The higher delinquency level and downstream net charge-offs are primarily the result of elevated accounts per employee through the last five months of 2013 and most of the first quarter, which caused challenges in properly servicing the growth in accounts. While Regional Management was able to reduce its accounts per employee by the end of the quarter, it expects higher net charge-off levels will continue for several months primarily due to the previously elevated accounts-per-employee level.

350.    Commenting on these disappointing results and developments, which confirmed that the Company was more deeply affected by the delinquencies and staffing issues than previously disclosed, Fortin acknowledged that "our provision for credit losses was well above our estimate for the quarter, causing our net income to fall short of our first quarter goals . . . ." As he explained: "For the first quarter 2014, our annualized net charge-offs were 9.7% of average finance receivables, necessitating a significant increase in our provision for credit losses."

351.    Moreover, while noting contractually delinquent accounts had purportedly "decreased sequentially in the quarter from 8.0% to 7.3%," Fortin cautioned that the Company "expect[s] that the increased level of net charge-offs will continue for several months." In an attempt to counter this news, he tried to assuage concerns by assuring: "we have already made, and are actively making, a number of operational changes to reduce the level of fluctuation in our delinquencies and net charge-offs going forward."

352.     Following the issuance of the April 29, 2014 press release, the Company held a conference call with analysts and investors to discuss its 2014 first quarter earnings.  Fortin and Thomas participated in the call, which other members of the executive management team joined.  In his opening remarks, Fortin immediately acknowledged that "net charge-offs and provision for credit losses were well above our expectations" and that, "[a]s a result, our net income and earnings per share for the first quarter fell far short of our goals."  He was also forced to admit that the net charge-off rate of 9.7% was the highest of any quarter during the Company's 27-year history, stating:

> [T]he major issue for us in the quarter was with our provision for credit losses as we recorded annualized net charge-offs as a percentage of average receivables of 9.7% necessitating a much higher provision than initially anticipated. The 9.7% charge-off rate is a high mark for any quarter for regional in our 27-year history, and we are very disappointed with that result.

353.     Similarly, Thomas observed that the Company's "provision for credit losses in the first quarter of 2014 was $16.9 million, 110% higher than the prior-year period due to a larger total portfolio, increased net charge-offs, and a continued level of elevated contractual delinquencies."  He also provided further detail on the staffing issues, revealing that higher delinquency levels and net charge-offs occurred in large part because branches were operating at over an average of 300 accounts-per-employee ("APE"), when 300 APE is the optimal level.  Specifically, Thomas stated:

> The delinquency level and associated net charge-offs were caused by higher-than-normal accounts per employee, or APE, over an extended period of time. We have determined an APE around 300 allows us to run the business efficiently and effectively. From August through February, our APE was well above this level of 300. Due to seasonal account decreases and our push to hire additional employees, our APE dropped to 305 at the end of March and was at 294 in mid-April.

354.     Additionally, Thomas indicated that the Company had engaged in efforts to remedy the problem during the first quarter of 2014, disclosing:

> During the first quarter of 2014, we implemented a new labor guideline that provides more headcount to the branches, and we enhanced our labor forecasting model to hire employees sooner than before. These and other steps are intended to ensure that our

branches are staffed to fully carry out our standard servicing and collection procedures.

355. In this vein, Thomas confirmed that Regional Management "continue[d] to monitor delinquency daily, resolve branch-specific APE issues, and take other actions, as necessary, to reduce delinquency as quickly as possible," adding: "With APE below the 300 level, this should mark the end of the delinquency period." At the same time, Fortin represented that "the transition to our new loan management system [GOLDPoint] . . . remains on track to be implemented in the back half of this year . . . ."

356. Separately, Fortin confirmed the link between the Company's understaffing and the dramatic increase in delinquencies and concomitant charge-offs, representing: "our analysis shows a direct correlation to having too many accounts per employee for an extended period of time." For his part, Thomas also explained the connection, stating that "when you're in a position where you have high APE, I think that it's quite normal that you don't have enough capacity to track down everything, and you wind up with a little bit more charge-off than collection in some cases." And, Thomas purported to further explain how the APE impacted the Company's business, including the timing of the staffing deficiencies, while acknowledging that the Company *knew* that seasonality in the business would have required an increase in branch-level employees:

> [T]he seasonal trend we see as we cross over the holiday period and the end of the year is typically we'll jump a little bit in December and maybe behind January and then come right down. So it's a very short spike.
>
> In 2013 we got below 300 for a good portion of the year until August, and in August with the really outstanding response to our back-to-school direct mail campaign. We fell behind and jumped in the 330 range, and we're there for an extended period of time through January and even most of February before it really started coming down.
>
> So there's a six months time period there when it was at a very high level, and that extended time period was just too much.

357.     In turn, Thomas noted that as of March 31, 2014, small installment loans had dropped to 51% of the total loan portfolio.  As he explained, demand for the live check program had dropped, which contributed to the decline in small loans.  Contrary to Fortin's representations during the July 31, 2013 conference call that live check borrowers were receptive to higher APR loans, Thomas admitted that interest rates on the check loans were higher during the first quarter of 2014 than the same period the previous year:

> [O]ur first quarter of 2014 convenience check campaigns were at normal interest rates rather than the lower rates that we sent out in the first quarter of 2013. Therefore, we originated less convenience check volume and, when combined with the normal decrease in the other small loans, our small loan category overall declined about 20 million more this year than last.

358.     Despite the purported normalization of interest rates on live checks during the first quarter, Fortin confirmed that the Company "sent out twice as much volume in the first quarter of this year as last year," yet had "less loans originated this year than last year."  Additionally, Thomas warned that "[g]iven the decrease we have experienced in our loan portfolio in the first quarter of 2014, our total loan portfolio growth for the year may be less than it was in 2013."  In fact, in response to an analyst question, Thomas confirmed the Company experienced "a $43 million drop in our ledger in the first quarter."  As such, Fortin claimed that the Company would adopt a renewed focus on *large* installment loans, stating: "I think that there's a strong need and demand for that product out there, and I think what you'll see coming from Regional in the next few quarters is really more of a focus on that product category to continue to spur on growth."

