UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WATERFORD TOWNSHIP POLICE &
FIRE RETIREMENT SYSTEM, individually
and on behalf of all others similarly situated,

        Plaintiffs,

    -v-                                 No.  14 CV 3876-LTS

REGIONAL MANAGEMENT CORP.,
PALLADIUM EQUITY PARTNERS III, L.P.,
PALLADIUM EQUITY PARTNERS III, L.L.C.,
PARALLEL 2005 EQUITY FUND, LP,
PARALLEL 2005 EQUITY PARTNERS, LP,
THOMAS F. FORTIN, C. GLYNN
QUATTLEBAUM, DONALD E. THOMAS,
DAVID PEREZ, ROEL C. CAMPOS,
RICHARD T. DELL'AQUILA, RICHARD A.
GODLEY, JARED L. JOHNSON, ALVARO
G. DE MOLINA, CARLOS PALOMARES,
ERIK A. SCOTT, STEPHENS INC., KEEFE,
BRUYETTE & WOODS, INC., BMO
CAPITAL MARKETS CORP., JMP
SECURITIES LLC, and FBR CAPITAL
MARKETS & CO.,

        Defendants.

OPINION AND ORDER

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD
LLP
          By:     Samuel H. Rudman, Esq.
                  Joseph Russello, Esq.
58 South Service Road
Suite 200
Melville, NY 11747

*Lead Counsel and Attorneys for Plaintiffs*

SIMPSON THACHER & BARTLETT LLP
          By:     George S. Wang, Esq.
                  Anar Rathod Patel, Esq.
                  Shannon K. McGovern, Esq.
425 Lexington Avenue
New York, NY 10017

*Attorneys for Regional Management,
Palladium Equity Partners III, L.P.,
Palladium Equity Partners III, L.L.C.,
Parallel 2005 Equity Fund, LP, Parallel 2005
Equity Partners, LP, Thomas F. Fortin, C.
Glynn Quattlebaum, Donald E. Thomas,
David Perez, Roel C. Campos, Richard T.
Dell'Aquila, Richard A. Godley, Jared L.
Johnson, Alvaro G. de Molina, Carlos
Palomares, and Erik A. Scott*

ALSTON & BIRD LLP
          By:     Jessica P. Corley, Esq.
                  Joseph G. Tully, Esq.
90 Park Avenue
New York, NY 10016

*Attorneys for Stephens Inc., Keefe, Bruyette
& Woods, Inc., BMO Capital Markets Corp.,
JMP Securities LLC, and FBR Capital
Markets & Co.*

LAURA TAYLOR SWAIN, United States District Judge

Lead Plaintiff Waterford Township Police & Fire Retirement System ("Lead Plaintiff") brings this action on behalf of a putative class of investors ("Plaintiffs") who purchased publicly traded securities issued by Regional Management Corp. ("RM" or the "Company"), between May 2, 2013, and October 30, 2014 (the "Class Period").  RM is a consumer finance company that provides loan products primarily to subprime borrowers who have limited access to traditional lenders and banks.  Plaintiffs principally allege that Defendants violated the federal securities laws by failing to disclose, in public statements and filings and in connection with two secondary public stock offerings, certain underwriting and staffing issues relating to RM's portfolio of so-called "live check" loans, which were checks mailed directly to consumers that, when deposited, would create a loan between RM and the depositing consumer in the amount of the check.  Defendants now move to dismiss Plaintiffs' Second Amended Complaint ("SAC").  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

Plaintiffs group the Defendants as follows in the SAC, and the Court uses the same nomenclature for the purposes of this opinion:

• Palladium Equity Partners III, L.P. and Palladium Equity Partners III, LLC are referred to jointly as "Palladium" (SAC ¶ 22);

• Parallel 2005 Equity Fund, LP and Parallel 2005 Equity Partners, LP are referred to jointly as "Parallel" (SAC ¶ 23);

• Chief Executive Officer ("CEO") Thomas F. Fortin, Chief Operating Officer ("COO") C. Glynn Quattlebaum, Chief Financial Officer ("CFO") Donald E. Thomas, Chairman of the Board of Directors David Perez, Director Roel C. Campos, Director Richard T. Dell'Aquila, Director Richard A. Godley, Director Jared L. Johnson, Director and later Chairman of the Board Alvaro G. de Molina,

Director Carlos Palomares, and Director Erik A. Scott are referred to as the "Individual Defendants" (SAC ¶ 35);

- Fortin, Quattlebaum, and Thomas are referred to as the "Officer Defendants" (SAC ¶ 35);

- Keefe, Bruyette & Woods, Inc. ("Keefe"), BMO Capital Markets Corp. ("BMO"), JMP Securities LLC ("JMP"), and FBR Capital Markets & Co. ("FBR"), five firms that were involved in underwriting secondary public offerings of RM's stock, are referred to as the "Underwriter Defendants" (SAC ¶ 41).