359.     Notwithstanding these developments, the Officer Defendants were, for the first time, conspicuously unable – or unwilling – to provide any insight into the credit quality of the portfolio. In response to an analyst question for a description of what it means to have an "elevated" charge-off

rate in subsequent months (as disclosed in the press release), Thomas's answer was opaque and left

much to be desired:

> [O]bviously, we don't give guidance, so we won't be able to answer completely. I
> think that what we see over the next several months is something fairly similar to
> what we've seen in the first quarter – fairly high level and beyond the next two or
> three months, it's not as clear as to what we'll have, and we're working very hard to
> get it down.

360.    These and other answers appeared to cause analysts to press for further information

regarding the nature and timing of the delinquencies and staffing issues, as the following exchange

reflects:

> **David Scharf** *– JMP Securities – Analyst*: "[L]ast question, and I'll try to phrase it
> delicately, but just to kind of give us a handle on maybe where we are in Q2, but,
> obviously, the fourth quarter call was held a good 70 days into a 90-day quarter.
> Were there any particular buckets in those last 20 days that kind of really surprised –
> I'd just kind of get our arms around sort of what surfaced in maybe the last three
> weeks of the quarter."
>
> **Thomas**: "Yes, I would say the small loan category, David, seemed to be certainly a
> big portion of the increase that occurred in March."

361.    Nevertheless, the Officer Defendants were more than forthcoming when asked

whether underwriting differed between mature and new branches: according to Thomas, the answer

was a resounding no.  As he explained: "as we look at our delinquency analysis and update it from

month to month, we're looking for any sign that underwriting has played a role and just have not

been able to find evidence of that at this point in time."

362.    Accordingly, although the pervasive underwriting issues remained concealed, the

Company continued to reveal additional information concerning the staffing and delinquency issues

that it had not revealed before.  These new facts included, among other things: the precise nature of

the staffing issue, including the timing and employee staffing level; that the provision for credit

losses was 110% higher than the prior-year period; that "elevated contractual delinquencies " would continue; and that management could not provide clarity on the nature of additional possible losses.

363.    In response to the devastating news that the Company reported a decline in earnings per share due to the issues discussed on the conference call, the Company's stock price plummeted. On April 30, 2014, the Company's stock price declined by a massive $6.76 per share – or 30.6% – to close at $15.30 per share on extremely high trading volume.  Subsequently, the stock price continued to slide for six consecutive trading days from May 1, 2014 through May 8, 2014, when it closed at $14.26 per share.  The Company's stock had not traded at these levels consistently since its IPO in 2012, when it priced at $15 per share.

364.    Analysts *again* negatively reacted to these developments.  In fact, certain analysts revised their price targets and expressed disappointment at the Company's financial performance and the opaque nature of its credit exposure.

365.    In an April 30, 2014 research report, securities analyst BMO Capital Markets ("BMO Capital") noted that Regional Management reported first quarter 2014 adjusted earnings per share ("EPS") of 36 cents, far below BMO Capital and consensus estimates of 65 cents.  BMO Capital also remarked that the net charge-off rate of 9.7% "marks the highest level in the company's 27-year history (prior high was 8.6%) despite the current credit environment being benign, in our view."  As BMO Capital noted, "the credit problems have centered more in the company's mature branches rather than newer branches, which gives us discomfort."

366.    Lowering its 2014/2015 adjusted EPS estimates from $2.90/$3.40 to $1.92/$2.75 "owing to higher expected loan loss provisioning[,]" BMO Capital explained: "with the lack of visibility surrounding credit losses over the next few quarters, we believe a more conservative rating

and valuation is warranted." Due to these issues, BMO Capital reduced its 12-month price target for Regional Management shares from $35 to $22 per share.

367.    In an April 30, 2014 research report, securities analyst Jefferies likewise indicated that Regional Management's first quarter 2014 EPS came in far below Jefferies' estimate of 67 cents. Jefferies noted that "[n]et charge-offs increased to 9.7% from 7.8% in 4Q and 6.5% in 3Q, continuing a trend of weaker credit seen recently at RM." As Jefferies explained: "The apparent weakness is being driven by loan servicing issues as management has indicated accounts per employee is north of what they think is sustainable."

368.    Indicating that "higher net charge-offs drove provision expense to ~$17M, roughly double its level a year ago[,]" Jefferies further acknowledged that the Company's "credit issues appear to be company-specific, and not a result of broader systemic weakness . . . ." As Jefferies reasoned: "Typically credit improves in the consumer finance space during the calendar first quarter as tax refunds come in, which implies a more pronounced 'organic' credit weakness at RM." Due to these issues, Jefferies reduced its 2014/2015 EPS estimates from $2.72/$3.33 to $1.83/$2.81 and its 12-month price target from $29 to $22 per share.

369.    Nevertheless, the Company continued to conceal material facts about the problems facing the Company, including persistent disclosure and internal control deficiencies brought about by underwriting deficiencies concerning the issuance of live checks. In fact, the full truth would not come out for several months, during which time the stock price remained artificially inflated.

**L.    The May 8, 2014 Form 10-Q**

370.    On May 8, 2014, the Company filed its Form 10-Q, which formally presented its financial results for the first quarter ended March 31, 2014. In addition to reiterating the quarterly results reported April 29, 2014, the Company made statements about its business and operations.

371.    Under the heading "***Asset Quality***," the Company stated that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio." This statement was false and materially misleading when made because it failed to reveal the issues concerning live check underwriting.

372.    Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factors driving the provision for credit losses for each of these loan types are the general economic conditions in the areas in which we conduct business and" – *for the first time* – "the effectiveness of our collection efforts."  While this statement was partially true because it finally disclosed that staffing issues were at least partially to blame for the increased credit loss provision, it was materially misleading in the absence of disclosure of the live check and other underwriting problems.