Plaintiffs assert claims under the federal securities laws against RM and various current or former RM executives, directors, and underwriters, as well as against the private equity funds that controlled a majority of RM's stock at the outset of the Class Period and sold their stock in the two secondary public offerings.  Specifically, in the operative Second Amended Complaint ("SAC" or "Complaint"), Plaintiffs assert the following claims:

1.  Against all defendants except C. Glynn Quattlebaum, for violations of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k ("Section 11");

2.  Against all defendants, for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)");

3.  Against the Individual Defendants, Palladium, and Parallel, for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15");

4.  Against RM and the Officer Defendants, for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), as well as Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); and

5.  Against the Individual Defendants, Palladium, and Parallel, for violation of

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1 ("Section 20(a)").  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

Before the Court are two motions to dismiss the SAC: one filed by RM, Parallel, Palladium, and the Individual Defendants; the other filed by the Underwriter Defendants (who are only named in two of the Securities Act claims).  The Court has reviewed thoroughly all of the parties' submissions, including notices of supplemental authority.  For the following reasons, Defendants' motions are granted in their entirety.

A.

BACKGROUND

For the purposes of these motions, the Court takes as true the following facts drawn from the SAC (docket entry no. 60), the documents incorporated by reference therein, and public filings of which the Court may take judicial notice.[1]  Plaintiffs' 173-page SAC details Plaintiffs' allegations as to the history and operation of RM's live check program, as well as allegations regarding related material misstatements and omissions.  The Court assumes the parties' familiarity with the record and limits the following summary of Plaintiffs' factual allegations to matters material to the Court's legal conclusions.

RM's Business Model and Statements Regarding the Live Check Program

RM was founded in 1987 by Godley and Quattlebaum as a consumer finance company specializing in subprime lending.  (SAC ¶ 136.)  RM operates primarily in the southern

---

[1]      See Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006) (holding that SEC filings are amenable to judicial notice).

United States and maintains branches that service its customers.  (Id.)  RM sources its loans, which range from $300 to $27,500, from a number of channels, including direct mail campaigns like the live check program.  (SAC ¶ 137.)  In its live check program, which is the focus of Plaintiffs' allegations, RM would send customers valid checks through the mail that, when cashed, would become loans that RM would service through its branches.  (SAC ¶ 3.)  RM's live check loans ranged from $300 to $2,500, and were payable in fixed-rate monthly installments with terms up to 36 months.  (SAC ¶ 138.)  The issuance of live checks was conducted by RM's central headquarters, with servicing and collection of the resulting loans managed at the branch level.  (SAC ¶ 152.)

RM began the live check program in 1999.  (SAC ¶ 152.)  Historically, live check campaigns were timed to coincide with seasonal demand, such as for holiday spending.  (SAC ¶ 154.)  Breaking from this pattern in 2013, the Company conducted a live check mailing during the first quarter of that year.  (SAC ¶ 278.)  A speech given in May 2013 by CEO Fortin described the live check program as a "very productive source of growth" for RM.  (SAC ¶ 293.)  In that speech and in other public statements, Fortin represented that RM was "very sound in terms of our underwriting methodology and I think that is certainly expressed in terms of the downstream collection metrics . . . ."  (SAC ¶ 295.)  Similar statements about RM's underwriting appear in RM's SEC filings, including the May 13, 2013 Form 10-Q, which stated that the "quality of [RM's] asset portfolio is the result of our ability to enforce sound underwriting standards, maintain diligent portfolio oversight, and respond to changing economic conditions as we grow our loan portfolio."  (SAC ¶ 298; see also, e.g., id. ¶ 317 (August 9, 2013 Form 10-Q); ¶ 341 (November 8, 2013 Form 10-Q); ¶ 371 (March 17, 2014 Form 10-K).)

RM's first off-season live check program lead to a significant expansion of RM's

exposure to live check loans as a percentage of its overall portfolio.  As of June 30, 2013, small loans (regardless of origination method) made up 45% of RM's total portfolio, and live check loans were a "sizeable balance" of those loans.  (SAC ¶ 304.)  On a yearly basis, small installment loans increased by 71.2% from June 2012 through June 2013, representing an additional $86 million of outstanding loans on RM's balance sheet.  (SAC ¶ 317.)

On September 16, 2013, RM announced that it would conduct a secondary public offering ("SPO") of common stock on September 20, 2013 (the "First SPO").  (SAC ¶ 319.) RM's announcement indicated that only Parallel and Palladium, and not RM itself, would be offering shares for sale.  (SAC ¶ 319.)  In announcing the First SPO, CEO Fortin declared that RM had mailed "more than one million convenience [live] checks to pre-screened individuals" between the last week of June and the first week of August, 2013.  (SAC ¶ 321.)  The First SPO closed on September 25, 2013.  (SAC ¶ 324.)

On December 2, 2013, RM announced that it would conduct another SPO of common stock on December 5, 2013 (the "Second SPO").  (SAC ¶¶ 1, 343.)  As in the First SPO, RM itself did not sell any shares.  (SAC ¶ 343.)  The Second SPO closed on December 10, 2013.  (SAC ¶ 349.)  After the completion of the Second SPO, Parallel and Palladium had completely divested their holdings of RM stock.  (SAC ¶ 201.)  The putative Plaintiff class includes investors who purchased stock pursuant and/or traceable to the offering documents issued in connection with the First and Second SPOs.