373.    Finally, in representing that small installment loans had "increased by $74.7 million, or 41.4%, to $255.1 million at March 31, 2014, from $180.4 million at March 31, 2013," the Company attributed this growth to the live check program, stating: "[o]ur direct mail campaigns drove significant loan growth in existing and new branches."  The Company also indicated that the $8.9 million quarterly increase in the provision for credit losses "was primarily due to elevated contractual delinquencies and an increase in net charge-offs."  Again, although this statement was partially true, it was materially misleading in the absence of disclosure of the live check and other underwriting problems, as stated above.

## M.    The July 2, 2014 Press Release

374.    On July 2, 2014, the Company issued a press release announcing that Quattlebaum was appointed Vice Chairman of the Board and would step down from his positions as President and

COO "upon the announcement of his successor" after the conclusion of a national search.  Prior to this time, there was no indication that Quattlebaum would resign from his senior management-level positions.

375.    In the press release, the Company also announced that it had expanded its Board from five directors to eight, and that Dunn had filled one of the new director positions.

**N.    The July 30, 2014 Press Release and Conference Call**

376.    On July 30, 2014, after the close of trading, Regional Management issued a press release announcing its financial results for the second quarter and six months ended June 30, 2014. The Company reported revenues of $47.4 million (a 21.1% increase from the prior-year period), diluted earnings per share of $0.34, finance receivables of $518 million (an increase of 12% from the prior-year period), and same-store revenue growth of 11.6%.

377.    Importantly, the Company once again reported declined net income of $4.4 million – a 31.1% *decrease* from the prior year period – and also disclosed that: "[p]rovision for credit losses for the second quarter of 2014 was 28.7% of revenue, an increase from 21.5% in the prior-year period"; and "[a]nnualized net charge-offs as a percentage of average finance receivables for the second quarter of 2014 were 10.5%, an increase from 6.6% in the prior-year period."  Additionally, the Company admitted that "higher net charge-offs were primarily the result of elevated accounts per employee that caused challenges in properly servicing accounts from the latter portion of 2013 through the first quarter of 2014."  Still, however, the Company failed to disclose the questionable underwriting practices that had perennially plagued the live check campaign.

378.    Commenting on these results, Fortin attempted to engage in damage control, assuring: "we made it a priority in the quarter to further reduce our accounts per employee to diminish the volatility in our delinquencies, and as a result, we successfully reduced contractually delinquent

accounts in the quarter sequentially from 7.3% to 6.6%." He also represented that the worst was over, stating: "[t]he delinquency rate is now more aligned with historical levels" and "we expect that the lower delinquency rate will result in improved net charge-off performance in the second half of 2014." Again, however, the Company failed to disclose the live check underwriting problems.

379.    Following the issuance of the July 30, 2014 press release, the Company held a conference call with analysts and investors to discuss its 2014 second quarter earnings. Fortin and Thomas participated in the call, which other members of the executive management team joined. In his opening remarks, Fortin addressed the staffing delinquency problem, claiming that the Company "considerably reduced our APE level in the first quarter and made it our top priority in the second quarter to further reduce our APE level to the range of 285 to 300, which is a range where we have historically had success in running the business." He further disclosed that the Company had "cut the APE level from well over 300 at the beginning of the year to 287 at the end of June."

380.    Now, however, Fortin more specifically explained that the understaffing issue also involved an issue with properly *training* employees, thereby implicitly – if not explicitly – covering underwriting. Assuring the public that "we believe we now have a firm handle on our APE levels," he nevertheless conceded that proper training was and is key to adequately managing delinquencies, stating: "we recognize fully that we must continue to properly train our new employees and remain ever vigilant of our delinquency levels." Yet, analysts were not so sure that the problems facing the Company only involved staffing, prompting one to ask: "Now that we have a few quarters of this phenomenon as history, I mean you're pretty confident that it was just collections activity, it's not anything in the underwriting, correct?" Thomas responded:

> We are confident . . . . [T]o answer your question directly, yes, we've continued to
> test throughout the quarter the adequacy of all of our underwriting programs and we
> remain very confident that it was not a degradation in our credit granting activities
> that are rather directly linked to staffing.

381.    Additionally, in response to an analyst question about whether delinquency rates would return "to normal or closer to averages," Fortin stated that on the last call (April 29, 2014), management was "very clear having identified or diagnosed the problem namely lack of sufficient staffing in certain branches . . . ."  As a result, he claimed: "we very much expect to see charge-offs decline overall in the second half of the year."  Later, Thomas confirmed that this would be the case, stating: "[t]he net charge-offs that we expect in the second half of the year certainly will be less than what we had in the first half of the year."  He also added that net charge-offs would be lower in the third quarter than the second.  In fact, Thomas made these statements notwithstanding "that during the second half, we're also taking a lot of labor hours in training people around our new GOLDPoint loan management system, so there is some distraction in the operation during the second half."

382.    During the question-and-answer session, an analyst asked whether the Company was "being more selective in the zip codes [and] the regions you send [live] checks out to based on the collection performance of the individual stores," as well as whether mailing volume would increase "towards the back half of the year as you get those APEs more in line[.]"  In response, Fortin stated that, during the second quarter, the Company had "rebalanced and refocused the geography of our mailing, so as to not overwhelm already busy branches," but represented that they "did not pull back in terms of Q2 mail volumes . . . ."  Instead, he assured that the live check campaign was proceeding according to plan, noting that the Company had already "mailed out substantially all of our back-to-school campaign," stating: "We're right on plan in terms of the volumes that we had planned on sending out."

383.    Moreover, while claiming the check campaign "is an evolving model," Fortin again assured that Regional Management took a "surgical" approach to identifying and cultivating live check borrowers, stating: "Every mailing that we send we're learning something about responses and

- 119 -

downstream results and that certainly allows us to be more precise and shall we say more surgical

with not only where we send those checks, but the terms and conditions of those checks, so that we

can maximize or optimize rather the response."  Thomas later added that the "June campaign went

out mid-month and we've seen the expected nice growth from that particular campaign . . . ."