During the same time period as the First and Second SPOs – the second half of 2013 – RM began experiencing an increase in accounts per employee ("APE"), a measure representing the number of outstanding loan accounts for which branch loan supervision and collection personnel were responsible.  The Company later admitted that the APE increase was a

source of delinquency problems.  (SAC ¶¶ 356-58.)  This staffing issue was first disclosed to investors on March 11, 2014, when the Company announced its 2013 fourth-quarter and full-year earnings, which included an increase in charge-offs, or delinquencies, from 7.1% in the prior year period to 7.8% in the fourth quarter of 2013.  (SAC ¶¶ 350-56.)  CFO Thomas told investors that, although the Company traditionally "followed a formulaic approach" in staffing its branches, the overall APE had begun to increase due to "growth [that] outpaced [RM's] hiring . . . which was the primary reason for the increase in delinquencies."  (SAC ¶¶ 356-58.)  Fortin stated that RM had been "pushing our branches in our various geographies higher on accounts per employee . . . [and] what we have seen is there is a natural flattening to gains in labor productivity. . . . [W]e have gone through each and every branch, done a very granular analysis as to the adequacy of staffing . . . [and] we have shown a very concrete correlation between collection performance and what we call APE . . . ."  (SAC ¶ 358.)  Fortin went on to say that RM was making adjustments to its staffing in order to remediate the issue.  (SAC ¶ 359.)

In a conference call one month later, in April 2014, the Company disclosed that the staffing issue had arisen during "the last five months of 2013" and continued into the first quarter of 2014.  (SAC ¶¶ 373-375.)  Fortin stated that RM had "determined an APE around 300 allows us to run the business efficiently and effectively."  (SAC ¶ 379.)  Fortin then noted that APE was "well above" 300 from August 2013 through February 2014, but had decreased below 300 as of April 2014 due to additional hiring.  (SAC ¶ 379.)  Thomas went on to describe RM's efforts to remediate the staffing issue, stating that RM "implemented a new labor guideline that provides more headcount to the branches, and we enhanced our labor forecasting model to hire employees sooner than before."  (SAC ¶ 380.)  After the March 11, 2014, conference call, RM's stock dropped by 5.83% and then by 9.9% in the following two days of trading.  (SAC ¶ 366.)

The day after the April 2014 conference call, RM's stock dropped by 30.6%.  (SAC ¶ 389.)

Principally citing statements from ten confidential witnesses who were formerly employed in RM's branch offices and one former internal auditor, Plaintiffs allege that RM did not properly underwrite its live check loan program.  Specifically, Plaintiffs proffer confidential witness statements from former branch employees that they had serviced live check-originated loans to individuals who would not have been granted credit under the criteria employed for consumers who applied directly to branches for loans, that they noticed high delinquency rates for live check customers, that loans for live check customers were frequently renewed or extended even when the borrowers were not current with payments on the loans, and that some live check borrowers were not even traceable to the addresses to which the checks had been mailed.  (See SAC ¶ 56.)

The former auditor, who had traveled among RM's branches and regions to perform his work, is alleged to have stated that RM issued live checks based on lists purchased from credit bureaus that had incomplete information resulting in unaffordable multiple checks going to some borrowers, and that the information was not updated during the course of the year even though it was used throughout the year for live check issuances.  (SAC ¶¶ 95-100.) According to the former auditor, there were regular patterns of delinquencies following the issuance of live checks, and RM carried delinquencies for an unusually long time to make its ledger look better and pushed renewals and rollovers of loans, with some branches failing to follow company underwriting standards in connection with renewals.  (SAC ¶¶ 101-107.) Plaintiffs also note in connection with their allegations of unsound underwriting practices that, in October 2014, RM increased dramatically its loan loss reserves, citing an elevated level of live check loan delinquencies as a principal reason for the increase.  (SAC ¶ 420-21.)

In April 2014, the Company changed the way in which it selected customers who would receive live checks.  Rather than directly selecting customers from credit bureau files, RM entered into a contract with a "data aggregator" who would select the customers for RM.  (SAC ¶ 427.)  This change was not mentioned during the April 2014 conference call.  (See SAC ¶ 427; ¶¶ 373-388.)  In RM's July 30, 2014, conference call with investors, Thomas still did not mention this changeover, but stated that the Company "continued to test throughout the quarter the adequacy of all of our underwriting programs."  (SAC ¶ 406.)  The Company disclosed the change in its October 30, 2014, investor conference call (which included notice to investors that CEO Fortin would be leaving the Company), stating that "the selection parameters with the new vendor did not get set properly" and that discrepancy had led to a higher-than-usual number of delinquencies in RM's loan portfolio.  (SAC ¶ 427.)  The day after this disclosure, on October 31, 2014, RM's stock fell 35.2%.  (SAC ¶ 431.)