384.    Finally, Fortin provided an update on the status of the GOLDPoint implementation,

continuing to express the belief that the system "will be up and running by October," as follows:

> As mentioned on the prior call, before we commit to additional branch openings in
> the latter half of the year, we want to ensure that our new GOLDPoint loan
> management system is performing properly and is able to handle the additional
> workload. We continue to believe that the GOLDPoint system will be up and running
> by October and it ultimately should make us even more efficient in processing and
> servicing our product portfolio, as well as enabling us to accommodate substantial
> future growth for Regional.

385.    The Officer Defendants' statements disavowing that underwriting was a cause of the

increased delinquencies in the small loan portfolio were false and misleading when made, because,

as detailed herein, live check underwriting practices were virtually non-existent – and not calculated

to appropriately identify creditworthy borrowers.  Moreover, the statements regarding the progress

of the GOLDPoint implementation were false and misleading when made, because the notion that

the Company could successfully rollout the system was unreasonable in view of the information then

known to management.  Specifically, the staffing issues would require more time, attention and

resources to address, which, in turn, was reasonably likely to prevent GOLDPoint's implementation.

Further, the check underwriting issues – which remained concealed but were continuing to wreak

havoc on the Company's delinquency net charge-off levels – were also reasonably likely to prevent

the successful implementation of GOLDPoint during the second half of 2014.

386.    In view of the conflicting information conveyed during the July 30, 2014 conference

call, the price of the Company's common stock remained artificially inflated.  Nevertheless, the

trading price was adversely impacted by the partial disclosure of truthful information concerning the staffing issues and their impact on the Company.

### O.     The August 7, 2014 Form 10-Q

387.     On August 7, 2014, the Company filed its Form 10-Q, which formally presented its financial results for the second quarter ended June 30, 2014.  In addition to reiterating the quarterly results reported July 30, 2014, the Company made statements about its business and operations.

388.     Under the heading "***Asset Quality***," the Company stated that "[t]he quality of our asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent servicing and collection of the portfolio, and respond to changing economic conditions as we grow our loan portfolio."  This statement was false and materially misleading when made because it failed to reveal the issues concerning live check underwriting.  Moreover, the addition of the reference to "diligent servicing and collection of the portfolio" confirms that the similar statement in the earlier Forms 10-Q, which did not mention this issue, were false and materially misleading when made.

389.     Additionally, after providing financial data regarding the Company's four loan types, the Company represented that "the primary underlying factors driving the provision for credit losses for each of these loan types are the general economic conditions in the areas in which we conduct business and the effectiveness of our collection efforts."  While this statement remained partially true because it disclosed that staffing issues were at least partially to blame for the increased credit loss provision, it was materially misleading in the absence of disclosure of the live check and other underwriting issues.

390.     Further, in representing that small installment loans had "increased by $68.5 million, or 33.1%, to $275.5 million at June 30, 2014, from $206.9 million at June 30, 2013," the Company

attributed this growth to the check program, stating: "[o]ur direct mail campaigns drove significant loan growth in existing and new branches."

391.    Finally, the Company stated that the $5.2 million quarterly increase in the provision for credit losses "was primarily due to an increase in net charge-offs that resulted from previously elevated contractual delinquencies." The Company also stated that "[t]he higher delinquency level and resulting higher net charge-offs were primarily the result of elevated accounts per employee which caused challenges in servicing the growth in accounts." While these statements were partially true, they were materially misleading without disclosure of the live check and other underwriting problems, as stated above.

### P.    The September 22, 2014 Press Release

392.    On September 22, 2014, the Company issued a press release announcing that the Board had appointed Jody L. Anderson to succeed Quattlebaum as President and COO, effective October 1, 2014. The press release contained a favorable comment from Fortin, who was then still employed as CEO.

### Q.    The End-of-Class-Period October 30, 2014 Press Release and Conference Call

393.    The Class Period ends on October 30, 2014, when, after the close of trading, Regional Management dropped a bombshell. On that date, the Company issued a press release announcing Fortin's resignation as CEO and a director, effective as of October 30, 2014, and reported its financial results for the third quarter ended September 30, 2014. The Company also disclosed that Dunn, who was only recently appointed a director, was appointed as interim-CEO.[8] According to the press release, the Company was "conducting a search process among internal and external candidates for a permanent CEO." Yet, during the quarterly conference call, Dunn acknowledged

---

[8]    On November 20, 2014, the Company issues a press release announcing that Dunn was selected to serve as CEO permanently.

that he had only been brought in as interim-CEO hours before the call.  Thus, Fortin's departure was apparently not planned; rather, it appears he was forced out.

394.    In reporting its quarterly financial results, the Company reported revenues of $53.9 million (a 21.7% increase from the prior-year period), and same-store revenue growth of 14.7%. However, the Company posted a *dramatic decrease* in net income: $1.4 million, an 80.7% decrease, compared to net income of $7.2 million in the prior-year period.  Diluted earnings per share were also dramatically impacted, with the Company reporting $0.11, a decrease from $0.56 in the prior-year period.  Likewise, the Company disclosed that the provision for credit losses "was $22.5 million versus $11.1 million in the prior-year period, primarily due to an elevated level of delinquencies"; and "GAAP annualized net charge-offs as a percentage of average finance receivables for the third quarter of 2014 were 10.3%, an increase from 6.5% in the prior-year period."  The Company further stated it had changed its charge-off policy during the quarter, which resulted in an additional $2.1 million in charge-offs that were 190 or more days past due.  Finally, the Company stated that general and administrative expenses skyrocketed to $25.3 million, an increase of 44.2% from $17.5 million in the prior-year period, "primarily related to increased personnel costs . . . and costs related to the implementation of the GOLDPoint loan management system platform."