In November 2014, after the appointment of an Interim CEO to replace Fortin, RM disclosed in its Form 10-Q for the third quarter of 2014 that material weaknesses in its internal and disclosure controls had existed during the second and third quarters of 2014.  (SAC ¶ 440.)  RM stated in the third-quarter Form 10-Q that its prior management had "concluded that our disclosure controls and procedures were effective as of June 30, 2014.  However, our Interim CEO and our CFO have now concluded that our disclosure controls and protocols were not effective as of June 30, 2014, because of . . . material weaknesses in our internal control over financial reporting . . . ."  (SAC ¶ 441.)  The third-quarter Form 10-Q further stated that the Form 10-Q for the second quarter of 2014 would be "amend[ed]" to reflect this disclosure.  (SAC ¶ 441.)  However, the third-quarter Form 10-Q noted that the "material weakness did not result in any adjustments to our prior-period interim or annual consolidated financial

statements."  (SAC ¶ 441.)

On November 20, 2014, RM filed an amendment to its second-quarter Form 10-Q, which described the material weakness as follows: "Management has identified a control deficiency that constituted a material weakness in our internal control over financial reporting as of June 30, 2014.  Specifically, we did not design and maintain effective controls over the credit risk associated with the origination of direct mail loans, resulting in a reasonable possibility that a material misstatement of our allowance for credit losses would not be prevented or detected on a timely basis."  (SAC ¶ 442.)  Plaintiffs characterize this disclosure as an admission that RM did not "adequately monitor, properly apply, or accurately describe its underwriting practices."  (SAC ¶ 443.)


Alleged Material Misstatements and Omissions

Plaintiffs contend that Defendants began to mislead the market materially with regard to RM's live check campaign in RM's May 2, 2013, press release and investor conference call that disclosed the Company's financial results for the first quarter of 2013; that Defendants continued to mislead the market through various public filings and investor conferences throughout the Class Period; and that the material misstatements and omissions were not fully cured until the October 30, 2014, press release and conference call discussing Fortin's departure and RM's financial results for the third quarter of 2014.  Plaintiffs point to many allegedly actionable misstatements and omissions.

Plaintiffs assert, based on the 2014 disclosures and the fact that increases in the live check program without contemporaneous staffing increases would necessarily have altered the company's historic staff-to-accounts ratios, that Defendants were aware of the understaffing

issue and the link to delinquencies from at least August 2013.  Plaintiffs further allege that

Defendants' 2013 disclosures, which lauded the live check program expansion and attributed

delinquency rate increases to auto loans, constituted material misstatements and omissions.

(See, e.g., SAC ¶ 279-80.)  The thrust of all of Plaintiffs' allegations is that RM's positive

statements regarding the live check program expansion, its loan loss reserve provisions, and its

underwriting practices were materially misleading, or omitted information necessary to make the

statements not misleading, because RM and the Individual Defendants knew, at the time of each

such statement, that: (1) staffing problems had created, or were likely to lead to, increased

delinquencies; (2) that RM's underwriting practices were unsound and would lead to increased

delinquencies as the live check program grew; and (3) that there were material undisclosed

financial reporting and control problems.

          The following representative sampling of Plaintiff's allegations suffices to

support the legal analysis that follows.

### RM's May 2, 2013 Investor Conference Call

          In discussing RM's financial results for the first quarter of 2013, Fortin disclosed

the Company's first-ever off-season live check campaign.  Fortin characterized the live check

program as "focused" (SAC ¶ 284) and stated that RM chose its live check customers based on

"very precise" "marketing analytics" that targeted customers appropriately (SAC ¶ 288).  Fortin

also stated that RM was "confident with the 41 [new branch] stores that we have announced that

we have the right people in place to absorb [the] growth" resulting from the live check program.

(SAC ¶ 289.)  Plaintiffs allege that the disclosure was materially misleading in the absence of

disclosures that: (1) the live check campaign would increase the Company's APE, preventing the

Company from adequately servicing loans and increasing delinquencies; and (2) the live check

campaign was conducted without adequate underwriting and would therefore result in increasing

delinquencies.  (SAC ¶ 280.)

RM's 2013 Disclosures and the SPOs

Plaintiffs contend that RM repeated many of the false and misleading statements

regarding the live check program throughout its disclosures in 2013 and in statements leading up

to, and during, the First and Second SPOs.

The First SPO was announced on September 16, 2013.  (SAC ¶ 319.)  In

announcing the First SPO, Fortin stated that RM had mailed "more than one million convenience

checks to pre-screened individuals" over the summer of 2013.  (SAC ¶ 320.)  Fortin further

stated that RM's "credit quality remains consistent with recent history" and described a decrease

in net delinquencies.  (SAC ¶ 321.)  Plaintiffs allege that Fortin's statements about the live check

program were materially misleading absent disclosure that: (1) RM did not employ sound

underwriting practices for those live checks, and (2) demand for the live checks was from

borrowers who were not creditworthy.  (SAC ¶ 322.)