395.    In his comments, Dunn admitted that credit quality and poor underwriting associated with the live check program had adversely impacted quarterly results, stating: "third quarter results were impacted by a charge of $6.5 million to augment our provision for credit losses, necessitated by a higher than normal proportion of lower credit quality loans originated in our summer direct mail campaigns."  As he further admitted: "These lower credit quality loans typically experience higher delinquencies and we have already seen our direct mail delinquency significantly increase. This higher delinquency rolls into higher subsequent charge-offs and GAAP requires us to reserve for that

today."  By contrast, "[d]elinquencies for all other loan categories, including branch-based small installment loans, declined or were stable from the second quarter of 2014."

396.    Clearly attempting to assuage investor concerns, Dunn assured that "[t]he direct mail campaigns for the fourth quarter have been adjusted to prevent the same issue from occurring . . . ." Furthermore, contrary to the Officer Defendants' statements on the July 30, 2014 call, Dunn stated: "we expect to see an elevated net charge-off rate for the next several months."

397.    Finally, contrary to Fortin's statement that GOLDPoint "will be up and running by October," Dunn disclosed that the Company had shelved the system for the immediate future and postponed its implementation "until the first quarter of 2015."  In an effort to explain the decision, Dunn claimed "[t]he postponement shifts the loan management system implementation out of the busy holiday season – when we are focused on growing our business – into a time period where seasonality is lower and gives us an opportunity to fully concentrate on it."  The writing was on the wall, however: increased delinquencies, brought about by staffing deficiencies and underwriting issues, required the Company to rehabilitate its business before completing the implementation of the GOLDPoint system.

398.    Following the issuance of the October 30, 2014 press release, the Company held a conference call with analysts and investors to discuss its 2014 third quarter results.  Dunn and Thomas participated in the call, which other members of the executive management team joined.  In his opening remarks, Dunn commented that he had "been on the job for about an hour . . . ."  He then confirmed that the credit issues related exclusively to the small loan portfolio and "resulted from our convenience check campaigns," explaining: "the credit issue that was addressed in the third quarter through the builds of the allowance relates to problems in our small loan portfolio.  All of the other loan categories behaved within our normal historical ranges."

399.     Additionally, Dunn claimed that the live check issues related to the second and third quarters of 2014.  As Dunn disclosed, during those quarters, "the Company engaged in the typical direct mail campaigns to originate small installment loans through the program that is called the convenient check program . . . ."  Nevertheless, he indicated that the campaign "originated a higher than normal proportion of these lower credit quality loans," resulting in an increase in delinquency rates and credit loss provisioning, among other things.  As in the press release, Dunn reiterated that "[o]ur direct mail campaigns that we have used historically have been adjusted for the fourth quarter and including October's campaign to prevent any reoccurrence . . . ."

400.     In his opening remarks, Thomas described the change in the Company's charge-off policy.  Acknowledging – seemingly, for the first time – that the policy adhered to during the Class Period was "to charge off [loans] no later than 365 days" past due, he explained that the new policy required charge-offs "no later than 180 days past due."  As Thomas stated: "We believe this policy change is in step with industry practice and will ultimately provide greater transparency with respect to our charge-offs going forward"

401.     During the question-and-answer session, analysts focused on the nature of the credit issues involving the live check campaign.  In response to a question for "more color on when these problem loans were originated and . . . what specifically went wrong in the underwriting process," Thomas claimed "the origination started in the later part of the second quarter and continued through into most of the third quarter," the Company used a different vendor, and "the selection parameters were not handled well in the process."  Specifically, he admitted that the Company "move[d] away from direct selection from credit bureau files and to a particular data aggregator. And so that was a vendor move that we made and clearly the selection parameters with the new vendor did not get set properly."  As Thomas confirmed, two-thirds of the $200 million small loan portfolio consisted of

direct mail loans, and the "direct mail portfolio overall has moved up from the 6% range to the 9.1% range" in terms of delinquencies.

402.    Moreover, despite the fact that the Company claimed that the live check underwriting issue was constrained to the second and third quarters, Thomas revealed that the Company intended to shift its focus to other mailing campaigns that allow for more rigorous underwriting, such as pre-screened offers that would require a potential borrower to participate in the underwriting process at a branch.  Specifically, he stated:

> The convenience check portion of our mailing programs is gradually shrinking and we're beginning to send higher quantities of pre-qualified or pre-screened offers of credit that would require the customer to come into the branch and finish the underwriting process.

403.    Additionally, when pressed for detail on when the problems first became known, Thomas claimed that the Company saw a "slight uptick" in delinquencies in the small loan portfolio "in August," followed by a "dramatic uptick in September," which prompted further investigation and ultimately led to identifying live checks as the cause.  Yet, one analyst observed that the cause of the delinquencies appeared to be shifting – from staffing to live check underwriting – while another commented that growth in finance receivables increased in 2013 when the Company "dramatically increased the number of [check] mailings per year," followed by "elevated losses . . . by the end of that year into this year."  In response, Thomas acknowledged that the check campaigns are "a bit of a continuous learning system," noting that the Company was undergoing an initiative to significantly strengthen its underwriting practices – including hiring a Chief Credit Risk Officer.  His comments, in pertinent part, are as follows:

> [A]re there additional things we can do to continue to evaluate and improve the underwriting over time as we have over the last several years? Absolutely. Are we going to continue that? Absolutely. We are continuing to work on credit and underwriting standards, and to that end, I can tell you that we are in the market right now and are conducting a search for a Chief Credit Risk Officer to add to our team.

And so we are moving down the path with that and expect to be carrying out interviews in the very near future.

404.    Accordingly, Regional Management had finally disclosed, among other things, that: the Company's issues were not merely limited to staffing deficiencies, but did, in fact, involve poor underwriting practices; these practices induced a greater level of delinquencies, net charge-offs and credit loss provisioning; and delinquencies, net charge-offs and credit loss provisioning would remain elevated for a longer period of time than management had previously led investors to believe. Additionally, in disclosing that it would postpone the implementation of GOLDPoint despite stating that the implementation was on track, investors learned for the first time that the staffing and credit-based issues were adversely affecting other portions of the Company's business.