Between the two SPOs, during the October 30, 2013, call following RM's

announcement of its earnings for the third quarter of 2013, Fortin described RM's "consistently

sound portfolio quality" (SAC ¶ 333), and Thomas stated that RM's "[c]redit quality remains

good" (SAC ¶ 334).  Although RM reported an increase in delinquencies, Thomas stated that the

increase was due to "auto delinquencies that increased more than the other categories in Q3" and

that "an increase in our delinquency rate at this time of year is fairly normal."  (SAC ¶ 335.)  In

its Form 10-Q for the third quarter of 2013, RM stated that the "quality of our asset portfolio is

the result of our ability to enforce sound underwriting standards, maintain diligent portfolio

oversight, and respond to changing economic conditions as we grow our loan portfolio."  (SAC

¶ 341.)

The Second SPO was announced on December 2, 2013.  (SAC ¶ 343.)  In announcing the Second SPO, the Company disclosed accounting errors relating to non-income based franchise taxes.  (SAC ¶ 344.)  RM also stated that it "continue[d] to experience strong growth in its receivables" due in part to the "convenience check campaigns."  (SAC ¶ 346.) Plaintiffs allege that these disclosures were materially misleading in that RM did not explain underwriting and staffing issues relating to the live check program, and because RM did not explain the full scope of its accounting irregularities, which Plaintiffs contend were material notwithstanding RM's assertions in its 2014 disclosures that the accounting issues were not material ones requiring restatements of RM's financials.  (SAC ¶¶ 347, 441.)

### RM's Disclosure of Staffing Issues

In March 2014, the Company announced its fourth-quarter and full-year 2013 financial results.  (SAC ¶ 350.)  These results included an increase in charge-offs as a percentage of average finance receivables to 7.8%, from 7.1% in FY 2012.  (Id.)  In a conference call after the earnings announcement, Fortin explained the increase in delinquencies as follows: RM's "growth outpaced our hiring during Q4 2013 and [RM] saw [its] accounts per employee move up."  (SAC ¶ 356.)  Fortin also stated that RM had "historically followed a formulaic approach for staffing branches based on the number of accounts," and that management had been "pushing our branches in our various geographies higher on accounts per employee" as the Company "attempt[ed] to gain more labor productivity."  (SAC ¶ 358.)  Fortin went on to state that

> It doesn't go to infinity and beyond and I think what we have seen
> there is a natural flattening to gains in labor productivity.  It actually
> varies quite a bit by state just depending on product mix.  So the
> concrete actions that we are taking is we have gone through each and
> every branch, done a very granular analysis as to the adequacy of
> staffing, particular market conditions that are going on and as Don

> [Thomas] had indicated in the prepared remarks, we have been and
> we continue to add to our labor force. And we expect to incur higher
> personnel costs associated with that additional hiring, but we have
> shown a very concrete correlation between collection performance
> and what we call APE, accounts per employee. So it stands to reason
> that with additional staffing, we will begin to get our arms around
> those collection issues.

(SAC ¶ 358.) In response to an analyst's question regarding whether the credit performance of

live checks was among the factors driving the fourth-quarter loss rates, Thomas stated that

"convenience checks actually run slightly better than the rest of our small loans. We are

screening those opportunities to a higher level because we don't see the customer and their data

in front of us. And the end result is that they just perform better." (SAC ¶ 360.) Thomas also

asserted that auto loan delinquencies were the cause of an overall increase in delinquencies

during the quarter. (SAC ¶ 360.) Plaintiffs contend that this disclosure concerning the staffing

problem was incomplete, given that RM would later disclose that the staffing issues arose prior

to the fourth quarter of 2013, and further argue that RM was concealing underwriting problems

relating to the live check program, given that RM would later disclose that a change in its

underwriting vendor led to a decrease in underwriting quality.

       In April 2014, the Company announced its first-quarter 2014 financial results.

(SAC ¶ 373.) These results included an increase in charge-offs as a percentage of average

finance receivables to 9.7%, from 6.4% in the first quarter of 2013. (SAC ¶ 374.) This

represented the highest level of charge-offs in RM's history. (SAC ¶ 391.) In its press release,

RM disclosed that the increase in charge-offs was "primarily the result of elevated accounts per

employee through the last five months of 2013 and most of the first quarter [of 2014], which

caused challenges in properly servicing the growth in accounts." (SAC ¶ 375.) The Company's

stock declined 30.6% after the release of this information. (SAC ¶ 389.)

In July 2014, the Company held a conference call with analysts to discuss its second-quarter 2014 financial results.  On the call, Fortin stated that RM's management believed "we now have a firm handle on our APE levels," but went on to say that "we recognize fully that we must continue to properly train our new employees and remain ever vigilant of our delinquency levels."  (SAC ¶ 406.)  Plaintiffs assert that this was only a "partial disclosure of truthful information concerning the staffing issues and their impact on the Company."  (SAC ¶ 412.)

RM's Disclosure of Underwriting Issues

In April 2014, RM changed the vendor it used to identify customers who would receive live check loans.  (SAC ¶ 427.)