405.    The developments and results announced in the October 30, 2014 press release and conference call shocked the market.  In response to the disclosure of previously-concealed problems with live check underwriting and other matters, the Company's stock price tumbled as the artificial inflation was released from the stock.  Specifically, on October 31, 2014, the stock price dropped by $6.33 per share – *a massive 35.2%* – to close at $11.66 per share on extremely heavy volume.

406.    As would be expected, analysts negatively reacted to these developments.  In fact, certain analysts again revised their price targets and expressed disappointment at the Company's financial performance and the opaque nature of its credit exposure.

407.    For example, in an October 30, 2014 research report, analyst Macquarie lowered both its price target to $15 per share and "EPS estimates moderately," stating there was "more bias to the downside given 1) a temporary management team as the company searches for its CEO, and 2) volatile credit driven by policy changes and shifts in strategies for loan growth."  It also expressed concerns regarding credit deterioration stemming from the check program, commenting as follows:

> We continue to be concerned about direct mail driving further credit deterioration (35-40% of originations), given RM's delayed reaction to resolving the weak underwriting of 3Q direct mail loans. The hiring of a Chief Credit Risk Officer should help, but we think this is a longer-term catalyst.

408.    Given these issues, Macquarie was understandably not convinced by management that the problems facing the Company could be remediated so quickly, as reflected by the following comments:

> At best, we expect the next three quarters will be spent remediating credit concerns, which leads us to expect weak earnings growth near-term. For us to get more constructive, we would have to see: 1) stable charge-offs, 2) better efficiency but with a workforce right-sized to handle high-touch servicing, and 3) stable loan growth trends. We think these catalysts arrive 2H15E at earliest.

409.    On October 31, 2014, analyst Jefferies downgraded the Company and reduced its price target to $14 per share, noting "3Q14 results significantly missed expectations due to ongoing credit issues, which is disappointing as we had observed signals of stabilization last quarter."  As Jefferies observed: "little visibility in credit trends means low visibility in provisioning means low visibility in EPS."  Moreover, Jefferies doubted that management had a handle on the Company's credit problems, stating:

> Given the sharp and unexpected rise in early-stage DQs, we do not believe RM has its hands around credit issues and as a result there is low visibility in our forecasts. We are reducing our PT to $14 and downgrading to Hold; we await strong evidence of a real credit recovery before revisiting this stock.

410.    On October 31, 2014, analyst Stephens expressed similar concerns when it lowered its price target from $23 to $14 per share, observing that "RM announced 3Q14 EPS of $0.11 versus our $0.45 estimate . . . ."  Additionally, Stephens pointed out that "the Company has been facing troubling credit performance going back to late last year," when "management asserted that the deteriorating credit performance was related to accounts per employee (APE) running at higher than historical levels, causing collections and servicing issues which led to worse credit performance

across the portfolio." According to Stephens, "poor credit performance is likely to persist as it will take time for the Company to adjust to a more efficient and pointed direct mailings model and as this disappointing pool of loans runs through the system."

411.    And, on October 31, 2014, analyst JMP Securities observed that the Company's EPS of $0.11 fell far short of its estimate of $0.52, while noting that the Company "experience[ed] credit deterioration for the past 12 months that has corresponded with the growth in direct mailings . . . ." Accordingly, JMP Securities "advis[ed] investors to move to the sidelines . . . ." After the decline in the Company's stock price following the Company's October 30, 2014 disclosures, it appears that investors followed that advice.

### R.    The November 10, 2014 Form 10-Q and November 20, 2014 Form 10-Q/A

412.    On November 10, 2014, the Company filed its Form 10-Q, which formally presented its financial results for the third quarter ended September 30, 2014.  In addition to reiterating the quarterly results reported October 30, 2014, the Company made statements about its business and operations.

413.    In the Form 10-Q, the Company disclosed that its provision for credit losses had increased during the quarter due to "a higher than normal proportion of lower credit quality loans originated in our summer direct mail campaigns."  Noting that it has "already seen our direct mail delinquency significantly increase," the Company warned of "an elevated net charge-off rate for the next several months."

414.    Additionally, the Company confirmed for the first time what investors had suspected based on the October 30, 2014 disclosures: that the Company had material weaknesses in its internal and disclosure controls for a significant portion of the Class Period.  Specifically, the Company disclosed that material weaknesses existed, at a minimum, as of the second and third quarter ended

June 30, 2014 and September 30, 2014, respectively.  These weaknesses involved the underwriting

associated with the live check program and, the Company warned, could require or otherwise result

in the restatement of its financial statements.

415.    The Form 10-Q described the material weaknesses, as well as the Company's efforts

to address them, in pertinent part, as follows:

> In connection with the preparation of this Quarterly Report on Form 10-Q for the
> quarterly period ended September 30, 2014, our management, under the supervision
> and with the participation of our Interim Chief Executive Officer ("Interim CEO")
> and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our
> disclosure controls and procedures as of September 30, 2014. Based on their
> evaluation, our Interim CEO and our CFO have concluded that, because a material
> weakness in the Company's internal control over financial reporting existed at
> September 30, 2014, the Company's disclosure controls and procedures were not
> effective as of September 30, 2014.
>
> A material weakness is a deficiency, or a combination of deficiencies, in internal
> control over financial reporting, such that there is a reasonable possibility that a
> material misstatement of our annual or interim financial statements will not be
> prevented or detected on a timely basis. Management has identified a control
> deficiency that constituted a material weakness in our internal control over financial
> reporting as of September 30, 2014. Specifically, we did not design and maintain
> effective controls over the credit risk associated with the origination of direct mail
> loans, resulting in a reasonable possibility that a material misstatement of our
> allowance for credit losses would not be prevented or detected on a timely basis.
> Controls were not effectively designed to apply sufficient scrutiny to the credit
> quality criteria used to identify direct mail recipients and to audit the resulting
> recipient list. Accordingly, we have determined that this control deficiency
> constitutes a material weakness. This material weakness did not result in any
> adjustments to our prior-period interim or annual consolidated financial statements.
>
> In addition, on August 7, 2014, at the time we filed our Quarterly Report on Form
> 10-Q for the quarterly period ended June 30, 2014, our principal executive officer
> and principal financial officer concluded that our disclosure controls and procedures
> were effective as of June 30, 2014. However, our Interim CEO and our CFO have
> now concluded that our disclosure controls and procedures were not effective as of
> June 30, 2014 because of the material weakness in our internal control over financial
> reporting described above. We will be amending our Quarterly Report on Form 10-Q
> for the second quarter of 2014 to reflect the conclusion that our disclosure controls
> and procedures were not effective as of June 30, 2014.