In July 2014, when announcing its financial results for the second quarter of 2014, RM announced that charge-offs as a percentage of average finance receivables had increased to 10.5%, from 6.6% in the second quarter of 2013, a problem the Company continued to attribute to elevated accounts per employee.  (SAC ¶ 403.)  In response to questions about underwriting, Thomas stated that RM had "continued to test throughout the quarter the adequacy of all of our underwriting programs and we remain very confident that [the elevated percentage] was not a degradation in our credit granting activities that are rather directly linked to staffing."  (SAC ¶ 406.)  Plaintiffs allege that this disclosure was false or misleading given RM's later disclosure of underwriting problems that were traceable to a new vendor that was hired during the second quarter of 2014.

On October 30, 2014, in announcing its financial results for the third quarter of 2014, RM made several significant new disclosures.  (SAC ¶ 419.)  RM disclosed the change in its vendor used to originate live check loans, and attributed an increase in charge-offs to loans

originated through that vendor, stating that "the selection parameters with the new vendor did

not get set properly." (SAC ¶ 427.) The Company also announced the immediate resignation of

Fortin as CEO and a director. (SAC ¶ 419.) The Company's stock dropped 35.2% the next day.

(SAC ¶ 431.) The stock closed at $11.66 per share. (Id.) The stock offering price had been

$27.50 for the First SPO (SAC ¶ 324), and $31 per share for the Second SPO (SAC ¶ 349). The

Class Period for Plaintiffs' Exchange Act claims ends on October 30, 2014. (SAC ¶ 1.)


B.

<u>DISCUSSION</u>

When deciding a motion to dismiss a complaint for failure to state a claim

pursuant to Federal Rule of Civil Procedure 8(a) and 12(b)(6), the Court accepts as true the non-

conclusory factual allegations in the complaint, drawing all reasonable inferences in favor of the

plaintiff. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009); <u>Roth v. Jennings</u>, 489 F.3d 499, 501 (2d Cir.

2007). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to

relief that is plausible on its face." <u>Bell Atl. v. Twombly</u>, 550 U.S. 544, 570 (2007). However, a

"pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of

action will not do." <u>Iqbal</u>, 556 U.S. at 678 (internal quotation marks and citations omitted).

Plaintiffs assert that Defendants' written and oral disclosures violated Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which make it unlawful to,

<u>inter</u> <u>alia</u>, "make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading . . . in connection with the purchase or sale of any security." 17

C.F.R. § 240.10b-5. Claims alleging fraud-based violations of the federal securities laws are

subject to additional pleading requirements.  Plaintiffs' Section 10(b) claims are subject to the

heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the Private

Securities Litigation Reform Act of 1995 (the "PSLRA").  In re Scholastic Corp., 252 F.3d 63,

69-70 (2d Cir. 2001).  Rule 9(b) requires that fraud allegations be stated with particularity.  Fed

R. Civ. P. 9(b).  To satisfy the particularity requirement of Rule 9(b), the complaint must: "(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain why the statements were

fraudulent."  Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal

quotation marks and citation omitted).  Similarly, under the PSLRA, when a plaintiff seeks

money damages that require proof of scienter, "the complaint [must] . . . state with particularity

facts giving rise to a strong inference that the defendant acted with the requisite state of mind."

15 U.S.C.S. § 78u-4(b)(2) (LexisNexis 2008).  The Second Circuit has identified several non-

exclusive factors for consideration in determining whether plaintiffs have adequately pleaded the

required "strong inference" of scienter: "the inference may arise where the complaint sufficiently

alleges that the defendants: (1) benefitted in a concrete and personal way from the purported

fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information

suggesting that their public statements were not accurate; or (4) failed to check information they

had a duty to monitor."  Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) (internal citations

omitted).

Section 11 of the Securities Act provides a private right of action for investors

who purchase securities pursuant to a registration statement that, at the time it became effective,

"contained an untrue statement of a material fact or omitted to state a material fact required to be

stated therein or necessary to make the statement therein not misleading."  15 U.S.C.S. § 77k

(LexisNexis 2008).  Section 11 liability extends to issuing companies, executives and directors, underwriters, and accountants who consent to being named as having prepared or certified any part of the registration statement or any report used in connection with the registration statement. Id.  Under Section 12(a)(2) of the Securities Act, a person who offers or sells a security based on any prospectus or oral communication that contained a material misstatement or omission is liable to the purchaser unless he can prove that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.  15 U.S.C. § 77l(a)(2). Finally, under Section 15 of the Securities Act, liability is extended to include defendants who controlled a primary violator of Section 11.  15 U.S.C. § 77o.  The standard for a materially misleading statement under Section 11 and Section 12(a)(2) is identical to the standard under Section 10(b): "whether representations, viewed as a whole, would have misled a reasonable investor."  Rombach v. Chang, 355 F.3d 164, 178 n.11 (2d Cir. 2004).

Plaintiffs assert claims against all defendants (except Quattlebaum) for alleged violations of Section 11; (2) against all defendants for alleged violations of Section 12(a)(2); and (3) against the Individual Defendants, Palladium, and Parallel under Section 15.  Plaintiffs' Securities Act claims are based on purchases during the two SPOs, the offering documents for each of which incorporated by reference RM's Forms 10-Q, 10-K, and 8-K.