In response to the material weakness described above, our management, with oversight from the Audit Committee of our Board of Directors, has taken steps and plans to take additional measures to remediate the underlying causes of the material weakness. While we believe we will remediate the material weakness prior to December 31, 2014, we can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.

416.    On November 20, 2014, the Company filed an amendment to the August 7, 2014 Form 10-Q for the second quarter ended June 30, 2014, as it represented it would.  In the amended Form 10-Q, the company disclosed the following regarding the material weaknesses in its internal controls for the second quarter of 2014:

In connection with the preparation of the Original Filing, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures. On August 7, 2014, at the time we made our Original Filing with the SEC, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of June 30, 2014. However, our Interim Chief Executive Officer (the "Interim CEO") and our Chief Financial Officer (the "CFO") have since concluded that, because of the existence of a material weakness in our internal control over financial reporting described below, our disclosure controls and procedures were not effective as of June 30, 2014.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Management has identified a control deficiency that constituted a material weakness in our internal control over financial reporting as of June 30, 2014. Specifically, we did not design and maintain effective controls over the credit risk associated with the origination of direct mail loans, resulting in a reasonable possibility that a material misstatement of our allowance for credit losses would not be prevented or detected on a timely basis. Controls were not effectively designed to apply sufficient scrutiny to the credit quality criteria used to identify direct mail recipients and to audit the resulting recipient list. Accordingly, we have determined that this control deficiency constitutes a material weakness. This material weakness did not result in any adjustments to our prior-period interim or annual consolidated financial statements.

In response to the material weakness described above, our management, with oversight from the Audit Committee of our Board of Directors, has taken steps and plans to take additional measures to remediate the underlying causes of the material weakness. While we believe we will remediate the material weakness prior to

December 31, 2014, we can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2014.

417.     The Company's admission of these material weaknesses further confirms that for a large part of the Class Period, the Company did not adequately monitor, apply or publicly describe its underwriting practices.

## CLASS ACTION ALLEGATIONS

418.     Plaintiffs bring this action as a class action on behalf of all purchasers of Regional Management common stock: (i) pursuant and/or traceable to the Offering Documents, seeking to pursue remedies under the Securities Act ("Securities Act Class"); and (ii) during the Class Period, seeking to pursue remedies under the Exchange Act ("Exchange Act Class") (collectively, the "Classes").

419.     Excluded from the Classes are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

420.     The members of the Classes are so numerous that joinder is impracticable.  While the exact number of members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Classes. Record owners and other members of the Classes may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

421.     Plaintiffs' claims are typical of the claims of the members of the Classes as all members are similarly affected by Defendants' wrongful conduct in violation of federal law.

- 132 -

422.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action and securities litigation.

423.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.

424.    Among the questions of law and fact common to the Securities Act Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Registration Statements were negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)    to what extent the members of the Securities Act Class have sustained damages and the proper measure of damages.

425.    Among the questions of law and fact common to the Exchange Act Class are:

(a)    whether Defendants (other than those named solely in the Securities Act claim Counts) violated the Exchange Act;

(b)    whether statements made by these Defendants to the investing public omitted and/or misrepresented material facts about the business and operations of Regional Management;

(c)    whether these Defendants knew and/or deliberately disregarded that their statements were false and misleading and acted with scienter; and

(d)    to what extent the members of the Exchange Act Class have sustained damages and the proper measure of damages.

426.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FRAUD ON THE MARKET PRESUMPTION OF RELIANCE

427.    At all relevant times, the market for Regional Management common stock was an efficient market for the following reasons, among others:

(a)    Regional Management common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

(c)    Regional Management regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Regional Management was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

428.    As a result of the foregoing, the market for Regional Management common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Regional Management common stock during the Class Period suffered similar injury through their purchase of such stock at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

429.     During the Class Period, the Officer Defendants made false and materially misleading statements that misrepresented the Company's business and artificially inflated the price of Regional Management common stock.  Later, when their misrepresentations became known to the market, the price of Regional Management common stock fell precipitously as the artificial inflation came out of the price.  As a result of their purchases of Regional Management common stock during the Class Period, Plaintiffs and other members of the Classes suffered economic loss, *i.e*., damages, under the federal securities laws.

## NO SAFE HARBOR

430.     Defendants are liable for any forward-looking statement because they knew that the statement was false or misleading when made.  Moreover, any such statement was authorized and/or approved by an executive officer of Regional Management, who knew that the statement was false or misleading when made.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants (Except Defendants Palladium, Parallel and Quattlebaum)

431.     For the purposes of this Count, Plaintiffs incorporate by reference those allegations concerning the parties, the FEs, the Registration Statements, and the Securities Act Class only.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

432.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Palladium, Parallel and Quattlebaum.  For the

purposes of this Count, Plaintiffs do not allege that any of Defendants named in this Count had scienter, which is not an element of a Section 11 claim.

433.    The Registration Statements for the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

434.    Regional Management is the registrant for the Offerings.  The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statements.

435.    As issuer of the shares, Regional Management is strictly liable to Plaintiffs and the Securities Act Class for any misstatements and omissions.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, devoid of the omission of any material facts, and were not misleading.

436.    By reason of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

437.    Plaintiffs acquired Regional Management common stock pursuant and/or traceable to the Offerings and, and, at the time of their purchases, Plaintiffs and other purchasers of common stock in the Offerings were unaware of the facts concerning the wrongful conduct alleged herein.