RM, Parallel, Palladium, and the Individual Defendants argue that the SAC should be dismissed because it fails to allege any actionable misstatement or omission of material fact.  They assert that none of the statements Plaintiffs identify was false when made, and argue that Plaintiffs have failed to allege facts demonstrating plausibly that any of the underwriting or staffing practices were known to be unsound or likely to lead to material losses prior to the times RM claimed, in its disclosures, to have discovered them.  The Underwriter

Defendants, who are only alleged to have violated the Securities Act, argue that, even if the offering documents for the SPOs contained material omissions or misstatements, the Section 12(a)(2) claims should be dismissed as to them because they were not statutory sellers within the meaning of that section of the Securities Act.

### The Exchange Act Claims

#### Rule 10b-5 Claims Against RM and the Officer Defendants

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts indicating that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003).

The securities laws do not require a corporation to disclose every fact a reasonable investor would like to know; once a corporation speaks on a given topic, however, that communication creates "a duty to disclose all facts necessary to ensure the completeness and accuracy of [the corporation's] public statements." In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). A corporation's omission is material, and therefore actionable under Rule 10b-5, "only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re Int'l Business Machines Corporate Sec. Litig., 163 F.3d 102, 106-07 (2d Cir. 1998) (citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)).

The Second Circuit has recognized "several important limitations on the scope of

liability for securities fraud."  Novak, 216 F.3d at 309.  Plaintiffs may not sustain causes of

action based on "fraud by hindsight," relying on "allegations that defendants should have

anticipated future events and made certain disclosures earlier than they actually did."  Id.

Additionally, in order to state claims based on the falsity of statements of opinion, Plaintiffs

"must allege that defendant's opinions were both false and not honestly believed when they were

made."  Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011); see also Omnicare, Inc. v.

Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1329 (2015) ("[I]f a

registration statement omits material facts about the issuer's inquiry into or knowledge

concerning a statement of opinion, and if those facts conflict with what a reasonable investor

would take from the statement itself, then § 11's omissions clause creates liability. . . . The

reasonable investor understands a statement of opinion in its full context, and § 11 creates

liability only for the omission of material facts that cannot be squared with such a fair reading.")

        Notwithstanding Plaintiffs' repeated allegations in the SAC that delinquency rates

on live check loans were high at relevant times, Plaintiffs plead no facts demonstrating that

RM's computed delinquency rates, as disclosed in the relevant documents and announcements,

were inaccurate as of the dates of the relevant disclosures.  Nor do Plaintiffs identify any figures

that were restated, other than the tax-related revisions identified in RM's December 2013 and

March 2014 disclosures.  (SAC ¶ 270.)  Plaintiffs allege in a conclusory fashion that the changes

reflected in the tax-related revisions were material, but proffer no facts inconsistent with RM's

assertions in the December 2013 disclosure documents that "the Company, in consultation with

its advisors" did not believe "the amounts related to any quarter or any year are material" (SAC

¶¶ 202, 204), or in the March 2014 disclosure that "the errors were immaterial to the previously

issued financial statements" (SAC ¶ 211).  Accordingly, the SAC identifies no material

misstatements of RM's financial performance.

Plaintiffs' remaining allegations fall into two general categories: (1) that RM's characterizations of its underwriting practices as "sound" or "targeted," its positive statements regarding the sufficiency of its staffing, and its attributions of delinquency trends to causes other than staffing deficiencies were false; and (2) that RM failed to disclose material trends and information relating to the likely effects of its expansion of the live check program on the ability of its branch staff to manage the loans, and the alleged insufficiency of its underwriting practices.

The alleged misstatements as to RM's underwriting were statements in the nature of belief or opinion, and Plaintiffs do not allege facts demonstrating that RM or the Officer Defendants did not believe the statements were true at the time they were made.  See Fait, 655 F.3d at 112 ("Requiring plaintiffs to allege a speaker's disbelief in, and the falsity of, the opinions or beliefs expressed ensures that their allegations concern the factual components of those statements."); see also Omnicare, 135 S. Ct. at 1327 ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong.")  Although Plaintiffs have alleged that lower-level branch staff were skeptical of RM's live check underwriting and were experiencing difficulties in servicing live check loans, Plaintiffs have alleged no facts demonstrating that RM's management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type, which involved offering loans to large numbers of subprime borrowers at high interest rates (the Company referred to rates "as low as 29% APR" (SAC ¶ 307)), with the expectation that a small percentage of the offerees would actually take the loans (Fortin stated in October 2013 that the response rate for live checks was historically "between 1.5% and 5%"

(SAC ¶ 325)).  Nor have Plaintiffs pleaded facts demonstrating that RM knowingly failed to
follow the underwriting practices that it actually disclosed, or that those practices were
objectively unsound in the context of the live check program.  See Omnicare, 135 S. Ct. at 1328
("[A] statement of opinion is not misleading just because external facts show the opinion to be
incorrect.")