438.    Plaintiffs and the other members of the Securities Act Class have sustained damages. The value of Regional Management common stock has declined substantially subsequent to and due to the Securities Act violations described herein.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

439.    For the purposes of this Count, Plaintiffs incorporate by reference those allegations concerning the parties, the FEs, the Registration Statements, and the Securities Act Class only, consisting of those allegations contained and incorporated in Count I.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.

440.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants.  For the purposes of this Count, Plaintiffs do not allege that any of Defendants named in this Count had scienter, which is not an element of a Section 12(a)(2) claim.

441.    By means of the defective Prospectuses, which were part of the Offering Documents, Defendants promoted and sold Regional Management common stock to Plaintiffs and other members of the Securities Act Class.

442.    The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and other members of the Securities Act Class who purchased Regional Management common stock pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

443.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time Plaintiffs acquired Regional Management common stock.

444. By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Securities Act Class who purchased Regional Management common stock pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the stock.

445. Accordingly, members of the Securities Act Class who hold the common stock issued pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants sued in this Count. Securities Act Class members who have sold their common stock seek damages to the extent permitted by law.

### COUNT III

**For Violation of Section 15 of the Securities Act**
**Against Regional Management, Palladium and Parallel,**
**and the Individual Defendants**

446. Plaintiffs incorporate by reference the allegations concerning the background of the Defendants named in this Count, as well as the allegations concerning the preparation, signing and dissemination of the Registration Statements and the allegations set forth in Counts I and II, above.

447. This count is brought pursuant to Section 15 of the Securities Act [15 U.S.C. §77o] against the Company, Palladium and Parallel and the Individual Defendants.

448. As alleged herein, a primary violation of the Securities Act occurred, in that certain of Defendants engaged in conduct in violation of Section 11 of the Securities Act.

449. Palladium and Parallel were control persons of Regional Management pursuant to their stock ownership, designees on the Board, the Shareholders Agreement, and their other affiliations, if any, with the Company and/or its officers and directors. The Individual Defendants were control persons of Regional Management by virtue of their positions as directors and/or senior officers of Regional Management, as well as some being parties to the Shareholders Agreement. The Individual Defendants each had a series of direct and/or indirect business and/or personal

- 138 -

relationships with other directors, officers and/or major shareholders of Regional Management, including Palladium and Parallel.  The Company controlled its employees.

450.    Defendants named in this Count were culpable participants in violating Section 11 of the Securities Act, based on having signed, authorized or directed the signing of the Registration Statement, which otherwise formed part of the Offering Documents, and otherwise participating in the process which allowed the Offerings to be successfully completed.

451.    Accordingly, Plaintiffs and the Securities Act Class have sustained damages.  The value of Regional Management common stock has declined substantially subsequent to and due to these Defendants' violations.

<div align="center">

**COUNT IV**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against Regional Management and the Officer Defendants**

</div>

452.    Plaintiffs incorporate by reference all of the allegations set forth above, except those that disclaim the intentional or fraudulent nature of the conduct alleged herein.

453.    During the Class Period, the Company and the Officer Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as detailed above.

454.    Defendants named in this Count violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, in that they:

        (a)    employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Regional Management common stock during the Class Period.

455.    Accordingly, Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Regional Management common stock.  Plaintiffs and the Exchange Act Class would not have purchased Regional Management common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT V

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants and Palladium and Parallel

456.    Plaintiffs incorporate by reference all of the allegations set forth above, including those that would establish the culpable participation, in any primary violation of the Exchange Act, of Defendants named in this Count, to the extent necessary.

457.    As alleged herein, a primary violation of the Exchange Act occurred, in that certain of Defendants engaged in conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

458.    The Individual Defendants and Palladium and Parallel were controlling persons of Regional Management within the meaning of Section 20(a) of the Exchange Act, and had the power and authority to cause Regional Management to engage in the wrongful conduct alleged.

459.     Accordingly, by reason of such conduct, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.       Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Counsel as Class counsel;

B.       Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.       Awarding rescission or a rescissory measure of damages, as appropriate; and

E.       Granting such other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  November 24, 2014          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   SAMUEL H. RUDMAN
                                   JOSEPH RUSSELLO
                                   AVITAL O. MALINA


                                          /s/ Samuel H. Rudman
                                   SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
amalina@rgrdlaw.com

*Lead Counsel for Plaintiffs*

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

*Additional Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 24, 2014, I authorized the foregoing Amended Complaint for Violation of the Federal Securities Laws to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

## AMENDED CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Weston v. CIBER, Inc., et al.*, No. 1:11-cv-02827 (D. Colo.)
*McHardy v. KIT digital, Inc., et al.*, No. 12-cv-4199 (S.D.N.Y.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

REGIONAL MANAGEMENT

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of November , 2014.

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM

By: _____
PHILIP F. LONGUEUIL

Its: Vice Chairman

REGIONAL MANAGEMENT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/20/2013 | 915 | $27.94 |
| 09/20/2013 | 3,276 | $27.50 |
| 12/05/2013 | 347 | $32.50 |
| 12/05/2013 | 1,075 | $31.00 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 05/09/2014 | 4,559 | $14.25 |
| 05/13/2014 | 1,054 | $14.70 |

## AMENDED CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.   Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Waterford Township Police & Fire Ret. Sys. v. Ply Gem, et al.*, No. 14-cv-3577 (S.D.N.Y.)

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

REGIONAL MANAGEMENT

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of _____, 2014.

<div style="margin-left:40%">

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM

By: _____

Its: _____

</div>

REGIONAL MANAGEMENT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/20/2013 | 405 | $27.94 |
| 09/20/2013 | 1,451 | $27.50 |
| 12/05/2013 | 155 | $32.50 |
| 12/05/2013 | 482 | $31.00 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 05/09/2014 | 2,024 | $14.25 |
| 05/13/2014 | 469 | $14.70 |