    Plaintiffs' allegation of a material omission based on RM's failure to disclose that
unusual delinquencies were likely at the time it changed vendors is also lacking a plausible
factual basis, as the Company maintained that the delinquencies resulted from failure to program
the underwriting properly and that the failure was only discovered on later investigation.
Plaintiffs have pleaded no facts to the contrary, resting solely on the impermissible theory that
RM "should have anticipated future events and made certain disclosures earlier than they
actually did." Novak, 216 F.3d at 309.  Plaintiffs have also failed to plead facts demonstrating
that the Company's representation that it was monitoring the underwriting was false.
Accordingly, Plaintiffs have failed to identify actionable misstatements or omissions insofar as
their claim is premised on RM's disclosures regarding its underwriting practices.

    Plaintiffs' claims regarding RM's staffing levels are, similarly, allegations of
fraud by hindsight.  Plaintiffs assert that RM's statements about the adequacy of its staffing were
false because APE was later understood to have been too high at the time the positive statements
were made.  This conclusion is premised solely on the Company's own post hoc disclosure of
information that RM attributed to a "deep dive" study by RM, after delinquencies began to
increase, that identified 300 APE as an optimal ratio that had been exceeded in the latter half of
2013.  (SAC ¶ 359.)  Plaintiffs plead no facts demonstrating that the Company did not actually
believe that it could achieve increased labor productivity with the increased loan volume at the

time it made the positive statements, nor do they identify any contemporaneous facts that would

have rendered such a belief unfounded.

Finally, Plaintiffs' allegation regarding misstatements relating to the sufficiency

of internal controls fails because there are no facts pleaded to support an inference that the

Company knew, at time of the earlier disclosures and under its old management team, that its

internal controls were insufficient.  RM did not restate its financial results; rather, it revised the

Company's stated opinion as to the sufficiency of internal controls, and Plaintiffs have not

pleaded facts demonstrating falsity of the prior disclosure in relation to information then known

to the Company.  Plaintiffs have similarly failed to plead facts demonstrating that RM's earlier

loss reserve provisions were not the product of sincere opinions regarding appropriate loss

reserves, notwithstanding the subsequent substantial increase in those provisions following the

change of management.

Plaintiffs' allegations therefore do not identify misstatements or omissions of

material facts, but rest solely on non-actionable opinion statements by the Officer Defendants

and RM, and failures to forecast future events without factual allegations demonstrating that

proper bases for such forecasts existed at the relevant times.  Given that Plaintiffs have failed to

establish a material misstatement or omission, it is unnecessary to consider the remaining

elements of their Section 10(b) and Rule 10b-5 claim.  That claim is, accordingly, dismissed.

Section 20(a) Claims for Control Person Liability

A plaintiff must show "(1) a primary violation by a controlled person; (2) control

of the primary violator by the defendant; and (3) that the controlling person was in some

meaningful sense a culpable participant in the primary violation" in order to establish a claim for

control person liability under Section 20(a) of the Exchange Act.  Boguslavsky v. Kaplan, 159

F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted).  As explained above, Plaintiffs

have not stated a claim under Section 10(b) and Rule 10b-5 with respect to RM or the Officer

Defendants.  Therefore, Plaintiffs cannot state a claim under Section 20(a).  This claim is,

accordingly, dismissed.


The Securities Act Claims

Section 11 Claims Against All Defendants

Plaintiffs' Section 11 claims do not state a claim of material misstatement or

omission, for the reasons discussed above.  This claim is therefore dismissed.

Section 12(a)(2) Claims Against All Defendants

Plaintiffs' Section 12 claims do not state a claim of material misstatement or

omission, for the reasons discussed above.  This claim is therefore dismissed.

Section 15 Claims Against Parallel, Palladium, and the Individual Defendants

Claims for control person liability under Section 15 of the Securities Act are

evaluated according to the same standard as those under Section 20(a) of the Exchange Act.  In

re Global Crossing, Ltd. Sec. Litig., 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005).

Because Plaintiffs did not state a claim for control person liability under Section 20(a) as to any

Defendants, they have not stated a claim for control person liability under Section 15 either, and

this claim is also dismissed.


CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Second

Amended Complaint are granted in their entirety.  This opinion and order resolves docket entry

nos. 61 and 64.

    In their memorandum in opposition to the instant motions, Plaintiffs requested leave to amend their complaint for a third time in the event Defendants' motions were granted. Plaintiffs are hereby granted leave to move for permission to file a Third Amended Complaint. Any such motion must be filed by **April 21, 2016**, comply with the relevant local rules, and be accompanied by (1) a proposed Third Amended Complaint, and (2) a blackline of the proposed Third Amended Complaint showing the changes made from the Second Amended Complaint. If no timely motion is filed, or if the motion is denied, the dismissal of the Second Amended Complaint will be with prejudice and judgment will be entered in Defendants' favor without further advance notice.

    SO ORDERED.

Dated: New York, New York
   March 30, 2016

           /s/ Laura Taylor Swain
           LAURA TAYLOR SWAIN
           United States District Judge